**LITE DEPALMA GREENBERG, LLC**
Victor A. Afanador
Mayra V. Tarantino
Steven J. Greenfogel
Jeffrey A. Shooman
Adam Najib
Two Gateway Center, Suite 1201
Newark, NJ 07102
Phone: (973) 623-3000
vafanador@litedepalma.com
mtarantino@litedepalma.com
sgreenfogel@litedepalma.com
jshooman@litedepalma.com
anajib@litedepalma.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CITY OF JERSEY CITY,**<br><br>             **Plaintiff,**<br><br>v.<br><br>**THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and THE PORT AUTHORITY TRANS-HUDSON CORPORATION,**<br><br>             **Defendants.** | **CIVIL ACTION NO. 14-3286**<br><br><br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff, City of Jersey City (the "City"), a municipal corporation of the State of New Jersey having its principal place of business at 280 Grove Street, Jersey City, New Jersey, by way of Complaint against Defendants, The Port Authority of New York and New Jersey, a Bi-State agency of the States of New York and New Jersey created by Compact approved by Congress having its principal place of business at 225 Park Avenue South, New York, New

York, and The Port Authority Trans-Hudson Corporation, a wholly owned subsidiary of The Port Authority of New York and New Jersey having its principal place of business at 1 Path Plaza, Jersey City, New Jersey (collectively the "Port Authority"), says:

1.    This is an action by the City seeking declaratory and other relief with respect to the Port Authority's obligations under the Bi-State Compact and amendatory legislation enacted pursuant thereto (the "enabling statutes") to pay real estate taxes and/or make fair and reasonable Payments in Lieu of Taxes ("PILOT") with respect to the many properties it owns in the City.  Among other things, the City seeks the production of documents heretofore requested from the Port Authority under the Port Authority's "Freedom of Information Code", an accounting to determine the proper disposition to be made as to each of the properties owned by the Port Authority in the City, the appointment of a special master, reformation of existing PILOT agreements, the execution of additional PILOT agreements, the disgorgement of properties where appropriate, and such sums of money as fairly compensate the City for its undue loss of real estate taxes by reason of the acquisition and ownership of property by the Port Authority in the City.

## JURISDICTION AND VENUE

2.    Jurisdiction over this action and over the defendants is invoked pursuant to 28 U.S.C. §1331, as this matter arises under the Bi-State Compact entered into by the States of New Jersey and New York, N.J.S.A. 32:1-1 *et seq.* and New York Unconsol. Laws §6401 *et seq.* (McKinney 1961), with the consent of Congress pursuant to Public Resolution No. 17, 67th Congress (S.J. Res. 88) Chap. 77, 42 Stat. 174, as authorized by the Compact Clause of the United States Constitution, art. 1, §10, cl. 3.

3.    The construction of interstate compacts approved by Congress pursuant to the Compact Clause presents a federal question, as does construction of amendments thereto.

472261.1

4.      The City also seeks relief, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*  There exists an actual and substantial controversy between plaintiff and defendants, parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

5.      To the extent state law claims are also raised, the supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1367(a).

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2). Further, N.J.S.A. 32:1-162 provides that an action against the Port Authority can be laid within a judicial district established by the United States and situated wholly or partially within the Port District.

## THE PARTIES

7.      Plaintiff, City of Jersey City, is a municipal corporation organized pursuant to N.J.S.A. 40:69A-31 *et seq.*, having its principal place of business at 280 Grove Street, Jersey City, New Jersey, and is the second most populous municipality in the State of New Jersey.

8.      Defendant, The Port Authority of New York and New Jersey, has its principal place of business at 225 Park Avenue South, New York, New York and is a body corporate and politic created by a Bi-State Compact between the States of New York and New Jersey in 1921, with the consent of Congress, as authorized by the Compact Clause of the United States Constitution.

9.      Defendant, The Port Authority Trans-Hudson Corporation, a wholly owned subsidiary of The Port Authority of New York and New Jersey, has its principal place of business at 1 Path Plaza, Jersey City, New Jersey.

472261.1

## INTRODUCTION

10.     The Port Authority owns forty properties in the City.  It pays no real estate taxes on any of them. The properties would currently yield about $18 million annually in real estate taxes and would have yielded more than $315 million in additional tax revenue during the periods the properties have been owned by the Port Authority and taken off the tax rolls.

11.     While the Port Authority has entered into three Pilot Agreements with the City, they cover only seven of the 40 properties and generate only about $2.2 million in annual PILOT payments, which is millions of dollars less per year than if these seven properties had been regularly taxed.

12.     The loss of revenues to the City as the Port Authority has accumulated properties from taxpaying property owners has been astronomical, when at the same time the property owned by the Port Authority has increased enormously in value -- as have the Port Authority's revenues.

13.     While the Port Authority has benefited handsomely from its acquisition and ownership of properties in the City, the City has suffered an undue loss of taxes and assessments from PILOT payments that are neither fair nor reasonable and from the Port Authority's refusal to even enter into PILOT agreements for the majority of the properties it owns in the City.

14.     The New Jersey and New York Legislatures have provided a qualified tax exemption for Port Authority-owned properties that are used for specifically defined, statutorily authorized public purposes (e.g., marine terminals, railroad facilities, and industrial development projects and facilities), but the qualified exemption has been abused by the Port Authority.

15.     Notwithstanding the language of the Port Authority's enabling statutes, the Port Authority has taken the position that: it is exempt from taxation because of its mere ownership of property; it has no obligation to enter into PILOT agreements with affected municipalities or use its

472261.1

discretion to do so reasonably; and its PILOT payments must be capped even if this renders them unfair and unreasonable and even if an affected municipality thereby suffers an undue loss of taxes and assessments.  The Port Authority's position on these issues is unfounded and has caused an undue loss of taxes to the City.

16.     The Legislatures of New Jersey and New York never intended that the Port Authority's qualified tax exemption would create a financial burden for the residents of municipalities where a property is located.  However, that is exactly what has happened in the City as the Port Authority has adopted a construction of its enabling statutes that is contrary to their letter and intent.

17.     In December 2010 the Port Authority acquired a nearly one-acre tract in the City that is improved with a five-story, 177,000 square foot office building ("2 Montgomery Street"). Notwithstanding the fact that it acquired this property nearly three and a half years ago from a private owner who was paying more than $1.1 million a year in real estate taxes, the Port Authority has paid no taxes on the property and has not entered into a PILOT Agreement with respect to this property.

18.     Dozens of other Port Authority-owned properties (including properties comprising a portion of a marine terminal known as "Port Jersey" that have been held for thirty years or more but, upon information and belief, never used for public purposes) have, similarly, not yielded a dime to the City in either taxes or PILOT payments, even though the current taxes on these properties would total approximately $3.5 million a year.

19.     Another Port Authority-owned property ("Path Plaza") has been the subject of a PILOT Agreement for nearly a half century, although the Agreement does not provide for PILOT payments.  While the current real estate taxes on this property would be nearly $9.6 million

5

annually, the City receives only $86,729.27 annually in payments, less than 1% of the current taxes, after having received nothing at all for the first twenty years after the Port Authority acquired this property.

20. When the Port Authority entered into the PATH Plaza PILOT Agreement with the City on December 20, 1967, the Port Authority had total assets of $1.8 billion, gross operating revenues of $207.5 million, and net operating revenues of less than $100 million. The Port Authority has projected in its budget for 2014 total assets of $57.5 billion, gross operating revenues of $4.4 billion, and net operating revenues of $1.6 billion.

21. During this period, municipal budgets and the cost of living have increased tremendously, and City infrastructure and municipal resources have been substantially burdened by Port Authority activities in the City.

22. Just as it has refused to reform the Path Plaza PILOT Agreement to remedy a manifestly unjust situation, the Port Authority has refused to reform other PILOT Agreements (for areas known as "Greenville Yards" and "Port Jersey") where escalators or other remedial measures are necessary to achieve the statutory purposes that PILOT payments be fair and reasonable to the end that a municipality not suffer an undue loss of taxes and assessments.

23. In attempting to justify this clear inequity, the Port Authority relies selectively on language in the Port Authority's enabling statutes, which it claims "caps" in perpetuity PILOT payments at the taxes last paid on the property at the time of acquisition by the Port Authority, while failing to give any meaning to other, key provisions of the statutes – in violation of basic principles of statutory construction.

472261.1

24.     Upon information and belief, the Port Authority has taken inconsistent and arbitrary positions with respect to this issue with other municipalities in New Jersey and New York when it has found it expedient to do so.

25.     Both the City and its counsel have made requests under the Port Authority's Freedom of Information Code for documents relevant not only to the Port Authority-owned properties in the City but also to the Port Authority's inconsistent treatment of properties in other municipalities -- but to no avail.  After months of delay tactics and boilerplate letters that do not even comply with the Port Authority's own rules, not a single document has been produced by the Port Authority.

26.     Notwithstanding its professions of transparency, the Port Authority has shrouded in secrecy its dealings with municipalities on issues of taxation and PILOT payments – even though these issues are matters of clear public importance.

27.     The Port Authority's wrongful conduct and violation of the letter and intent of the Port Authority's enabling statutes has been continuing.

## THE PORT AUTHORITY COMPACT

28.     The Port Authority was originally established as the result of a Bi-State Compact enacted by the Legislatures of the States of New Jersey and New York in 1921, and consented to by Congress. N.J.S.A. 32:1-1 *et seq.*

29.     From the time the Port Authority was first created up to the present date, it has always been intended as a vehicle for furthering the public welfare by promoting certain forms of commerce.

30.     The Bi-State Compact and the legislation enacted pursuant thereto by the Legislatures of New Jersey and New York impose a fiduciary obligation on the Port Authority

7

that is  evidenced by the language of the original Compact and its amendments, including, *inter alia*, N.J.S.A. 32:1-1, N.J.S.A. 32:1-2, N.J.S.A. 32:1-35.50(2), and N.J.S.A. 32:1-35.72(a),(d), (h).

31.     According to its Preamble, the Compact amended an 1834 Agreement which fixed "the rights and obligations of the two states in and about the waters between the two states, especially in and about the bay of New York and the Hudson River."  It was "confidently believed," the Preamble stated, "that a better co-ordination of the terminal, transportation and other facilities of commerce in, about and through the port of New York, will result in great economies, benefiting the nation, as well as the states of New York and New Jersey." N.J.S.A. 32:1-1.

32.     In Article I of the Compact, the States of New Jersey and New York solemnly pledged "each to the other, faithful co-operation in the future planning and development of the port of New York, holding in high trust for the benefit of the nation the special blessings and natural advantages thereof." N.J.S.A. 32:1-2.

33.     Under Article III of the Compact, creating the Port Authority, the Port Authority was to have the powers and jurisdiction enumerated in the original Compact and "such other and additional powers as shall be conferred upon it by the Legislature of either State concurred in by the Legislature of the other, or by Act or Acts of Congress, as hereinafter provided." N.J.S.A. 32:1-4.

34.     Article VI of the Compact constituted the Port Authority as "a body, both corporate and politic, with full power and authority to purchase, construct, lease and/or operate any terminal or transportation facility..." within a geographical area defined as the Port District. N.J.S.A. 32:1-7.

35.     Under Article VII, Congress authorized the New Jersey and New York Legislatures to jointly delegate additional powers and duties to the Port Authority. N.J.S.A. 32:1-8.  The Legislatures have so acted and have enacted various amendatory enabling statutes relating to

specifically authorized uses of Port Authority property and including tax and PILOT provisions, several of which are involved in this litigation.

36.     The powers conferred on the Port Authority were not to be unbridled or unlimited.

37.     On the contrary, in the Compact the Legislatures were careful not to encroach on any pre-existing rights of any local public entity.

38.     For example, the Compact provided that the Port Authority could not take property held by a municipality without the municipality's consent. <u>N.J.S.A.</u> 32:1-7.

## <u>THE PORT AUTHORITY'S ENABLING STATUTES</u>

39.     Similarly, in subsequent enabling statutes, the New Jersey and New York Legislatures were careful to provide statutory safeguards designed to protect municipalities such as the City.

40.     For example, the Legislatures provided that when the Port Authority entered into a PILOT agreement with a municipality, PILOT payments, among other things, had to be fair and reasonable to the end that the municipality not suffer undue loss of taxes and assessments by reason of the Port Authority's acquisition and ownership of the property.

41.     The Legislatures never intended the Port Authority's qualified tax exemption to become a vehicle for the oppression of municipalities such as the City and its residents.

## <u>THE MARINE TERMINAL LEGISLATION</u>

42.     The subject of taxation of the Port Authority was expressly addressed for the first time in 1931 in the Port Authority's enabling statutes, when the New Jersey and New York Legislatures enacted concurrent legislation which provided for certain payments to municipalities "in lieu of taxes" with respect to "marine or inland terminal property" owned by the Port Authority.

43.     This legislation, which was enacted in New Jersey as L. 1931, c. 69 (and now codified as N.J.S.A. 32:1-144 *et seq.*) made plain that, from the outset, the Legislatures of the two states were concerned with protecting local tax bases.

44.     The statute provides in relevant part as follows in a section entitled "Agreement between Port Authority and municipalities; amount and manner of payments":

> To the end that counties, cities, boroughs, villages, towns, townships and other municipalities in the Port of New York District, may not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property therein by the Port of New York Authority (hereinafter called the port authority), the port authority is hereby authorized and empowered, in its discretion, to enter into a voluntary agreement or agreements with any county, city, borough, village, town, township or other municipality in said port district, whereby it will undertake to pay a fair and reasonable sum or sums annually in connection with any marine or inland terminal property owned by it, not in excess of the sum last paid as taxes upon such property prior to the time of its acquisition by the port authority.  Such payment or payments which the port authority is hereby authorized and empowered to make, shall be in such amount or amounts and shall be payable at such time or times and under such terms and conditions as shall be agreed upon by and between the port authority and such county, city, village, borough, town, township or other municipality concerned.

N.J.S.A. 32:1-144.

45.     This legislation applies to the Greenville Yards and Port Jersey properties, as hereinafter discussed in detail.

### THE RAILROAD FACILITIES LEGISLATION

46.     Enacted in 1962 (L. 1962, c. 8), legislation relating to railroad facilities owned by the Port Authority similarly protects local tax bases with respect to properties acquired by the Port Authority.

47.      Codified as N.J.S.A. 32:1-35.50 *et seq.*, the railroad facilities statute provides in relevant part as follows:

472261.1

The port authority shall be required to pay no taxes or assessments upon any of the property acquired or used by it for any of the purposes of this act … .  However, to the end that no municipality shall suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property by the port authority for any of the purposes of this act, the port authority is hereby authorized and empowered, in its discretion, to enter into a voluntary agreement or agreements with any municipality whereby the port authority will undertake to pay in lieu of taxes a fair and reasonable sum or sums annually in connection with any real property acquired and owned by the port authority for any of the purposes of this act.  Such sums … shall not be more than the sum last paid as taxes upon such real property prior to the time of its acquisition by the port authority; … .  Each such municipality is hereby authorized and empowered to enter into such agreement or agreements with the port authority and to accept the payment or payments which the port authority is hereby authorized and empowered to make, and the sums so received by such municipality shall be devoted to purposes to which taxes may be applied unless and until otherwise directed by law of the State in which such municipality is located.

N.J.S.A. 32:1-35.60.

48.     The statute also authorizes municipalities to cooperate with the Port Authority with respect to the purposes of the statute upon such reasonable terms and conditions as may be determined by the municipality and the Port Authority. N.J.S.A. 32:1-35.57.

49.     This legislation applies to the Path Plaza property, as hereinafter discussed in detail.

## THE INDUSTRIAL DEVELOPMENT PROJECTS AND FACILITIES LEGISLATION

50.     Legislation pertaining to industrial development projects and facilities, enacted in 1978 (L. 1978, c. 110), echoes the same concepts as the earlier enabling statutes with respect to the protection of local tax bases.

51.     The introductory provisions of this statute, codified as N.J.S.A. 32:1-35.72 *et seq.*, emphasize the Legislature's desire to protect local economies within the Port District and, as reflected in N.J.S.A. 32:1-35.72(c), voice concern regarding the kind of tax base erosion which has precipitated the need for this lawsuit.

472261.1

52.     The statute expressly requires the Port Authority to reach agreement with a municipality regarding PILOT payments <u>before</u> constructing any industrial development project:

> No such port district industrial development projects or facilities are to be constructed unless and until the port authority has entered into an agreement or agreements with the municipality in which any such project or facility is to be located with respect to payments in lieu of real estate taxes and the location, nature and scope of any project or facility … .

<u>N.J.S.A.</u> 32:1-35.72(p).

53.     A related "in lieu of tax" provision, now codified as <u>N.J.S.A.</u> 32:1-35.82, further states that:

> The port authority shall be required to pay no taxes or assessments upon any of the property acquired and used by it for any of the purposes of this act... . However, to the end that no taxing jurisdiction shall suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property by the port authority for any of the purposes of this act, the port authority is hereby authorized and empowered, in its discretion, to enter into a voluntary agreement or agreements with any city, town, township or village whereby the port authority will undertake to pay in lieu of taxes a fair and reasonable sum, if any, or sums annually in connection with any real property acquired and owned by the port authority for any of the purposes of this act and to provide for the payment as a rental or additional rental charge by any person occupying any portion of any industrial development project or facility either as lessee, vendee or otherwise of such reasonable sum, if any, or sums as hereinafter provided.  Such sums in connection with any real property acquired and owned by the port authority for any of the purposes of this act shall not be more than the sum last paid as taxes upon such real property prior to the time of its acquisition by the port authority; provided, however, that in connection with any portion of any industrial development project or facility, which is owned by the port authority or another governmental entity and improved pursuant to this act with buildings, structures or improvements greater in value than the buildings, structures or improvements in existence at the time of its acquisition, development or improvement by the port authority, any person occupying such portion of such industrial development project or facility either as lessee, vendee or otherwise shall, as long as title thereto shall remain in the port authority or in another governmental entity, pay as a rental or additional rent charge an amount in lieu of taxes, if any, not in excess of the taxes on such improvements and on personal property, including water and sewer service charges or assessment, which such person would have been required to pay had it been the owner of such property during the period for which such

12

payment is made.  Each such city, town, township or village is hereby authorized and empowered to enter into such agreement or agreements with the port authority … and to accept the payment or payments which the port authority is hereby authorized and empowered to make or which are paid by a person occupying any such portion of such industrial development project or facility as rental or as additional rental in lieu of taxes, and the sums so received by such city, town, township or village shall be devoted to purposes to which taxes may be applied … unless and until otherwise directed by law of the state in which such city, town, township or village is located.

54.     The statute also authorizes municipalities to cooperate with the Port Authority with respect to the purposes of the statute upon such reasonable terms and conditions as may be determined by the municipality and the Port Authority. N.J.S.A. 32:1-35.79.

55.     This legislation applies to the Greenville Yards property, as hereinafter discussed in detail.

## THE PORT AUTHORITY'S PROPERTIES IN THE CITY

56.     Notwithstanding these statutory provisions, the Port Authority has not contributed its fair share with respect to the properties it owns in the City, as it has failed to enter into PILOT agreements with the City in a number of instances as required and, even where it has, its PILOT payments to the City have in no way been "fair" or "reasonable" in their impact upon the residents of the City and do not even begin to make up for the loss of tax revenue which the City has suffered as a result of the Port Authority's acquisition of properties in the City.  A chart setting forth the assessments, implied fair market values, and current taxes, as well as the date of acquisition by the Port Authority, of each of the properties owned by the Port Authority in the City is attached hereto as Exhibit A.

472261.1

## PORT AUTHORITY PROPERTIES WITHOUT PILOT AGREEMENTS

57.     There are 33 Port Authority-owned properties in the City for which the Port Authority has failed to enter into PILOT Agreements (see Section II of Exhibit A).

58.     The City is receiving neither real estate taxes nor PILOT payments with respect to any of these properties.

59.     These properties have aggregate current assessments totaling in excess of $75 million and implied fair market values totaling nearly $250 million. The aggregate current real estate taxes on these properties would total approximately $5 million.

60.     A large number of these properties were acquired decades ago and, upon information and belief, have been vacant and have not been used in all that time for a public purpose.

## 2 MONTGOMERY STREET

61.     2 Montgomery Street is a .8841 acre tract that is improved with a five-story 175,000+ square foot office building located adjacent to Exchange Place.

62.     The property was acquired by the Port Authority on December 22, 2010, three and a half years ago.

63.     The property has a current assessment of $15,200,000 and an implied fair market value of $48,655,570, and the current real estate taxes on this property would be $1,134,837.

64.     However, the City is receiving neither real estate taxes nor PILOT payments with respect to the 2 Montgomery Street property.

14

## PORT JERSEY NON-PILOT PROPERTIES

65.     Among the other properties not covered by a PILOT Agreement are nine "Port Jersey" properties, totaling 123.499 acres, adjacent to those properties covered by the Port Jersey PILOT Agreement between the Port Authority and the City.

66.     Upon information and belief, the non-PILOT "Port Jersey" properties have remained vacant and unused even though eight of the nine properties were acquired by the Port Authority in January 1982.

67.     The non-PILOT "Port Jersey" properties have an aggregate current assessment of $45,761,000 and an aggregate implied fair market value of $146,514,090, and the aggregate current real estate taxes on these properties would be $3,417,262.

68.     However, the City is receiving neither real estate taxes nor PILOT payments with respect to any of these properties.

## THE PORT AUTHORITY'S PILOT AGREEMENTS WITH THE CITY

69.     The Port Authority has entered into three PILOT Agreements with the City that cover only seven of the 40 properties the Port Authority has acquired and presently owns in the City.

70.     The PILOT payments made by the Port Authority under these Agreements have been neither fair nor reasonable and have resulted in the City suffering undue loss of taxes and assessments.

71.     Enacted decades ago, the Port Authority PILOT statutes sought to balance the survivability of the Port Authority when it was in its relative infancy with protection of the financial well-being of municipalities where the Port Authority acquired property.

472261.1

72.     That balance has shifted dramatically since the formation of the Port Authority. The Port Authority is no longer a fledgling entity struggling for survival.   In contrast, municipalities and their residents have suffered enormously from the Port Authority's acquisition and warehousing of properties which are taken off the tax rolls of municipalities like the City.

73.     The Legislatures of New Jersey and New York never contemplated that the statutes governing the Port Authority would be construed by the Port Authority to cause this devastating effect on municipalities, while Port Authority assets and revenues continue to grow exponentially.

## THE 1967 PILOT AGREEMENT ("PATH PLAZA")

74.     The Port Authority Trans-Hudson Corporation entered into an Agreement with the City dated December 20, 1967 relating to the Journal Square Transportation Center (Ex. A, §I, ¶1). A copy of the Agreement is attached hereto as Exhibit B.

75.     However, the Agreement does not provide for any PILOT payments to the City.

76.     The Agreement also has no defined term.

77.     While the Port Authority began making minimal payments, of less than $87,000 a year, at some point after the Agreement was executed, these payments constituted less than 1% of what the current real estate taxes would be on the property.

78.     With a current assessment of $128,556,300 and a current implied fair market value of $411,511,843, the current real estate taxes on this property would be $9,598,013.

79.     Among other things, since the Port Authority acquired the property, a 10-story office tower known as "Path Plaza" has been constructed on the property.

80.     When the Port Authority entered into the Path Plaza PILOT Agreement with the City on December 20, 1967, the Port Authority had total assets of $1.8 billion, gross operating

revenues of $207.5 million, and net operating revenues of less than $100 million. The Port Authority has projected in its budget for 2014 total assets of $57.5 billion, gross operating revenues of $4.4 billion, and net operating revenues of $1.6 billion.

## THE 1988 PILOT AGREEMENT ("GREENVILLE YARDS")

81.     The Port Authority entered into an Agreement with the City dated August 19, 1988 relating to a marine terminal property known as Greenville Yards (Ex. A, §I, #2). A copy of the Agreement is attached hereto as Exhibit C.

82.     The Agreement provides for initial annual PILOT payments of $866,000, to be reduced subsequently to $762,000 per year.

83. The Port Authority has, for some time, been making PILOT payments of only $736,304.79 per year.

84. The PILOT payments made by the Port Authority to the City over the past 25 years, which total slightly more than $20 million, are less than 56% of what the real estate taxes would have been on the property during this period.

85.     The property has a current assessment of $29,585,500 and an implied fair market value of $94,703,905, and the current real estate taxes on this property would be $2,208,853.

86.     When the Port Authority entered into the Greenville Yards PILOT Agreement with the City on August 19, 1988, the Port Authority had total assets of $8.5 billion, gross operating revenues of $1.4 billion, and net operating revenues of $345 million. The Port Authority has projected in its budget for 2014 total assets of $57.5 billion, gross operating revenues of $4.4 billion, and net operating revenues of $1.6 billion.

472261.1

87.    This property is soon to be the subject of a $118 million Port Authority redevelopment project, which will enhance the value of the property to the Port Authority while further burdening the City's infrastructure.

## THE 2012 PILOT AGREEMENT ("PORT JERSEY")

88.    The Port Authority entered into an Agreement with the City dated May 18, 2012 relating to marine terminal properties adjacent to Greenville Yards known as Port Jersey (Ex. A. §I, #3).  A copy of the Agreement is attached hereto as Exhibit D.

89.    The Agreement provides for PILOT payments of $1,360,030.10 per year.

90.    Notably, the Port Authority reserved the right to renegotiate the Agreement in the event the New Jersey Legislature took any action which resulted in a diminishment of the conventional taxes upon which the PILOT payments were based.

91.    The properties which are the subject of the Agreement have an aggregate current assessment of $16,103,400 and an implied market value of $51,547,375, and the aggregate current real estate taxes on these properties would be $1,202,280.

92.    However, the properties which are the subject of this Agreement are properties that the Port Authority has purchased from a taxpaying property owner and then leased back to the owner, resulting in the present and future payment to the City of PILOTs which are capped at 2010 tax values, rather than real estate taxes on the property which would increase as the value of the properties increase.

93.    When the Port Authority entered into the Port Jersey PILOT Agreement with the City on May 18, 2012, the Port Authority had total assets of $52 billion, gross operating revenues of $4 billion, and net operating revenues of $1.4 billion. The Port Authority has

projected in its budget for 2014 total assets of $57.5 billion, gross operating revenues of $4.4 billion, and net operating revenues of $1.6 billion.

94.    Adjoining "Port Jersey" properties that were already owned by the Port Authority were not made part of the May 18, 2012 or any other PILOT agreement, and, as noted, the aggregate current real estate taxes on these properties would be $3,417,262 but the Port Authority is paying no taxes on these properties which it is warehousing.

## PORT AUTHORITY PROPERTIES IN THE CITY
## NOT USED FOR PUBLIC PURPOSES

95.    Upon information and belief, various properties owned by the Port Authority in the City have been, and are presently being, used, in whole or in part, for non-incidental private purposes and/or to raise revenue, rather than for public purposes authorized by the Port Authority statutes.

## THE CITY'S FUTILE REQUESTS TO THE PORT AUTHORITY FOR DOCUMENTS

96.    Over the past six months, the City and its counsel have made repeated efforts, pursuant to the Port Authority's Freedom of Information Code, to obtain documents from the Port Authority relevant to the subject matter of this litigation.

## THE REQUESTS BY THE CITY

97.    On October 9, 2013, the City made requests to the Port Authority for documents relating to a single property: Greenville Yards.

98.    To date, not a single document has been produced in response to the City's requests.

472261.1

99.     Instead, the City has received a series of boilerplate letters from the Port Authority repeatedly pushing back the time when a "determination" would be made as to "the availability of records responsive" to the request. Copies of the Port Authority's virtually identical letters dated October 16, 2013, November 18, 2013, December 23, 2014, January 9, 2014, February 14, 2014, March 10, 2014, April 8, 2014, and May 2, 2014 are attached hereto as Exhibit E.

## THE REQUESTS BY THE CITY'S COUNSEL

100.     On January 2, 2014, the City's counsel requested documents regarding each of the properties the Port Authority presently owns in the City, including documents concerning (i) purchase, (ii) present and intended use, (iii) development, (iv) leasing, (v) marketing, (vi) negotiation and implementation of PILOT Agreements, and (vii) PILOT payments made or other consideration provided by the Port Authority.  Copies of these Freedom of Information Code requests to the Port Authority are attached hereto as Exhibit F.

101.     On January 2, 2014, the City's counsel also requested documents, pursuant to the Port Authority's Freedom of Information Code, reflecting how the Port Authority has dealt with real estate tax, PILOT, and related issues in other municipalities, both in New Jersey and New York, including documents relating to (i) PILOT agreements, (ii) other agreements providing for a different form of consideration by the Port Authority, (iii) situations where the Port Authority has paid more than the amount paid as real estate taxes on a property when it was acquired by the Port Authority, (iv) situations where the Port Authority has passed real estate taxes on a property on to tenants, (v) situations where the Port Authority has paid regular taxes with respect to a property, (vi) situations where the Port Authority has made PILOT or other payments retroactively, and (vii) litigation or threatened litigation concerning the payment of real estate taxes or PILOT or other

472261.1

payments with respect to Port Authority-owned property.  A copy of this Freedom of Information Code request to the Port Authority is attached hereto as Exhibit G.

102.    In the January 2, 2014 letter requests, the City's counsel stated:  "[I]n order to minimize delay, please do not withhold making any of the requested records available because other requested records are not yet found, redacted, or otherwise prepared for release."

103.    To date, not a single document has been produced in response to any of the requests by the City's counsel.

104.    Instead, the City's counsel has received a series of boilerplate letters from the Port Authority repeatedly pushing back the time when a "determination" would be made as to "the availability of records responsive" to the request. Copies of the Port Authority's virtually identical letters dated January 16, 2014, February 18, 2014, March 28, 2014, and April 30, 2014 are attached hereto as Exhibit H.

## THE CITY'S DEMAND LETTERS TO THE PORT AUTHORITY

105.    On October 29, 2013, the City's Mayor, the Honorable Steven Fulop, wrote to the Executive Director of the Port Authority, Patrick Foye, in an effort to facilitate a resolution of tax and PILOT issues regarding Port Authority-owned property in the City that, as noted, have caused, and continue to cause, substantial harm to the City.  A copy of the letter is attached hereto as Exhibit I.

106.    Despite repeated follow-up e-mails by the City that were precipitated by the cancellation by the Port Authority of scheduled meetings, no meeting took place to discuss these issues.

107.    Consequently, on January 7, 2014, the City's counsel wrote to Mr. Foye and to the then Chairman of the Port Authority's Board of Commissioners, David Samson, in the hopes of

opening a meaningful dialogue to discuss and resolve these claims. The letter provided extensive information regarding the subject properties, detailed the nature of the claims to be discussed, and set forth arguments and underlying legal principles "to afford the Port Authority an opportunity to review and investigate the claims raised by the City, and respond in a manner that hopefully will avoid the need for litigation." The City's counsel also requested assistance in obtaining the documents it had requested from the Port Authority under the Port Authority's Freedom of Information Code. A copy of the January 7, 2014 letter, which was sent to the Port Authority by both Federal Express and certified mail, is attached hereto as Exhibit J.

## THE PORT AUTHORITY'S RESPONSE

108.    Thereafter, the Port Authority reviewed and investigated the City's claims.

109.    The Port Authority's counsel responded to the City's January 7, 2014 letter on January 31, 2014, asserting that it is the Port Authority's position that "(1) the Port Authority property is immune from taxation; (2) the Port Authority is never required to enter into a PILOT agreement; and (3) if the Port Authority exercises its discretion to enter into a PILOT agreement for the properties in question, the Port Authority's payment obligation is capped at the amount of real estate taxes paid on the property prior to the time of the Port Authority's acquisition." The Port Authority also argued that its claimed tax exemption applies "even when Port Authority property is leased in whole or in part to private entities, so long as the property is used for a public purpose consistent with the Port Authority's statutory mandates." A copy of the letter is attached hereto as Exhibit K.

110.    Counsel for the parties met thereafter to discuss the City's claims.

111.    Counsel for the parties also conferred orally on multiple occasions thereafter to discuss the City's claims.

112.     Notwithstanding, the parties have been unable to resolve the claims that are the subject of this litigation.   The failure of the Port Authority to resolve these claims has caused immediate and irreparable harm to the City in that each day that the Port Authority pays no taxes or PILOT payments, or makes an inadequate PILOT payment, deprives the City of substantial revenues sorely needed for the benefit of its residents, and such deprivation is continuing.

## COUNT ONE

## PRODUCTION OF PUBLIC RECORDS REQUESTED UNDER THE PORT AUTHORITY'S FREEDOM OF INFORMATION CODE.

(All Properties)

113.     The City repeats the preceding allegations as if more fully set forth herein.

114.     On its website, the Port Authority prides itself on its purported transparency, noting as to its Freedom of Information Code:

> The business and activities of The Port Authority of New York and New Jersey have a substantial impact on the people of the States of New York and New Jersey … .  As recognized in its By-Laws, it is the goal and policy of the Port Authority to conduct its business and activities in the public interest and therefore <u>the public should have access to the records of the Port Authority to the greatest extent possible</u>.  (emphasis added)

115.     Notwithstanding, the Port Authority has stonewalled the City's legitimate efforts to obtain documents relating to properties the Port Authority owns in the City and documents relating to the Port Authority's inconsistent treatment of properties it owns in other municipalities -- documents that are manifestly in the public interest.

116.     In doing so, the Port Authority has repeatedly violated its own Freedom of Information Code in failing to timely and appropriately respond to the City's requests.

117.     To date, not a single document requested by the City or its counsel has been produced by the Port Authority.

118.     Under the Port Authority's Freedom of Information Code, a person denied access to a Port Authority record may, after final determination, seek judicial recourse as may be available in either New Jersey or New York.

119.     The time for providing a final determination under the Port Authority's Freedom of Information Code has long expired.

120.     Under the circumstances and given the Port Authority's gross and deliberate failure to produce any of the documents requested, the City and its counsel should not have to await a final determination by the Port Authority with respect to their long outstanding requests.

WHEREFORE, the City demands judgment against the Port Authority:

(a)     Ordering production forthwith of all of the documents requested by the City from the Port Authority and its counsel pursuant to Exhibits E, F, and G attached hereto; and

(b)     Awarding such other and further relief as this Court may deem just and proper.

## COUNT TWO

## DECLARATORY JUDGMENT – TAXATION OF PORT AUTHORITY PROPERTIES

(2 Montgomery Street, Non-PILOT "Port Jersey" Properties, Other Non-PILOT Properties)

121.     The City repeats the preceding allegations as if more fully set forth herein.

122.     The Port Authority has taken the position, in PILOT Agreements and otherwise, including in its January 31, 2014 response to the City's January 7, 2014 demand letter, that it is immune from taxation and that its mere ownership of property entitles it to exemption from the payment of real estate taxes or PILOT payments.

123.    The Port Authority's position is contrary to the Port Authority's enabling statutes, to the New Jersey Constitution, and to applicable case law.

124.    The Port Authority's enabling statutes confer an unqualified tax exemption on the Port Authority in only very narrow and limited situations, which are not at issue in this case.

125.    Even where the Port Authority's tax exemption is unqualified, however, it is based not on mere ownership of the property by the Port Authority but rather on the particular statutorily authorized purpose for which the property was acquired by the Port Authority – e.g., the construction, maintenance and operation of the Bayonne Bridge (N.J.S.A. 32:1-113), or the construction, maintenance and operation of vehicular bridges and tunnels, including the Holland Tunnel (N.J.S.A. 32:1-131).

126.    Under the Port Authority's other enabling statutes, at issue in this case, the property also has to have been acquired for a statutorily authorized purpose, but the tax exemption is subject to the execution of an appropriate PILOT agreement. This qualified tax exemption also is not based on mere ownership of the property by the Port Authority.

127.    The Port Authority is required by its enabling legislation to act in accordance with the Constitutions of the States of New Jersey and New York, as well as the United States Constitution.  Pursuant to N.J.S.A. 32:1-33, the Port Authority is authorized to proceed with the development of the Port District in New Jersey and New York in accordance with a comprehensive plan and is "vested with all necessary and appropriate powers **not inconsistent with the constitution of the United States or of either state**." (emphasis added).

128.    The Port Authority's position that its mere ownership of property entitles it to exemption from the payment of real estate taxes is contrary also to Art. VIII, §1, ¶1 ("the Tax clause") of the New Jersey Constitution, which provides that "[p]roperty shall be assessed for

25

taxation under general laws and by uniform rules." To be constitutional, a tax exemption must be based on the use to which a property is put and not on the status of its owner.

129.    The Port Authority's mere ownership of the 2 Montgomery Street property is insufficient to entitle the Port Authority to a tax exemption.

130.    The Port Authority's mere ownership of the non-PILOT "Port Jersey" properties is insufficient to entitle the Port Authority to a tax exemption.

131.    The Port Authority's mere ownership of other properties it has acquired in the City that are not the subject of a PILOT agreement is insufficient to entitle the Port Authority to a tax exemption.

WHEREFORE, the City demands judgment against the Port Authority as follows:

(a)     Adjudicating and declaring that the Port Authority is not entitled to an unqualified tax exemption;

(b)     Adjudicating and declaring that mere ownership of property by the Port Authority does not entitle it to a tax exemption;

(c)     Ordering the Port Authority to pay all back real estate taxes which are due and owing with respect to the 2 Montgomery Street property and all real estate taxes which may become due and owing in the future;

(d)     Ordering the Port Authority to pay all back real estate taxes which are due and owing with respect to the non-PILOT "Port Jersey" properties and all real estate taxes which may become due and owing in the future;

(e)     Ordering the Port Authority to pay all back real estate taxes which are due and owing with respect to other properties the Port Authority has acquired in the City

that are not the subject of a PILOT agreement and all real estate taxes which may become due and owing in the future;

(f)     Ordering an accounting as to all properties the Port Authority owns in the City to identify properties owned but not used by the Port Authority;

(g)     Appointing a special master to oversee the accounting;

(h)     Awarding such sums of money as fairly compensate the City for its undue loss of taxes, together with interest and costs; and

(i)     Awarding such other and further relief as this Court may deem just and proper.

## COUNT THREE

## DECLARATORY JUDGMENT – THE PORT AUTHORITY'S OBLIGATION TO ENTER INTO PILOT AGREEMENTS

(2 Montgomery Street, Non-PILOT "Port Jersey" Properties, Other Non-PILOT Properties)

132.    The City repeats the preceding allegations as if more fully set forth herein.

133.    The Port Authority has taken the position, including in its January 31, 2014 response to the City's January 7, 2014 demand letter, that the Port Authority is never required to enter into a PILOT Agreement.

134.    The Port Authority's position that it can enter into PILOT agreements or not, at its pleasure, is inconsistent with the Port Authority's enabling statutes.

135.    As a condition of the Port Authority's entitlement to tax exemption with respect to property used for statutorily authorized marine terminal purposes, N.J.S.A. 32:1-144 authorizes the Port Authority to enter into a PILOT agreement with the municipality where the property is located that provides for PILOT payments (i) not in excess of the sum last paid as taxes upon the property prior to the time of its acquisition by the Port Authority (to protect the Port Authority) that,

however, (ii) are fair and reasonable (to protect the municipality) (iii) to the end that the municipality not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property by the Port Authority in the municipality (also to protect the municipality).

136.    As a condition of the Port Authority's entitlement to tax exemption with respect to property used for statutorily authorized railroad facilities purposes, N.J.S.A. 32:1-35.60 authorizes the Port Authority to enter into a PILOT agreement with the municipality where the property is located that provides for PILOT payments (i) not more than the sum last paid as taxes upon the property prior to the time of its acquisition by the Port Authority (to protect the Port Authority) that, however, (ii) are fair and reasonable (to protect the municipality) (iii) to the end that the municipality not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property by the Port Authority in the municipality (also to protect the municipality).

137.    As a condition of the Port Authority's entitlement to tax exemption with respect to property used for statutorily authorized industrial development projects and facilities purposes, N.J.S.A. 32:1-35.82 authorizes the Port Authority to enter into a PILOT agreement with the taxing jurisdiction where the property is located that provides for PILOT payments (i) not more the sum last paid as taxes upon the property prior to the time of its acquisition by the Port Authority (to protect the Port Authority) that, however, (ii) are fair and reasonable (to protect the municipality) (iii) to the end that the taxing jurisdiction not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property by the Port Authority in the municipality (also to protect the municipality).

138.    N.J.S.A. 32:1-35.72(p) expressly prohibits the construction of an industrial project or facility until the Port Authority has entered into an agreement with the municipality with respect to PILOT payments.

472261.1

139.    Notwithstanding the foregoing statutory provisions, the Port Authority has failed to enter into PILOT Agreements with the City with respect to 33 properties it owns in the City.

140.    The Port Authority is neither making PILOT payments nor paying real estate taxes with respect to any of these properties, and the City is suffering an undue loss of taxes and assessments as a result.

141.    Where the Port Authority has failed to enter into an appropriate PILOT agreement, such default creates an obligation to pay taxes on the property.

142.    The discretion which the Port Authority has where a Port Authority enabling statute authorizes a PILOT agreement is either to pay conventional taxes or to enter into an appropriate PILOT agreement.

143.    In the Bi-State Compact and in the Port Authority's enabling statutes, the Legislatures of the States of New York and New Jersey sought to balance the interests of the Port Authority and the interests of municipalities affected by the Port Authority's acquisition at properties -- and not to favor only the interests of the Port Authority, as the Port Authority now claims.

144.    As a public entity, the Port Authority has to exercise its discretion reasonably and not arbitrarily.

145.    Even if the Port Authority has discretion whether or not to enter into a PILOT Agreement, it does not have unbridled discretion, as the Port Authority claims.

146.    By taking the position that it has, the Port Authority is by definition acting arbitrarily – failing to acknowledge that, at a minimum, the exercise of its discretion must be based on objective, not subjective, standards.

472261.1

147.    The Port Authority minimally has an obligation to develop and promulgate standards governing its exercise of "discretion" in entering into PILOT agreements, but has failed to do so. The absence of adequate standards to guide the exercise of its discretion renders its decisions not to enter into a PILOT agreement arbitrary, capricious, and unreasonable.

148.    Upon information and belief, the Port Authority has acted inconsistently, and for reasons of expediency based on political and other factors, in exercising its "discretion" whether or not to enter into PILOT agreements with public entities other than the City.

149.    The City has sought documents, pursuant to the Port Authority's Freedom of Information Code, relating to this issue but has been stonewalled by the Port Authority.

150.    To construe the Port Authority's enabling statutes as the Port Authority suggests would render their PILOT provisions unconstitutional – in violation of the Equal Protection, Due Process, and Takings clauses of the United States Constitution and the Tax clause of the New Jersey Constitution.

151.    The Port Authority should be ordered to enter into an appropriate PILOT Agreement with respect to the 2 Montgomery Street property.

152.    The Port Authority should be ordered to enter into an appropriate PILOT Agreement with respect to the non-PILOT "Port Jersey" properties.

153.    The Port Authority should be ordered to enter into appropriate PILOT Agreements with respect to other properties it has acquired in the City.

154.    The Port Authority should be ordered to develop and promulgate standards governing its exercise of "discretion" in entering into PILOT agreements.

155.    Moreover, the City is entitled to a declaratory judgment that the Port Authority cannot construct any industrial project or facility in the City until the Port Authority has entered into an agreement with the City with respect to PILOT payments.

WHEREFORE, the City demands judgment against the Port Authority as follows:

(a)    Adjudicating and declaring that the Port Authority has wrongfully failed to enter into PILOT Agreements with respect to properties it owns in the City;

(b)    Adjudicating and declaring that the Port Authority has abused its discretion in failing to enter into PILOT Agreements with respect to properties it owns in the City and its refusal to enter into PILOT agreements without adequate standards to guide its exercise of discretion is arbitrary, capricious, and unreasonable;

(c)    Ordering the Port Authority to enter into an appropriate PILOT Agreement with respect to the 2 Montgomery Street property;

(d)    Ordering the Port Authority to enter into an appropriate PILOT Agreement with respect to the non-PILOT "Port Jersey" properties;

(e)    Ordering the Port Authority to enter into an appropriate PILOT Agreement with respect to other properties the Port Authority has acquired in the City;

(f)    Ordering the Port Authority to develop standards governing its exercise of "discretion" in entering into PILOT agreements and publishing such standards on its website;

(g)    Declaring that the Port Authority cannot construct any industrial project or facility in the City until the Port Authority has entered into an agreement with the City with respect to PILOT payments in accordance with the enabling statute therefor;

(h)     Awarding such sums of money as fairly compensate the City for its undue loss of

taxes, together with interest and costs; and

(i)     Awarding such other and further relief as this Court may deem just and proper.

## COUNT FOUR

## DECLARATORY JUDGMENT - CHANGED CIRCUMSTANCES MANDATING REFORMATION OF PILOT AGREEMENTS

(The PILOT Properties: Path Plaza, Greenville Yards, Port Jersey)

156.    The City repeats the preceding allegations as if more fully set forth herein.

157.    Changed circumstances mandate reformation of the Port Authority's existing PILOT Agreements with the City.

158.    Most egregiously, the Path Plaza PILOT Agreement executed in 1967 should be reformed to avoid the absurd result that presently exists: The Port Authority is paying the equivalent of less than 1% of the current real estate taxes on a property acquired by the Port Authority nearly a half century ago (when the Port Authority's revenues were a tiny fraction of what they are today), on which property a 10-story office tower has since been constructed.

159.    The Port Authority has itself recognized the appropriateness of reforming PILOT agreements to meet changing circumstances, in reserving the right to do so when it would be of benefit to the Port Authority.

160.    The Port Authority's argument that PILOT payments should not increase notwithstanding significant and often exponential increases in the value of the property is fundamentally unfair and unreasonable.

472261.1

161.    The current real estate taxes on the Path Plaza property would be $9,598,013 – at least 100 times more than they were in 1967, when the Path Plaza PILOT Agreement was entered into.

162.    Moreover, the Port Authority's projected net operating revenues in 2014 are $1.6 billion – more than 16 times what they were in 1967, when the Path Plaza PILOT Agreement was entered into.

163.    Yet, the City has received barely $2 million in PILOT payments on the Path Plaza property in the past 46 years.

164.    The current real estate taxes on the Greenville Yards property would be $2,208,853 – at least three times more than they were in 1988, when the Greenville Yards PILOT Agreement was entered into.

165.    Moreover, the Port Authority's projected net operating revenues in 2014 are $1.6 billion – more than four times what they were in 1988 when the Greenville Yards PILOT Agreement was entered into.

166.    Yet, the City has received barely $20 million in PILOT payments on the Greenville Yards property in the past 25 years.

167.    The PILOT payments being made by the Port Authority with respect to the Port Jersey properties will not in the future reflect the increased value of the properties or what the current aggregate real estate taxes on the property would be had the property not been sold to the Port Authority and then leased back to its former owner.

168.    Moreover, significant planned future improvements to the properties which are the subject of the PILOT Agreements between the Port Authority and the City, including, for example, a planned $118 million redevelopment project on the Greenville Yards property, will greatly

33

enhance the value of the property to the Port Authority while further burdening the City's infrastructure.

WHEREFORE, the City demands judgment against the Port Authority as follows:

(a)     Adjudicating and declaring that changed circumstances have dramatically altered, and will in the future continue to significantly alter, the circumstances underlying the PILOT Agreements between the Port Authority and the City;

(b)     Reforming the Path Plaza PILOT Agreement between the Port Authority and the City accordingly;

(c)     Reforming the Greenville Yards PILOT Agreement between the Port Authority and the City accordingly;

(d)     Reforming the Port Jersey PILOT Agreement between the Port Authority and the City accordingly;

(e)     Awarding such sums of money as fairly compensate the City for its undue loss of taxes, together with interest and costs; and

(f)     Awarding such other and further relief as this Court may deem just and proper.

## COUNT FIVE

## DECLARATORY JUDGMENT - REFORMATION OF THE PILOT AGREEMENTS TO PROVIDE FOR A REASONABLE TERM

### (The PILOT Properties: Path Plaza, Greenville Yards, Port Jersey)

169.    The City repeats the preceding allegations as if more fully set forth herein.

170.    The Path Plaza PILOT Agreement has no defined term.

171.    Under applicable law, perpetual contractual performance is disfavored.

172.    This is especially the case where the contract involves municipalities and/or public entities.

173.    Under applicable law, where there is no agreement as to term, the Court should supply a term that is reasonable under the circumstances.

174.    The Court's determination as to reasonableness in this case should take into account, among other things, increases in the value of the property while the contract has been in existence, changes in the use of the property, and increases in the cost of living and in municipal budgets as City infrastructure and municipal resources have been increasingly burdened by Port Authority activities in the City.

175.    The Court should apply these same principles to the other PILOT agreements entered into between the Port Authority and the City to determine for each a reasonable term under the circumstances.

Wherefore, the City demands judgment against the Port Authority as follows:

(a)    Adjudicating and declaring that the PILOT Agreements entered into between the Port Authority and the City should be reformed to prescribe as to each a reasonable term;

(b)    Reforming the Path Plaza PILOT Agreement between the Port Authority and the City accordingly;

(c)    Reforming the Greenville Yards PILOT Agreement between the Port Authority and the City accordingly;

(d)    Reforming the Port Jersey PILOT Agreement between the Port Authority and the City accordingly;

472261.1

(e)     Awarding such sums of money as fairly compensate the City for its undue loss of

taxes, together with interest and costs; and

(f)     Awarding such other and further relief as this Court may deem just and proper.

## COUNT SIX

### DECLARATORY JUDGMENT – PILOT PAYMENTS MUST NOT BE CAPPED INDEFINITELY OR ARBITRARILY BUT MUST BE FAIR AND REASONABLE TO THE END THAT THERE BE NO UNDUE LOSS OF TAXES

(All Properties)

176.    The City repeats the preceding allegations as if more fully set forth herein.

177.    The Port Authority has taken the position - in PILOT Agreements and otherwise,

including in its January 31, 2014 response to the City's January 7, 2014 demand letter - that

annual PILOT payments cannot exceed the amount last paid as taxes on a property when it was

acquired by the Port Authority.

178.    The Port Authority's position that the amount of its PILOT payments to the City are

frozen in time ignores the basic principles of statutory construction that a statute must be read in its

entirety and that meaning must be given to all provisions of a statute.

179.    The Port Authority's position is based on a selective reading of the Port

Authority's enabling statutes, and a failure to view the statutes in their entirety and give meaning

to the requirements in the statutes that PILOT payments be "fair and reasonable" "to the end"

that municipalities, like the City, "not suffer undue loss of taxes and assessments by reason of the

acquisition and ownership of property" by the Port Authority.

180.    The intent and purpose of the PILOT statutes was not to favor the Port Authority

at the expense of municipalities.

36

472261.1

181. All of these provisions can be reconciled, consistent with the intent and purpose of the PILOT statutes, by various constructions of the statutes, including, for example and without limitation, construing the provision that PILOT payments not exceed the taxes last paid at the time the property was acquired by the Port Authority (i) as a limitation on **initial** PILOT payments under a PILOT agreement to protect the Port Authority against possible gouging by a municipality and/or (ii) as applicable to the property as it existed at the time of acquisition by the Port Authority (i.e., **without subsequent improvements**).

182. In order to give meaning to the requirements that the PILOT payments be fair and reasonable and to the end that a municipality not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of the property by the Port Authority, adjustments are necessary to take into account a variety of factors - to avoid violation of another fundamental principle of statutory construction, namely, that a statute should not be construed in a manner that will lead to an absurd result.

183. PILOT payments that do not take into account significant increases in the value of the property are neither fair nor reasonable.

184. PILOT payments that do not take into account increases in the cost of living, increases in City budgets, and increases in the cost of municipal services are neither fair nor reasonable.

185. PILOT payments that do not take into account changes in the use of a property and corresponding increased burdens on the City's infrastructure are neither fair nor reasonable.

186. Construing the Port Authority's enabling statutes as the Port Authority suggests would render the statutes unconstitutional.

472261.1

187.   To construe the Port Authority's enabling statutes as the Port Authority suggests, capping PILOT payments at the taxes paid on the property when it was acquired by the Port Authority, without an escalator for the increased value of the property or the passage of time, would render the statutes unconstitutionally discriminatory and violate the Equal Protection clause of the Fourteenth Amendment of the United States Constitution.

188.   To construe the Port Authority's enabling statutes as the Port Authority suggests, capping PILOT payments at the taxes paid on the property when it was acquired by the Port Authority, without an escalator for the increased value of the property or the passage of time, would render the statutes unconstitutionally arbitrary and capricious and violate the Due Process clause of the Fourteenth Amendment of the United States Constitution.

189.   To construe the Port Authority's enabling statutes as the Port Authority suggests, capping PILOT Payments at the taxes paid on the property when it was acquired by the Port Authority, without an escalator for the increased value of the property or the passage of time, would render the statutes unconstitutionally confiscatory and violate the Takings clause of the United States Constitution.

190.   To construe the Port Authority's enabling statutes as the Port Authority suggests, capping PILOT Payments at the taxes paid on the property when it was acquired by the Port Authority, without an escalator for the increased value of the property or the passage of time, would violate Art. VII, §1, ¶1, the Tax clause, of the New Jersey Constitution, which provides that property shall be assessed for taxation under general law and by uniform rules.

191.   Upon information and belief, while imposing a cap on the PILOT payments to the City, the Port Authority has inconsistently and for reasons of expediency based on political and

other factors, failed to impose a cap on PILOT agreements it has entered into with other municipalities, and has employed a variety of machinations in doing so.

192.    The City's counsel has requested documents, pursuant to the Port Authority's Freedom of Information Code, that would reflect the disparate treatment of the City in contrast to other municipalities on these issues but it has been stonewalled by the Port Authority.

193.    By its actions in imposing a cap on the PILOT payments paid to the City, while inconsistently and arbitrarily and for reasons of expediency based on political and other factors failing to impose a cap with regard to its properties in other municipalities, the Port Authority has acted unreasonably and arbitrarily.

WHEREFORE, the City demands judgment against the Port Authority as follows:

(a)    Adjudicating and declaring that PILOT payments by the Port Authority to the City must be fair and reasonable to the end that the City not suffer undue loss of taxes and assessments by reason of the acquisition and ownership by the Port Authority of properties in the City and cannot be capped indefinitely;

(b)    Adjudicating and declaring that the application by the Port Authority of a cap that would frustrate this purpose is invalid;

(c)    Reforming all PILOT Agreements between the Port Authority and the City with an appropriate escalator;

(d)    Awarding such sums of money as fairly compensate the City for its undue loss of taxes, together with interest and costs; and

(e)    Awarding such other and further relief as this Court may deem just and proper.

472261.1

## COUNT SEVEN

## ESTOPPEL DUE TO THE PORT AUTHORITY'S DISPARATE TREATMENT OF OTHER MUNICIPALITIES

(All Properties)

194.     The City repeats the preceding allegations as if more fully set forth herein.

195.     Given its disparate treatment of properties in other municipalities, the Port Authority is estopped from invoking the statutory provision that PILOT payments be capped by the amount of real estate taxes on properties in the City when acquired by the Port Authority.

196.     Indeed, the Port Authority has entered into a PILOT agreement with respect to the Newark Legal and Communications Center.  The parties agreed to a PILOT that was tied annually to the municipal tax rate and not subject to any cap.

197.     The Port Authority entered into a PILOT agreement worth millions of dollars with the City of Elizabeth.

198.     The Port Authority entered into PILOT agreement with Bayonne for the Bayonne Peninsula.

199.     The Port Authority and New York City entered into a PILOT agreement with respect to the World Trade Center site.  Indeed, in 2003, the government announced that the Port Authority would increase its future PILOT payments for the site.   Moreover, the Port Authority and New York City entered into an agreement which significantly raised annual lease payments on both John F. Kennedy International and LaGuardia airports through 2050.  The agreement included a $500 million lump sum and a $90 million-per-year increase over the then-current lease payment of $3.5 million.  The deal meant a minimum of $5 billion in minimum total value of the lease to the City through 2050.

40

200.     By entering into PILOT agreements with other municipalities, the Port Authority is estopped from not entering into PILOT agreements with Jersey City.  By the Port Authority's voluntary conduct in connection with other municipalities, it is necessarily precluded from taking a course of action with respect to Jersey City that has worked and continues to work injustices to it. The Port Authority's repudiation of its own conduct, be it tacit or overt, is not permissible where, as here, it causes an injustice to Jersey City.

201.     It is contrary to the plainest principles of justice for the Port Authority, having entered into PILOT agreements with other municipalities, to invoke the law to defeat Jersey City's rightful claim for payment in connection with Port Authority-owned properties in Jersey City.  The Port Authority is estopped from denying payment under any arguable exercise of consensual authority under these circumstances.

202.     In short, the Port Authority is equitably estopped from denying Jersey City fair and equitable payment in connection with Port Authority-owned property.

WHEREFORE, the City demands judgment against the Port Authority as follows:

(a)     Determining that the Port Authority is estopped from invoking, inconsistently with its actions vis-à-vis other municipalities, the statutory provision that there is a cap on the amount that can be paid as PILOT payments;

(b)     Reforming all PILOT Agreements between the Port Authority and the City with an appropriate escalator;

(c)     Awarding such sums of money as fairly compensate the City for its undue loss of taxes, together with interest and costs; and

(d)     Awarding such other and further relief as this Court may deem just and proper.

472261.1

## COUNT EIGHT

## DECLARATORY JUDGMENT – USE OF PORT AUTHORITY PROPERTY FOR A PRIVATE PURPOSE

### (All Properties)

203.    The City repeats the preceding allegations as if more fully set forth herein.

204.    The Port Authority has taken the position -- including in its January 31, 2014 response to the City's January 7, 2014 demand letter -- that it has a tax exemption even when Port Authority property is leased in whole or in part to private entities so long as the property is generally being used for a statutorily authorized purpose.

205.    The Port Authority's position is contrary to the Port Authority's enabling statutes and to applicable case law.

206.    In granting a qualified tax exemption to the Port Authority under various enabling statutes, the New Jersey and New York Legislatures expressly limited that privilege to those purposes expressly authorized by the particular statute governing the Port Authority property – *e.g.*, marine terminals, railroad facilities, and industrial development projects and facilities.

207.    In order to be entitled to a qualified tax exemption, whereby the Port Authority can elect to make PILOT payments in lieu of paying taxes, a Port Authority property has to be presently used for a public purpose specifically authorized by a Port Authority statute or held with the present design to devote the property to such public use within a reasonable time.

208.    Upon information and belief, Port Authority-owned properties in the City are being used for non-incidental private purposes and are being used solely or primarily to raise revenue, which is not a statutorily authorized purpose.

209.    Among other things, the Port Authority has leased properties it has acquired in the City to private entities, which, in turn, unfairly avoid paying taxes based solely on their status as

42

lessees of the Port Authority – a practice that is especially pernicious because the Port Authority's lessees can use their unfair tax advantage in direct competition with other businesses which enjoy no such advantage and thereby drive legitimate tax-paying businesses out of the City or create a risk that such businesses will leave the City.

210.    The City's counsel has requested documents, pursuant to the Port Authority's Freedom of Information Code, on these issues but has been stonewalled by the Port Authority.

211.    Where a property is used for non-incidental private purposes and to raise revenue, the Port Authority, as owner of the property, has to bear a share of the tax burden equal to that of the ordinary citizen-owner.

WHEREFORE, the City demands judgment against the Port Authority as follows:

(a)    Adjudicating and declaring that those properties owned by the Port Authority in the City which are used for other than a public purpose specifically authorized by a Port Authority statute or are held without the present design to devote the properties to such public use within a reasonable time, or are used for a non-incidental private purpose, are not exempt from taxation;

(b)    Ordering an accounting as to all properties the Port Authority owns in the City to identify such properties;

(c)    Appointing a special master to oversee the accounting;

(d)    Ordering the Port Authority to pay all back real estate taxes which are due and owing with respect to such properties;

(e)    Awarding such sums of money as fairly compensate the City for its undue loss of taxes, together with interest and costs; and

(f)    Awarding such other and further relief as this Court may deem just and proper.

472261.1

## COUNT NINE

## DECLARATORY JUDGMENT – THE PORT AUTHORITY'S WHOLESALE AGGRANDIZEMENT OF PROPERTIES

(All Properties)

212.     The City repeats the preceding allegations as if more fully set forth herein.

213.     The Port Authority has engaged in a program of wholesale aggrandizement of properties in the City and should be required to disgorge all properties not presently used or presently intended to be used for a statutorily authorized purpose.

214.     As the New Jersey Supreme Court has said, a public entity may not arbitrarily or capriciously embark upon "a program of wholesale aggrandizement of territory" or completely disregard countervailing local interests.  Rather, a public entity's power to establish and maintain public facilities "must be reasonably exercised in response to the public need, both present and that fairly to be anticipated."  Aviation Services, Inc. v. Board of Adjustment, 20 N.J. 275, 285 (1956).

215.     In amassing more than three dozen properties in the City, many of which are vacant and unused and have been so for years, the Port Authority has gone well beyond these permissible limits.

216.     The following is a listing of Port Authority-owned vacant properties in Jersey City:

- 236 Provost St.

- 80 River Drive

- 154 Halleck Ave.

- Property on Merseles St.

- 20 Harbor Drive

- Route 169

- Foot of Port Jersey Blvd. (acquired in 1982)

- 403 Port Jersey Blvd. (acquired in 1982)

- 53-75 Port Jersey Blvd. (acquired in 1988)

- 203 Port Jersey Blvd.

217.    To the extent that the Port Authority has engaged in aggregating real estate for no present use or for projects unrelated to transportation and related statutory purposes, the Port Authority has exceeded its historic mission.  N.J.S.A. 32:1-1.

218.    Indeed, the Port Authority has admitted that it has a "Pre-Development Site Acquisition" program.  Pursuant to this program, on information and belief, the Port Authority buys properties and basically warehouses them to avoid paying current taxes on them.  For instance, marine terminal properties adjacent to Greenville Yards known as Port Jersey were leased back to the owner after the PILOT agreement was entered into in 2012, capping the PILOT agreement entered into by the Port Authority at 2010 rates.

219.    Such warehousing of properties to be developed by the Port Authority in the future is a way for the Port Authority to avoid paying current taxes or entering into PILOT agreements that reflect current tax rates.  On information and belief, this Pre-Development Site Acquisition program is designed as a way for the Port Authority to warehouse properties for long periods of time in an effort to avoid current tax rates.

220.    Significant amounts of property currently held by the Port Authority are not required to fulfill the Port Authority's statutory mandate, do not serve a public need either present or fairly to be anticipated, or can be more effectively maintained by a private entity that would be subject to taxation.

221.    By acquiring and retaining control of these properties, the Port Authority has deprived the City of millions of dollars of potential tax revenue which the City needs.  As the New

Jersey Supreme Court said a half century ago in <u>Moonachie v. Port of New York Authority</u>, 38 <u>N.J.</u> 414, 423-24 (1962):

> Recent years have witnessed … a steadily increasing taking of private property by both state and federal governments and various agencies thereof for public purposes, thus removing it from the tax rolls and casting a proportionately greater share of support of state and local government upon the private property owner. … Exemption of industrial property from taxation or its removal from tax rolls causes a particularly severe impact upon local government.  Such property is a vital part of the tax base in most communities since the tax revenue derived from it, as distinguished from residential property, usually greatly exceeds the cost of providing local public services.

222.    Under the circumstances, it is now appropriate and necessary to conduct a full-scale investigation and accounting of the current uses of each of the properties owned by the Port Authority in the City in order to ascertain which properties should continue to remain under its control and which should be disgorged.

223.    Thereafter, the Port Authority should be directed to sell or divest control of properties as appropriate so that the City may begin to realize tax revenues from such properties.

WHEREFORE, the City demands judgment against the Port Authority as follows:

(a)     Adjudicating and declaring that the Port Authority has arbitrarily and capriciously embarked upon a program of wholesale aggrandizement of territory under its control;

(b)     Determining that the Port Authority must sell those properties resulting from its aggrandizement which unfairly burden the City;

(c)     Ordering an accounting as to all properties the Port Authority owns in the City to identify those properties;

(d)     Appointing a special master to oversee the accounting;

(e)     Awarding such sums of money as fairly compensate the City for its undue loss of

taxes, together with interest and costs; and

(f)     Awarding such other and further relief as the Court may deem just and proper.

## PLAINTIFF'S RESERVATION Of RIGHTS

Plaintiff reserves the right to assert additional claims for relief with respect to matters that an

accounting, further FOIC requests, or additional discovery and investigation may reveal.

**LITE DEPALMA GREENBERG, LLC**

Dated:  April 1, 2015                    By:    *s/ Victor A. Afanador*
                                                Victor A. Afanador
                                                Mayra V. Tarantino
                                                Steven J. Greenfogel
                                                Jeffrey A. Shooman
                                                Adam Najib
                                                Two Gateway Center, Suite 1201
                                                Newark, NJ 07102
                                                Phone: (973) 623-3000
                                                vafanador@litedepalma.com
                                                mtarantino@litedepalma.com
                                                sgreenfogel@litedepalma.com
                                                jshooman@litedepalma.com
                                                anajib@litedepalma.com

                                                *Attorneys for Plaintiff*

472261.1

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I hereby certify to the best of my knowledge that the matter in controversy is not the subject of any other action pending in any court, or the subject of any pending arbitration or administrative proceeding.

Dated:  April 1, 2015                    By:    *s/ Victor A. Afanador*
                                                Victor A. Afanador

472261.1

# EXHIBIT A

## EXHIBIT A

### JERSEY CITY PORT AUTHORITY PROPERTIES

| I. | PROPERTIES THAT ARE COVERED BY AN EXISTING PILOT AGREEMENT. | |
|---|---|---|
| **PROPERTY** | **DATE OF ACQUISITION** | **CURRENT ASSESSMENT AND TAX INFORMATION** |
| 1. PATH Plaza (Block 9501, Lot 1) | 12/20/67 | Assessment: $128,556,300<br>Implied FMV: $411,511,843<br>Taxes: $9,598,013<br>Annual PILOT payments: $86,729.27 |
| 2. 20 Colony Road – Greenville Yard (Block 30501, Lot 1) | 12/30/81 | Assessment: $29,585,500<br>Implied FMV: $94,703,905<br>Taxes: $2,208,853<br>Annual PILOT payments: $736,304.79<br>(since at least FY1997; Agreement calls for $762,000) |
| 3. Port Jersey – Global Marine Terminal (Block 30403, Lot 1 & Block 30501, Lots 8, 9, 10 & 100) | 6/23/10 | Aggregate assessment on all five (5) lots: $16,103,400<br>Implied FMV: $51,547,375<br>Aggregate taxes: $1,202,280<br>Annual PILOT payments: $1,360,030 |

| II. | PROPERTIES THAT ARE NEITHER COVERED BY AN EXISTING PILOT AGREEMENT NOR PAYING REGULAR REAL ESTATE TAXES. | |
|---|---|---|
| **PROPERTY** | **DATE OF ACQUISITION** | **CURRENT ASSESSMENT AND TAX INFORMATION** |
| 1. Port Jersey Blvd. (Block 30501, Lot 3) | 1/15/82 | Assessment: $11,700,000<br>Implied FMV: $37,451,985<br>Taxes: $873,522 |
| 2. 53-57 Port Jersey Blvd (Block 30501, Lot 6) | 8/19/88 | Assessment: $5,338,300<br>Implied FMV: $17,088,028<br>Taxes: $398,557 |
| 3. Port Jersey Blvd (Block 30501, Lot 7) | 1/15/82 | Assessment: $237,100<br>Implied FMV: $790,973<br>Taxes: $18,448 |
| 4. Port Jersey Blvd. (Block 30501, Lot 13) | 1/15/82 | Assessment: $4,440,500<br>Implied FMV: $14,214,149<br>Taxes: $331,528 |
| 5. Port Jersey Blvd. (Block 30501, Lot 14) | 1/15/82 | Assessment: $3,243,400<br>Implied FMV: $10,382,202<br>Taxes: $242,152 |
| 6. Port Jersey Blvd. (Block 30404, Lot 4) | 1/15/82 | Assessment: $4,685,700<br>Implied FMV: $14,999,040<br>Taxes: $349,834 |
| 7. Port Jersey Blvd. (Block 30501, Lot 4) | 1/15/82 | Assessment: $9,803,200<br>Implied FMV: $31,380,287<br>Taxes: $731,907 |
| 8. 403 Port Jersey Blvd. (Block 30501, Lot 5) | 1/15/82 | Assessment: $3,139,000<br>Implied FMV: $10,048,015<br>Taxes: $234,358 |
| 9. Port Jersey Blvd. (Block 30501, Lot 12) | 1/15/82 | Assessment: $3,173,800<br>Implied FMV: $10,159,411<br>Taxes: $236,956 |

| II. | PROPERTIES THAT ARE NEITHER COVERED BY AN EXISTING PILOT AGREEMENT NOR PAYING REGULAR REAL ESTATE TAXES. | |
|---|---|---|
| **PROPERTY** | **DATE OF ACQUISITION** | **CURRENT ASSESSMENT AND TAX INFORMATION** |
| 10. 100 Academy St. (Block 10901, Lot 83) | 11/8/02 | Assessment: $3,375,000<br>Implied FMV: $10,803,457<br>Taxes: $251,978 |
| 11. Waldo Ave. Rear (Block 10901, Lot 90) | 1/1/89 | Assessment: $210,000<br>Implied FMV: $672,215<br>Taxes: $15,679 |
| 12. Inside Plot (Block 10901, Lot 113) | | Assessment: $31,200<br>Implied FMV: $99,872<br>Taxes: $2,329 |
| 13. 350 Washington St. (Block 11609, Lot 1) | 12/31/61 | Assessment: $1,261,200<br>Implied FMV: $4,037,132<br>Taxes: $94,161 |
| 14. Chestnut Ave. (Block 9702, Lot 3) | 1/1/89 | Assessment: $235,500<br>Implied FMV: $753,841<br>Taxes: $17,582 |
| 15. Chestnut Ave. (Block 9702, Lot 23) | 1/1/89 | Assessment: $20,000<br>Implied FMV: $64,020<br>Taxes: $1,493 |
| 16. 215 Baldwin Ave. (Block 10803, Lot 25) | | Assessment: $456,100<br>Implied FMV: $1,459,987<br>Taxes: $34,052 |
| 17. 246 Broadway (Block 9001, Lot 5) | | Assessment: $96,400<br>Implied FMV: $308,579<br>Taxes: $7,197 |
| 18. Columbus Dr. (Block 13101, Lot 3) | 2/28/85 | Assessment: $61,000<br>Implied FMV: $195,262<br>Taxes: $4,554 |
| 19. Inside Plot (Block 10901, Lot 110) | 6/30/87 | Assessment: $76,400<br>Implied FMV: $244,558<br>Taxes: $5,704 |
| 20. Inside Plot (Block 10901, Lot 112) | 6/30/87 | Assessment: $48,200<br>Implied FMV: $154,289<br>Taxes: $3,599 |
| 21. Merseles St. (Block 10901, Lot 114) | 6/30/87 | Assessment: $95,000<br>Implied FMV: $304,097<br>Taxes: $7,093 |
| 22. 90 Columbus Dr. (Block 13003, Lot 2) | 11/2/05 | Assessment: $260,600<br>Implied FMV: $834,187<br>Taxes: $19,456 |
| 23. 234 Provost St. (Block 8902, Lot 1) | 1/6/88 | Assessment: $507,100<br>Implied FMV: $1,623,239<br>Taxes: $37,860 |
| 24. Fourteenth & Provost (Block 7203, Lot 4) | | Assessment: $52,100<br>Implied FMV: $166,773<br>Taxes: $3,890 |
| 25. 124 Thirteenth St. (Block 7203, Lot 5) | 1/29/54 | Assessment: $701,200<br>Implied FMV: $2,244,558<br>Taxes: $52,352 |
| 26. 80 River Dr. (Rear) (Block 7302, Lot 25) | 6/13/00 | Assessment: $4,044,600<br>Implied FMV: $12,946,863<br>Taxes: $301,970 |

| II. | PROPERTIES THAT ARE NEITHER COVERED BY AN EXISTING PILOT AGREEMENT NOR PAYING REGULAR REAL ESTATE TAXES. | |
|---|---|---|
| **PROPERTY** | **DATE OF ACQUISITION** | **CURRENT ASSESSMENT AND TAX INFORMATION** |
| 27. 80 River Dr. (Block 7302, Lot 27) | 6/13/00 | Assessment: $67,300 Implied FMV: $215,429 Taxes: $5,025 |
| 28. 88 River Dr. (Block 7302, Lot 31) | | Assessment: $51,500 Implied FMV; $164,853 Taxes: $3,845 |
| 29. 86 River Dr. (Block 7302, Lot 29) | | Assessment: $142,900 Implied FMV: $457,426 Taxes: $10,669 |
| 30. 236 Provost St. (Block 7203, Lot 1) | 6/30/10 | Assessment: $30,500 Implied FMV: $97,631 Taxes: $2,277 |
| 31. 2 Montgomery St. (Block 11605, Lot 2) | 12/22/10 | Assessment: $15,200,000 Implied FMV: $48,655,570 Taxes: $1,134,832 |
| 32. 20 Harbor Dr. (Block 30306, Lot 1) | 9/23/74 | Assessment: $397,300 Implied FMV: $1,271,767 Taxes: $29,662 |
| 33. Route 169 (Block 30306, Lot 2) | 12/30/81 | Assessment: $2,422,400 Implied FMV: $7,754,161 Taxes: $180,856 |

# EXHIBIT B

THIS AGREEMENT made this 20. day of December, 1957 by and between the CITY OF JERSEY CITY, a municipal corporation of the State of New Jersey (hereinafter called the City) and PORT AUTHORITY TRANS-HUDSON CORPORATION, a body corporate and politic, and the joint agency of the States of New Jersey and New York (hereinafter called PATH)

WITNESSETH

WHEREAS, by virtue of the provisions of Chapter 8, Laws of New Jersey, 1962 and of Chapter 209, Laws of New York, 1962 and of the provisions of the Treaty between the said States dated April 30, 1921, PATH is fully authorized and empowered to operate the rail lines formerly known as the "Hudson Tubes" and to construct and operate terminal and transfer facilities in the "Journal Square terminal area" as defined in said statutes and in other terminal areas of said "Hudson Tubes", and

WHEREAS, by virtue of the provisions of Section 8 of the aforesaid statutes of New Jersey and New York, the City is authorized and empowered to cooperate with PATH and to enter into an agreement or agreements with it for the improvement of the "Journal Square terminal area" and of other terminal areas of said "Hudson Tubes" located in said City upon such reasonable terms and conditions as may be determined by the City and PATH and authorized and approved by a resolution passed by a majority vote of the City's governing body, and

WHEREAS, the City believes that the construction and operation by PATH of a modern Transportation Center in the "Journal Square terminal area", consisting of a new railroad station for the passengers using the rail facilities provided by PATH, new and improved facilities for the accommodation of omnibuses and their passengers and for the interchange of passengers between the bus lines and between the rail lines and the bus lines, new facilities for consumer services and for the parking of motor vehicles and, in addition thereto, new office facilities for PATH and other public agencies and for related railroad property purposes and the construction and operation by PATH of new station entrances for PATH passengers at Grove Street will be of great advantage to the City and its residents, and result in, among other things, rehabilitation, renewal and improvement of the Journal Square area and the relief of street congestion therein and improved traffic conditions in the Grove Street area, and

WHEREAS, representatives of the City and of PATH have, for several years past, joined and cooperated in the planning for such a Transportation Center and for changes in station entrances at PATH's Grove Street station and removal of the present station entrance, and

WHEREAS, PATH has advised the City that the railroad, bus, parking and related railroad property facilities of a Transportation Center of the type desired and of a design and scope satisfactory to the City, generally as shown on Exhibit "A" annexed hereto, can be constructed in the "Journal Square terminal area" and the required station entrance improvements at Grove Street can

-2-

be provided at a total presently estimated project cost of $34,300,000., and has further advised the City that if a grant of funds from the United States under the Urban Mass Transportation Act of 1964 satisfactory to it can be obtained and satisfactory agreements can be reached between it and the City and between it and the Board of Chosen Freeholders of the County of Hudson regarding various matters relating to the project, it will, notwithstanding the fact that economic analyses of the financial results of the said facilities demonstrate that they will, at best, be economically marginal, undertake the construction and operation of the aforesaid facilities of the Transportation Center and of the new Grove Street station entrances; and

WHEREAS, PATH has submitted the necessary application for the grant of Federal funds to the Urban Transportation Administration of the United States Department of Housing and Urban Development and contemplates that the requested funds will be granted to it; and

WHEREAS, the City and PATH now desire to enter into this Agreement setting forth the understandings between them, the City being aware that PATH will, upon the conditions aforesaid, proceed with the construction and operation of the Transportation Center and the Grove Street station entrance improvements in reliance on the assurances made to it by the City hereinafter, said assurances having been made to induce PATH to proceed with the construction and operation of the said facilities;

NOW, THEREFORE, the parties hereto for themselves, their successors and assigns mutually undertake, covenant and agree as follows:

-3-

A.  To provide relief from traffic congestion in the area, to facilitate construction of the Transportation Center, to permit easy passenger and vehicle access to and from said Center and to insure an appropriate traffic pattern to and from and in the vicinity of said Center,

1.  PATH will, upon receipt by it of a grant of funds satisfactory to it from the Urban Transportation Administration of the United States Department of Housing and Urban Development, of the approval of this Agreement by the City and of the enactment by the City of the resolutions referred to in paragraphs 2.(a),(b), 3.below and by the Board of Chosen Freeholders of the resolution referred to in paragraph 7 below, undertake the construction, in the aforesaid "Journal Square terminal area", of a Transportation Center generally as shown on Exhibit "A" attached hereto.

2.  In order to secure to the City the benefits of consolidating commuter and other bus loading and un-loading within the single location of the Transportation Center;

(a)  the City will, concurrently with, or as soon as practicable after its approval of this Agreement, enact a resolution, in the form annexed hereto as Exhibit "B", to become effective upon the opening to the public of the new facilities of the Transportation Center for the accommodation of omni buses and their passengers, prohibiting the pick-up or discharge by buses of passengers at the bus sto

-4-

on City streets listed in said resolution. The
City agrees that so long as the said facilities
for the accommodation of omnibuses and their pas-
sengers continue in existence for said purposes,
it will not permit the pick-up or discharge by
buses of passengers at any point on streets which
are now or hereafter may come under the jurisdic-
tion or control of the said City within the area
enclosed in red lines on Exhibit "C" attached
hereto;

(b) the City will, by appropriate amendment
to its zoning ordinance and other enactments re-
lating thereto, prohibit the expansion of existing
off street bus terminals or the construction of
new bus terminals at any point in the area of the
City within 1400 feet of the outer limits of the
"Journal Square terminal area" as defined in the
aforesaid statutes.

3. Upon acquisition by PATH of title to the real
property on both sides thereof, the City will, by ap-
propriate legislative action, close Bacot Street in
its entirety and that portion of Magnolia Avenue
designated by PATH for use in or in connection with
the Transportation Center.

4. Upon the opening to the public of the new fa-
cilities in the Transportation Center for the accommo-
dation of omnibuses and their passengers the City will
when requested so to do, by PATH, by appropriate

legislative action, prohibit vehicle parking on thos
portions of Pavonia, Magnolia, Sip and Summit (betwe
Sip and Pavonia) Avenues designated by PATH as neces
sary or desirable to permit efficient use of the Cen
by vehicles making use thereof, and make appropriate
provision for a taxicab stand and vehicle loading ar
at or adjacent to the Magnolia Street entrance to th
Center.

5.  PATH will, upon completion by it of the widen
ing of Pavonia Avenue from Kennedy Boulevard easterly
to the easterly side of the Transportation Center, de
liver to the City a deed dedicating the widened porti
of said Pavonia Avenue for street purposes and the Ci
will accept the same.

6.  PATH will, as soon as practicable, make ap-
plication to the Board of Freeholders of the County o
Hudson for its approval of the reduction in width of
John F. Kennedy Boulevard which is reasonably require
to permit construction of the Transportation Center,
for the grant of the necessary rights to use and alte
as required, the bridge which carries said Boulevard
over the railroad tracks at the westerly side of said
Center and the appurtenant structures, including the
existing pedestrian passageway and for the grant to i
of such property rights, if any, in the existing Boul
vard and bridge as may be necessary to permit con-
struction and operation of the Center.

7.  PATH will also make application to the said
Board of Freeholders for the immediate adoption by it

-5-

of a resolution, to become effective on the opening t
the public of the new facilities of the Transportatio
Center for the accommodation of omnibuses and their
passengers, prohibiting, so long as the said faciliti
continue in operation for said purposes, the parking
or standing of buses or the pick-up or discharge by
buses of passengers at any point on the streets or
roads, enclosed within red lines on Exhibit "C" at-
tached hereto, which now or hereafter may come under
the jurisdiction or control of said Board and for
legislative action to ban all vehicle parking (except
the standing of taxicabs at a taxi stand, the locatio
and size of which shall be agreed upon by PATH and
said Board) on the east side of that portion of John
F. Kennedy Boulevard which is adjacent to the Trans-
portation Center.

8. The City will join with PATH in the aforesaid
applications to the said Board of Freeholders and will
in connection therewith, take such actions, legislativ
or otherwise, as may be required to give evidence of
its consent to said actions by the said Board and to
the grant to PATH of such rights by the said Board.

9. PATH will join with the City in the applicatio
by the City to the said Board of Freeholders for such
widening and straightening of said John F. Kennedy
Boulevard north of Pavonia Avenue as is, in the opinio
of the City, necessary in connection with the develop-
ment by the City of its proposed Civic Center on the
west side of said Boulevard north of the existing rail
road tracks.

-7-

10. Upon the enactment thereof by it, the City will promptly forward to the New Jersey Division of Motor Vehicles all ordinances or resolutions adopted by it in the performance of its obligations under this Agreement which may require the approval of that Division and will take all steps necessary to obtain the required approvals as promptly as possible.

11. It is understood and agreed that if, notwithstanding occurrence of each of the aforesaid events, PATH's undertaking or completing the construction of the Transportation Center should, in the opinion of PATH, become impracticable in whole or in part, it shall be under no obligation to do so under this Agreement, nor shall it incur hereunder any liability of any kind to the City by reason of its failure to do so.

12. The City will, upon commencement of the construction of the Transportation Center, consult with PATH as to the new or changed traffic signals and signs, street lighting and other similar installations which will be required in City streets in the immediate vicinity of the Transportation Center to properly regulate the changed patterns of traffic and increased vehicular movement and will, at its expense, complete all necessary installations and changes so that the

-5-

signals, lights, etc. may be made operative upon the
opening to the public of the new facilities in the
Transportation Center for the accommodation of omni-
buses.

13. The City will, at its expense, provide, on
City streets adjacent to and in the vicinity of the
Transportation Center, policing, traffic control, snow
removal and similar services as necessary to permit
smooth ingress and egress of buses, other vehicles and
pedestrians to and from the Center.

B. To facilitate the elimination from reconstructed
Railroad Avenue of the existing PATH Grove Street station en-
trance thereby improving traffic conditions in the area and to
permit the construction and operation of new PATH station en-
trances for the benefit of the residents of the area and visitors
thereto,

1. The City will take appropriate legislative ac-
tion to authorize the grant to PATH of permanent rights
to construct and maintain, in the triangular park
bounded by Railroad Avenue, Newark Avenue and Grove
Street, a new entrance to its Grove Street station and
the grant to PATH of permanent rights to construct and
maintain a kiosk entrance to said station at a point,
on the south side of Railroad Avenue, east of Grove
Street and within 110 feet from the southeast corner
of the intersection of said Grove Street and Railroad
Avenue. All necessary deeds or other instruments shall
be executed and delivered to PATH.

-3-

2.  Upon the grant to it of the property rights
referred to in B.1 above and the delivery to and ac-
ceptance by it of the necessary deeds and other instru-
ments, PATH will immediately undertake the construction
of the new station entrances.

3.  At or prior to completion of the construction
of the new station entrance in the aforesaid triangular
park, PATH will, at no expense to the City, rehabilitate
said park, in accordance with plans to be agreed on by
the City and PATH.  PATH will thereafter maintain, in
first-class condition, its station entrance and the
City will maintain, in first-class condition, the re-
habilitated park.

4.  Upon application to it by PATH, the City will
close that portion of old Railroad Avenue lying be-
tween the northerly line of new Railroad Avenue and
the southerly line of lands of PATH on which is now
located PATH's car shop.

C.  Nothing herein contained is intended to nor shall
it be construed to oblige PATH to make any payments "in lieu"
of taxes to the City on the real property in the "Journal Square
terminal area" acquired by it in reliance on this Agreement for
the construction of the facilities referred to herein or on said
facilities, or on the Grove Street station improvements con-
structed by it, it being understood and agreed that the construc-
tion of the said facilities by PATH will improve the trade and
commerce of the City and facilitate the development of the Journal
Square area by improving transportation from numerous points to
said City and will be in other respects for the benefit of the
City and its residents.

-10-

D. Nothing contained herein is intended to nor shall be construed to create any rights of any kind whatsoever in this persons not a party to this Agreement.

E. Neither the Directors of PATH nor any individual officer or official of PATH or of the City, nor any agent or employee of either of them, shall be charged personally by any of the others with any liability nor held liable to either of the parties hereto under any term or provision of this Agreement or because of its execution or attempted execution or because of any breach hereof.

IN WITNESS WHEREOF, the parties hereto have executed these presents as of the day and year first above written.

THE CITY OF JERSEY CITY

By _____
                    Mayor

ATTEST:

_____
            City Clerk

[Seal]

PORT AUTHORITY TRANS-HUDSON
CORPORATION

By _____
                    President

ATTEST:

_____
    Vice President & General Manager

[Seal]

-11-

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )


BE IT REMEMBERED, that on the 23rd day of July,
One Thousand Nine Hundred and Sixty-eight, before me, an Attorney
at-Law of New Jersey, personally appeared AUSTIN J. TOBIN,
President of Port Authority Trans-Hudson Corporation, a body
corporate and politic, to me personally known to be the individual
described in and who executed the preceding instrument, and who
duly acknowledged to me the execution of same, and being by me
duly sworn, for himself, does depose and say that he is the said
President of Port Authority Trans-Hudson Corporation aforesaid,
that the seal affixed to the preceding instrument is the seal of
said Port Authority Trans-Hudson Corporation and that the said
seal and his signature as such President is duly affixed and
subscribed to said instrument by authority and direction of the
Board of Directors of said Port Authority Trans-Hudson Corporation.


Austin J. Tobin
President

Sworn and subscribed to before
me this 23rd day of July, 1968.

An Attorney-at-Law of New Jersey

STATE OF NEW JERSEY :
                              : ss.
COUNTY OF HUDSON :

        BE IT REMEMBERED that on this 20th day of December, 1967, before me the subscriber, a Notary Public of New Jersey, personally appeared WILLIAM P. BLACK, who, being by me duly sworn on his oath, doth depose and make proof to my satisfaction, that he is the City Clerk of the City of Jersey City, one of the parties named in the within instrument; that THOMAS J. WHELAN is the Mayor of the City of Jersey City; that the execution, as well as the making of this instrument has been duly authorized by a proper resolution of the Municipal Council of the City of Jersey City; that deponent well knows the corporate seal of said corporation; and the seal affixed to said instrument is such corporate seal and was thereto affixed and said instrument signed and delivered by said Mayor, as and for his voluntary act and deed and as and for the voluntary act and deed of said corporation, in the presence of deponent, who thereupon subscribed his name thereto as witness.

                              *William P. Black*

Subscribed and sworn to
before me at Jersey City,
the date aforesaid.

*Mildred A. Preston*
Notary Public of New Jersey

MILDRED A. PRESTON
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Aug. 10, 1970





RESOLUTION ABOLISHING CERTAIN BUS STOPS
HERETOFORE ESTABLISHED ALONG CERTAIN
STREETS IN THE CITY OF JERSEY CITY

Councilman                offered and moved adoption of
the following Resolution:

BE IT RESOLVED by the Municipal Council
of the City of Jersey City that, effective as
of the date hereinafter specified, the schedule
of bus stops for the various bus lines operating
over the streets of Jersey City heretofore
adopted by this Council by Resolution on July 6,
1955 be and the same is hereby amended by delet-
ing from said schedule the stops numbered and
lettered as follows:

| | |
|---|---|
| 9, b-1 | 95, c |
| 10, a | 95, d |
| 93, d | 96, z |
| 93, e | 96, a-1 |
| 93, f | 96, b-1 |

This Resolution shall become effective on
the date on which Port Authority Trans-Hudson Cor-
poration opens to the public the new facilities for
the accommodation of omnibuses and their passengers
in the Transportation Center in the Journal Square
area on the site of the existing PATH Journal Square
railroad station.

Exhibit "B"

BE IT FURTHER RESOLVED that a copy of this
Resolution be sent by the City Clerk to the New
Jersey Division of Motor Vehicles of the State
of New Jersey for approval, and that a copy be
made available to the bus lines operating in
and through the City of Jersey City.

-2-

Exhibit "B"



# EXHIBIT C

1507  2R

This Agreement entered into this 19th day of August, 1988 among the City of Jersey City, a municipal corporation of the State of New Jersey (hereinafter referred to as "City"), having its offices at City Hall, City of Jersey City, New Jersey and The Port Authority of New York and New Jersey, a body corporate and politic and the joint agency of the States of New Jersey and New York (hereinafter referred to as "Port Authority"), having its principal office at One World Trade Center, City of New York and State of New York and the Jersey City Economic Development Corporation, a non profit corporation of the State of New Jersey (hereinafter referred to as JCEDC), having its principal office at 601 Pavonia Avenue, Jersey City, New Jersey.

WITNESSETH

WHEREAS, by the Treaty of April 30, 1921, creating the Port Authority, the States of New Jersey and New York granted to the Port Authority full power and authority to purchase, construct, lease and operate marine terminals within the Port of New York District, and by Chapters Forty-four and Six Hundred and Thirty- one, respectively, of the Laws of New Jersey and Laws of New York of 1947, said two States have authorized and empowered cities and other municipalities in the Port of New York District to cooperate with the Port Authority in the development of marine terminals, and

WHEREAS, by resolutions of its Board of Commissioners adopted on September 10, 1981, January 14, 1982 and February 11, 1982, the Port Authority found and determined that the acquisition by the Port Authority of certain real property a portion of which is in the City of Jersey City is necessary for public use for marine terminal purposes, and

WHEREAS, the Port Authority believes that the development of portions of said real property as a marine terminal will be to the mutual advantage of the City and the Port Authority and will be to the benefit of the people of the States of New Jersey and New York, and

WHEREAS, the City and JCEDC believe that the development for industrial purposes of portions of certain property presently owned by the Port Authority is in the best interests of the City of Jersey City and the public interest and will promote and encourage economically sound industry in the City, will generate jobs, reduce the hazards of unemployment and otherwise be for the economic benefit of the City, and

WHEREAS, the Parties mutually agree that their cooperation in the development of both the Marine Terminal and an Industrial Development Project will be to the benefit of the region, and

WHEREAS, by virtue of the provisions of the "Industrial Development Projects and Facilities Act" Chapter 110, Laws of New Jersey 1978 and Chapter 651, Laws of New York 1978 and the provisions of the Compact between the States of New Jersey and New York dated April 30, 1921, the Port Authority is authorized and empowered, inter alia, to establish, acquire, construct, effectuate, develop, own, lease, maintain, operate, improve, rehabilitate, sell, transfer and mortgage projects or facilities referred to as "port district industrial development projects or facilities" as defined in said statutes, and

WHEREAS, by virtue of the provisions of Section 8 of the aforesaid statutes, the City is authorized and empowered to cooperate with the Port Authority and to enter into an agreement or agreements with it for and in connection with or relating to the effectuation of industrial development projects, and

WHEREAS, JCEDC by virtue of the provisions of its Charter is authorized and empowered to cooperate with the Port Authority and to enter into an agreement or agreements with it for and in connection with or relating to the effectuation of industrial development projects and to effectuate such projects

WHEREAS, the City hereby agrees and requests that the JCEDC be the entity to purchase from the Port Authority those properties outlined in Article III and to effectuate the development of said properties into an industrial park.

NOW, THEREFORE in consideration of the foregoing premises and the covenants, terms and conditions hereinafter set forth, the parties hereto agree as follows:

Definitions

As used in this Agreement, the following terms shall have the meanings set forth below and the definitions of such terms are equally applicable both to the singular and the plural terms thereof.

"Gross Operating Revenues" shall mean the aggregate amount of all monies and income determined in accordance with Generally Accepted Accounting Principles received by the JCEDC from or with respect to the ownership or operation of the Industrial Develop-

2

ment Project in any calendar year other than: (1) hazard insurance proceeds, and other proceeds on account of physical damage sustained to any building structure or improvement on the premises or equipment contained therein, to the extent such proceeds are used to repair, replace, or improve said buildings or improvements, (2) lump sum rent or other lump sum payments by tenants to the JCEDC to the extent such proceeds are applicable as Gross Operating Revenue in any succeeding calendar year, (3) proceeds, recoupment or refinancing of bonds or notes or other capital funds (including interest on such funds), (4) proceeds from governmental grants (5) proceeds from the sale or disposition of portions of the Project or an interest therein, except that such proceeds shall be counted as revenues as if JCEDC had received an equal proportioned share of the proceeds over a twenty (20) year period, (6) amounts received by the JCEDC which represent repayments of financing for any purpose whatsoever, including but not limited to equipment and building finishes, whether called rent by the JCEDC in any agreement with its tenant(s) or not, (7) any additional rent charge for taxes or for in lieu of taxes payments, collectible from the building's tenant(s) or (8) any assessments, such as water or sewer taxes collected by or on behalf of the City or a City agency.

"Net Operating Revenue" shall mean Gross Operating Revenues minus Deductions.

"Deductions" shall mean the sum of the following:

(1) Operation and Maintenance Expenses"

All expenses of the JCEDC which in accordance with Generally Accepted Accounting Principles are directly attributable to the operation and maintenance of the Project in each calendar year including but not limited to (a) the annual payments in lieu of taxes paid to the City by the JCEDC and not excluded from Gross Operating Revenues; (b) any costs or expenses incurred by the JCEDC from facilities and activities conducted outside the Project Site but directly related to or required in connection with the operation of the Project, and; (c) any costs or expenses for staff directly engaged in the administration or operation of the Project;

(2) "General and Administrative Expenses"

An amount equal to twelve and one half percent (12.5%) of the Operation and Maintenance expenses described in paragraph (1) above;

"Debt Service on JCEDC Infrastructure Investment" shall mean an amount equal to the actual repayment of interest and principle paid to lenders by the JCEDC with respect to the Infrastructure Investment.

"Debt Service on Port Authority Infrastructure Investment" shall mean, to the extent available after Debt Service on JCEDC Infrastructure Investment, an amount equal to interest and principle repayments by the JCEDC to the Port Authority according to the following formula:

(1) payments of simple interest on the Port Authority Outstanding Unamortized Principle Balance as of December 31 of any year calculated at eight and three quarters percent (8.75%), plus;

(2) payments of up to one twenty-fifth (1/25) of the Port Authority Outstanding Unamortized Principle Balance.

"Port Authority Outstanding Unamortized Principle Balance" shall mean the amount requested and received by the JCEDC under Section 4.04 of this agreement plus any unpaid interest from previous years, minus repaid principle amounts.

"Infrastructure" shall mean public facilities which are directly related to the Project including site preparation, highways and streets, water supply and distribution systems, utilities, waste water collection systems and storm drainage systems.

"Infrastructure Investment" shall be any cost incurred by the JCEDC in repairing, rehabilitating or constructing the Infrastructure, including but not limited to the sum of the following:

(1)   all costs associated with the acquisition for the Project Site and required easements and other interests in surrounding parcels, including but not limited to title search and insurance, survey, appraisal cost, and other costs of closing, net of $3.0 million as provided in Section 3.02;

(2)   all costs or expenses associated with Infrastructure planning and implementation;

(3)   all costs and expenses associated with the design, construction and supervision of construction of the Infrastructure improvements; and

(4)   the cost of financing, insurance and surety bonds during construction of Infrastructure improvements.

"Non-Infrastructure Investment" shall be any capital cost incurred by the JCEDC in construction of non-infrastructure improvements on the Project Site.

4

"Port Authority Infrastructure Investment" shall mean that amount up to $3.0 million, made available to JCEDC by the Port Authority for infrastructure improvements pursuant to this agreement.

ARTICLE I

MARINE TERMINAL

Section 1.01 The Port Authority has undertaken a project for the development of a marine terminal facility to be located partially within the City of Jersey City within an area more particularly described in Exhibit A hereto, which property and the facilities to be constructed thereon being referred to hereinafter as the "Marine Terminal". The Port Authority shall be responsible for the design, construction, financing and marketing of the facility and for the maintenance of roadways within the Marine Terminal.

Section 1.02  All details of the effectuation of the Marine Terminal project including, but not limited to, details of financing, construction, leasing, rentals, fees and other charges, rates, contracts, services and operations shall be within the sole discretion of the Port Authority and its decision in connection with any and all matters concerning the Marine Terminal shall be controlling and conclusive.

Section 1.03  Within the geographical limits of the Marine Terminal the Port Authority will have a right to utilize and will provide, construct and maintain within the marine terminal facilities all public ways, sewers, water mains and other utilities of whatsoever kind or description which it, in its sole discretion, may deem necessary. The Port Authority shall however be obliged to the best of its ability to provide access for subsurface storm drainage to be constructed by JCEDC   As between the City and the Port Authority, the City shall not be obligated to provide, within the Marine Terminal, street cleaning, snow removal, garbage or refuse collection services, it being understood that services of this character, to the extent deemed necessary or desirable by the Port Authority, will be provided by persons other than the City at the Port Authority's cost and expense.

Section 1.04  The Port Authority will provide such police or security personnel as it deems necessary for patrolling, security and traffic control within the Marine Terminal. The City agrees, however, that its Police Department will respond to calls for assistance from the Port Authority in the event of the commission of a crime, riots, disasters or other emergencies which may occur within the Marine Terminal and that its Fire Department will respond to calls to put out fires within the Marine Terminal. To this end, the Port Authority is hereby

5

authorized to connect a fire alarm system to be installed by the Port Authority within the Marine Terminal to the City's fire alarm system.

Section 1.05  The Port Authority, at its own expense, will make and maintain all connections. It deems necessary between the City water mains and sewers and installations within the Marine Terminal.  The City shall, subject to applicable State law, grant permission for such connections.  The Port Authority will pay water charges for water consumed by it or its tenants upon the same basis as other users throughout the City.

Section 1.06  Except as required by State and Federal law or regulation, no local law, enactment, ordinance, rule or regulation shall apply to the Marine Terminal or any part thereof constructed or operated by or on behalf of the Port Authority or its tenants.  The Port Authority, however, plans as a matter of policy, to conform to the existing laws, enactments, ordinances, rules or regulations of the City concerning health and fire protection so long as the Port Authority finds it practicable so to do without interfering with, impairing or otherwise adversely affecting the efficiency and economy of the development or operation of the Marine Terminal or the Port Authority's ability to operate the Marine Terminal upon a self supporting basis, or its obligations, duties and responsibilities to the States of New Jersey and New York, its bondholders and the general public, but the decision of the Port Authority as to whether it is practicable so to do shall be controlling.

Section 1.07  The City agrees to do all things necessary, proper, convenient and desirable by way of cooperation in connection with the development of and operation by the Port Authority of the Marine Terminal.  Whenever the consent of the City, another municipality, the State of New Jersey or the United States Government or any of their agencies, is necessary, proper, convenient or desirable in the opinion of the Port Authority, the City agrees to use its best efforts to provide or obtain such a consent.

Section 1.08  The City agrees to cooperate with the Port Authority, if so requested by the Port Authority, in making any necessary application for and in securing any and all Federal aid which may be obtainable under any applicable Federal laws for the development or operation of the Marine Terminal.   Provided however that such cooperation shall not be in conflict or competing for funds with other projects  the City designates as having a higher priority.

ARTICLE II

TAXES, IN LIEU OF TAXES AND ASSESSMENTS

Section 2.01  The Port Authority agrees to pay to the City for the year 1988 and for each calendar year thereafter for so long as the Port Authority shall own the premises described in Exhibit A and Exhibit B attached hereto in lieu of any and all taxes and assessments with respect to real property located within the City of Jersey City, the sum of $866,000, and the City hereby agrees to accept such sum as an annual payment as provided for in applicable statutes.   The Port Authority represents that under the existing Marine Terminal Legislation governing the payment of in lieu of taxes, the figures in Section 2.01 and Section 2.03 of this agreement represents the taxes last paid prior to acquisition by the Port Authority, and therefore the maximum payment allowable for the premises.

Section 2.02  Payments to be made to the City pursuant to Section 2.01 above for the years 1988 and 1989 will be made by the Port Authority to the City within 30 days of the effective date of this agreement, said date being defined in Section 12.05 of Article XII of this agreement (herein referred to as the "Effective Date").  Thereafter all such payments required to be made shall be made annually on or before the first day of July in each year for which such payment is due.  Each said payment shall be to the Treasurer of the City of Jersey City and checks shall be made payable to his order.  Said payments shall be devoted by the City solely to purposes to which taxes may be applied, unless and until otherwise directed by law of the State of New Jersey.

Section 2.03  Upon the conveyance to the JCEDC of the property described in Exhibit B attached hereto payments to be made to the City pursuant to this Section shall be reduced to $762,000, for years subsequent to the year of conveyance and the payment in lieu of taxes provided for the year in which such conveyance occurs shall be adjusted pro rata.

Section 2.04  For each year that the subject property is owned or controlled by the Port Authority, the City will cancel upon its tax records all items entered thereon for taxes, assessments and interest against the Marine Terminal and for each such year the City will mark the property comprising the Marine Terminal exempt on its tax records with a notation that such entry is made pursuant to this agreement.

Section 2.05  (a) It is understood and agreed that the sum to be paid to the City by the Port Authority in lieu of taxes as provided for herein represents the total amount to be paid by the

Port Authority to any taxing authority for taxes, in lieu of taxes or assessments with respect to the Marine Terminal and said payment will be held by the City for its benefit.  The City hereby agrees to indemnify and hold harmless the Port Authority against any claims for taxes, payments in lieu of taxes or assessments which may be made against the Port Authority or the subject property while owned or controlled by the Port Authority in any action or proceeding brought by any person or taxing authority attempting to impose or collect taxes, payments in lieu of taxes or assessments other than as provided in this Agreement.

(b) The payment in lieu of taxes to be paid by the Port Authority pursuant to this Article shall be reduced by any amount paid or due to the City as real or personal property taxes, in lieu of tax payments or payments for municipal services by any owner, developer, vender, tenant, occupant or other user of any part of the property described in Exhibit A hereof except for those payments made pursuant to Section 1.05 (a) hereof.  This paragraph shall not be construed however as subjecting any property owned or controlled by the Port Authority to taxation.

ARTICLE III

REAL ESTATE

Section 3.01  The JCEDC, subject to the conditions set forth in this Agreement shall undertake development, either directly or indirectly of what may be generally described as an Urban Industrial Development Project to be known as the Greenville Industrial Park (hereinafter referred to as "Project") and which is to be located on the property described in Exhibit B hereto (hereinafter referred to as the "Project Site").

Section 3.02  In consideration for the mutual promises and obligations of the parties pursuant to this agreement, the Port Authority shall, subject to the provisions of Section 4.05, as soon as practicable after the Effective Date, convey to the JCEDC, fee simple title to the Project Site, which site the parties agree to have a value of $3 million, subject to easements, covenants and restrictions of record and to such state of facts as an accurate survey may show. It is understood and agreed that the Port Authority shall be repaid $3 million, the value of the land conveyed, in a manner provided for in Section 5.01 hereof.

Section 3.03  Neither the Port Authority nor its Commissioners, officers, employees or agents shall be deemed to have made any representation, warranty or statement as to the condition of the property to be conveyed or the suitability thereof for the development thereon contemplated by the JCEDC. The Port Authority shall convey title to and deliver the

8

premises in its presently existing "as is" condition.  The JCEDC agrees to and shall accept the premises in its "as is" condition and the Port Authority shall have no obligation for furnishing work to or preparation of any portion of the premises other than as may be specifically provided for herein.

Section 3.04   If requested by the JCEDC, or if the Port Authority so elects, the Port Authority agrees to use its best effort to obtain a letter of non-applicability from the New Jersey Department of Environmental Protection (NJDEP) confirming that compliance with the New Jersey Environmental Cleanup Responsibility Act, N.J.S.A. 13:K-6 et seq (ECRA) is not required for the transaction contemplated.  If said letter of non- applicability is not obtained, the Port Authority shall, upon the request of the JCEDC, submit a negative declaration to the NJDEP for approval, provided however, that all costs of preparing and obtaining the negative declaration and its approval, including the cost of any soil testing which NJDEP shall require, shall be paid by the JCEDC.

Section 3.05   The JCEDC, may at its own cost and expense, promptly arrange for an inspection by its own staff or by a consultant to be selected by it into the composition of the Project Site in order to determine the presence in or on the premises of hazardous or toxic substances.  The JCEDC shall promptly transmit to the Port Authority copies of the reports prepared pursuant thereto as they are received.  In the event such investigation reveals the presence of any hazardous or toxic substances which will result in present or future hazard or prevent development, then in that event the JCEDC may, at any time prior to conveyance of title, but not later than December 30, 1988, elect not to accept conveyance of the Project Site.

Section 3.06   Should the JCEDC fail to award bona fide design and construction contracts for the development of the contemplated Project totalling at least One Million Dollars ($1,000,000) within two years after the Effective Date, title to the Project Site shall revert to the Port Authority.  In such an event, it shall be the obligation of the JCEDC to deliver possession of, and to reconvey title to the property to the Port Authority promptly in at least the same condition as at the time of conveyance of the property to the JCEDC by the Port Authority, title to be subject to only those encumbrances which existed at the time of conveyance to the JCEDC.  Upon reconveyance to the Port Authority, the provisions of Article 1 shall apply to the property reconveyed.   The aforesaid power of termination shall be incorporated in the  Port Authority's deed to the JCEDC.  A copy of the form of deed is attached as Exhibit D.

Section 3.07  The Port Authority agrees to make available to the City and to the JCEDC copies of the results of any environmental tests conducted on the Project Site that it has in its possession and, if so requested by the JCEDC, to cooperate with and assist the JCEDC in making any applications which may be required under applicable environmental laws and regulations as a prerequisite to the effectuation of the Project by the JCEDC.

Section 3.08  The JCEDC hereby guarantees and warrants that the Project Site will be used only for the development and operation of an Industrial Park and that neither the City nor JCEDC will permit said property to be used for any purpose or in any manner that will be inconsistent or incompatible with or will in any way interfere with or hinder the operation of the Marine Terminal, a restriction to such effect to be set forth in the Port Authority's deed to the JCEDC.

ARTICLE IV

PROJECT DEVELOPMENT AND OPERATION

Section 4.01  The JCEDC shall prepare and design the Project Site to accommodate a minimum of 100,000 square feet of industrial building space, and shall be solely responsible for the initial financing as described in this Article, the marketing of Project improvements and the provision of a Project-related on-site employment office.

Section 4.02  Unless otherwise provided for herein, all details of the effectuation of the Project including, but not limited to, details of design, construction, marketing, maintenance, financing, leasing and rentals, and the cost thereof, shall be within the sole discretion and responsibility of the JCEDC.  It is understood that the JCEDC may, in its discretion, utilize private real estate interests and developers in carrying out any aspect of the development of the Park.  The JCEDC shall not sell or lease substantially all of the Project Site to a single proposed purchaser or lessee without the prior written approval of the Port Authority.  Such approvals shall not be unreasonably withheld or delayed.

Section 4.03  The JCEDC shall commence preparation of the Project Site for construction within nine (9) months after conveyance by the Port Authority to the JCEDC of the Project Site, and will arrange through its own efforts, private developers or others for completion of construction of all buildings to be located within the Project Site.

Section 4.04  (a)  Subject to the terms and conditions of this agreement, the Port Authority will make available to the JCEDC, an amount up to $3 million to be used by the JCEDC in

the undertaking to provide certain Infrastructure Investment to the Project Site and sur-
rounding area, including any environmental testing of the Project Site, the total cost of
which the JCEDC has represented will be approximately $9 million.  The Port Authority will
provide said funds upon written request from the JCEDC, which request must specify the
purpose, amount and anticipated date of the expenditure by the JCEDC to others.  The
funds provided by the Port Authority will be provided pari passu with those provided by the
City or JCEDC for said improvements (ie. The Port Authority will provide money towards
JCEDC Infrastructure Investment at a ratio of one dollar to every two dollars of costs to be
incurred, until the $3 million dollar Port Authority commitment is exhausted).  The Port Au-
thority will have the right to review and approve the plans and specifications, such review
shall not be unreasonably withheld or delayed, but shall not have the obligation to do so.
The funds to be provided by the Port Authority will be used by the City solely for the pur-
poses provided for in this agreement.

(b) The Port Authority shall have the right to audit and inspect the books, records and other
data of the City and JCEDC relating to the JCEDC's expenditure of funds advanced by the
Port Authority for Infrastructure Investments and the JCEDC shall maintain and submit,
when requested, all documentation in support of such expenditures as may be reasonably
required by the Port Authority.

(c) It is understood and agreed that the Port Authority shall be repaid the monies provided
pursuant to this Section in the manner provided for in Section 5 hereof.

Section 4.05(a)  The City agrees that, as part of the infrastructure improvements provided
for in Section 4.04 hereof, it shall, prior to October 1, 1988, at its own cost and expense, ac-
quire and make available any property rights necessary to extend Colony Road northerly
from its present northerly terminus to property presently owned by the Port Authority, so as
to provide vehicular and utility access to the property owned by the Port Authority, which
road extension shall include a grade crossing over the tracks currently owned or operated
by the Port Jersey Railroad.  The City shall, upon request of the Port Authority, take such
action as may be required to dedicate such extension to public use as a public street.

(b)  The Port Authority, upon acquisition and  provision by the City of the necessary
property interests, will, at its own cost and expense, construct the extension of Colony Road
and grade crossing on behalf of the City.

(c) If for any reason the improvements to Colony Road contemplated by this Section are not completed and the extension of the road not dedicated by the date the JCEDC requests the conveyance of the Project Site as provided for in Section 3.02 hereof, then in that case the conveyance by the Port Authority of the Project Site shall be subject to a reservation by the Port Authority of an easement over the Project Site for access from Industrial Drive to the Greenville Yard Section of the Marine Terminal. Such easement shall be for use in connection with the Marine Terminal until such time as the improvements to Colony Road are completed and the road extension dedicated as a public thoroughfare providing access to the Marine Terminal, but in no event shall such easement extend later than one (1) year after conditions in Section 4.05(a) are met.

Section 4.06  The City and JCEDC shall, in planning, developing and maintaining the necessary improvements to the infrastructure including, but not limited to, roads, water and sewerage systems serving the Project and the general area, insure the reasonable proximity of and a capacity in each said improvement sufficient to meet the future needs of the Marine Terminal. It is currently anticipated that at full development the Marine Terminal will require not less than 0.10 million gallons of water per day at a pressure of 50 P.S.I. with a peak hour requirement of 550 G.P.M. and that the Marine Terminal will produce not less than 0.02 million gallons of sewerage effluent per day with a peak discharge 150 G.P.M.

Section 4.07  It is desirable for the successful effectuation of both the Project and the Marine Terminal that utility companies providing gas, telephone and electricity services, install, at their own cost and expense, facilities to serve the Project and the Marine Terminal. Toward that end, the parties agree to cooperate in obtaining such installations.

ARTICLE V

PROJECT REVENUES
Section 5.01  All revenues received by the City and the JCEDC as Net Operating Revenues from the Project shall be held by JCEDC and distributed in the following priority order:
  a)  Payment to JCEDC to cover its costs for Debt Service on JCEDC Infrastructure Investment.
  b)  Payment to the Port Authority to cover its costs for Debt Service on Port Authority Infrastructure Investment.
  c)  Payment to the JCEDC to cover its costs for Debt Service on Non-Infrastructure Investment.

d)  Thereafter, in each year in which sufficient funds are available, one half of such remaining funds shall be paid to the Port Authority until such time as the full amount of the $3 million representing the value of the property conveyed pursuant to Section 3.02 hereof has been repaid.

Section 5.02  Should the City or the JCEDC convey title to substantially all of the Project Site to a person or persons not a party to this agreement the balance of the funds to be repaid to the Port Authority pursuant to Section 5.01 which remain unpaid shall become immediately due and owing.

Section 5.03  The City and the JCEDC shall furnish to the Port Authority as soon as practicable after the end of each calendar year, and in any event within ninety (90) days thereafter, financial statements covering the operation of the Project, including the Gross Operating Revenues, Net Operating Revenues and components thereof as well as the distributions to be made pursuant to Section 5.01 hereof, all in reasonable detail, which statements shall be prepared in accordance with generally accepted auditing standards relating to reporting.

Section 5.04  Until such time as full repayment is made to the Port Authority as provided for in this Article, the Port Authority shall have the right by its agents, employees and representatives to audit and inspect all books, records and other data relating to the Project and the cost thereof, and all books, records and other data relating to revenues and income. The Port Authority hereby expressly reserves all rights and remedies available to it in law and in equity in the event any Port Authority audit or inspection shows that any payment or failure to pay the Port Authority any amount due hereunder was not in accordance with the provisions hereof, or was otherwise improper.

ARTICLE VI

MUNICIPAL COOPERATION

Section 6.01  The City and the Port Authority agree that the repair, replacement or rehabilitation of certain municipal infrastructure systems and support systems within the City may directly benefit the Project Site and the Marine Terminal and that it is their mutual interests to cooperate in the rehabilitation and upgrading of certain systems. The City and the Port Authority will confer and jointly identify certain work projects to be undertaken by the City in the nature of repair, replacement or rehabilitation of certain infrastructure systems, including

13

but not limited to streets, traffic signals and utilities in the City which relate directly to the Marine Terminal and the Project.

Section 6.02  The City shall advise the Port Authority in writing of the proposed work projects to be undertaken as aforesaid, the estimated cost thereof, whether the work project will be performed by the City through its employees or by independent contractors, the estimated date of completion of the work project and the amount of financial support requested of the Port Authority.

Section 6.03  The Port Authority agrees to provide an amount not to exceed $750,000 for use by the City toward the total cost of the work to be undertaken by the City pursuant to this Article.  The Port Authority will provide said funds, or a portion thereof, to the City upon written request from the City setting forth the information specified in Section 6.02 hereof.  The Port Authority will have the right to approve or reject such requests for funds and to review all bids and contracts for the work covered thereby.  Such review or approval shall not be unreasonably withheld or delayed.

Section 6.04  It is understood by the parties that the financial participation by the Port Authority in improvements to be undertaken by the City as provided for herein represents the entire Port Authority payment, either directly or indirectly, for work to be undertaken at sites other than on the Marine Terminal, and that no further requests for funds for such projects will be made by either the City or JCEDC.

ARTICLE VII

ROADS AND TRAFFIC

Section 7.01  (a) The City agrees that upon the request of the Port Authority which may be made from time to time, it shall adopt ordinances or take whatever other legal actions may be necessary and / or required to vacate all or any part of that portion of Port Jersey Boulevard described in Exhibit C attached hereto and to authorize the conveyance to the Port Authority of all of the City's right, title and interest therein.  Upon vacation by the City, and in consideration thereof the Port Authority shall continue the payments as provided in Section 7.03(b).

(b) Upon the vacation of all or any part of said street by the City, the Port Authority will assume control of and be responsible for the improvement and maintenance of the former

street area acquired as a Marine Terminal Highway and the City will be relieved of any future responsibility with regard thereto.

Section 7.02  The City agrees, that, upon the request of the Port Authority it will cooperate and endorse any application by the Port Authority to the New Jersey Department of Motor Vehicles or any other State or local department or agency having jurisdiction in the matter for any permission or authority necessary to enable vehicles not yet registered to transit over Port Jersey Boulevard between the eastern terminus of that road and the Greenville Yard portion of the Marine Terminal.

Section 7.03 (a)  The City agrees that from time to time it shall adopt such ordinances and take whatever other legal action may be necessary and / or required to grant to the Port Authority, for the duration of the Port Authority's ownership and control of the Marine Terminal, or for such greater or lesser time as the Port Authority may deem necessary, exclusive and sufficient legal rights to portions of Port Jersey Boulevard, more particularly described in Exhibit C attached hereto, for the Port Authority to utilize such property for marine terminal purposes including the construction, operation and maintenance of a private access road.

(b)  The Port Authority agrees that, in consideration for the grant by the City to the portions of Port Jersey Boulevard described in Exhibit C as well as other obligations undertaken by the City in this Agreement including those provided for in Section 7.01 hereof, it will pay or cause to be paid to the City the sum of $40,000 per year for a period of twenty-five (25) years.  The initial payment shall be made within thirty (30) days of the effective date of the ordinance granting said rights and thereafter on the anniversary of the effective date of said ordinance in each year a payment is due.

(c)  The Port Authority shall have the exclusive right to use the property which is subject to the rights to be granted pursuant to this Section and, at its cost and expense, may pave, fence and utilize said property in conjunction with the operation of the Marine Terminal.

(d)  The Port Authority agrees to indemnify and hold harmless the City against any and all claims and causes of action arising out of the use by the Port Authority of the portions of Port Jersey Boulevard described in Exhibit C attached hereto while under the operation and control of the Port Authority pursuant to paragraph (a) above.

Section 7.04  The Port Authority agrees that, in planning and constructing the location of rail ramps within the Marine Terminal, it will not construct or install any ramps that will hinder or impede traffic to and from the the Project and will confer with the City and JCEDC with re-

gard to the location of said ramps and will consider recommendations made by the City and JCEDC with regard thereto, it being understood however that the final decision with regard to the location of the ramps shall be solely within the Port Authority's discretion, subject to the above conditions.

Section 7.05  The City and JCEDC agree that, in planning the access and approach roads to the Project it will confer with the Port Authority and consider the possible impact on traffic to and from the Marine Terminal and will take no action or construct or install any roads, traffic systems or devices that will hinder or impede traffic to and from the Marine Terminal. It being understood however that the final decision with regard to the location of access and approach roads shall be solely within the City's and \ or JCEDC's discretion, subject to the above conditions.

ARTICLE VIII

MARKETING AND FOREIGN-TRADE ZONE COOPERATION

Section 8.01  The Port Authority will participate and cooperate with the City and JCEDC in the marketing of the Project and, toward that end, will provide technical services to the City and JCEDC to assist the City in obtaining foreign-trade zone status under the Foreign Trade Zone Act and will incorporate the Project Site in the Port Authority's current application. Toward that end the Port Authority and the JCEDC will seek to enter into a Foreign Trade Zone operating agreement.   The Port Authority will also investigate and advise the City and JCEDC as to the feasibility of extending foreign-trade zone status to the City's urban enterprise zone.

Section 8.02  The City and JCEDC agree to endorse and cooperate with the Port Authority in an application to be made by the Port Authority to the Foreign Trade Zones Board for foreign trade zone status for the Marine Terminal and Industrial Park.

Section 8.03  The Port Authority will use its best efforts, to the extent permitted by law, to encourage the lessees, tenants or operators at the Marine Terminal to endeavor to provide employment to local personnel.

Section 8.04  The City and JCEDC will use their best efforts, to the extent permitted by law, to encourage the lessees, tenants, grantees or operators of the Project to utilize marine terminal facilities of the Port of New York and New Jersey for the import or export of water borne cargo used, manufactured, fabricated, stored or distributed at the Project.

ARTICLE IX

LIMITATION OF LIABILITY AND INDEMNIFICATION

Section 9.01  The Port Authority shall not be liable for any claims arising or resulting from acts or omissions of the City, JCEDC, contractors or parties participating in the development of the Project provided that such limitation shall not extend to any claim arising or resulting from acts or omissions of the Port Authority, its officials, employees, agents or contractors or arising or resulting from the exercise of any rights or obligations which the Port Authority has reserved or assumed.  The City and JCEDC hereby undertake and agree to indemnify and save the Port Authority harmless from, and at the Port Authority's request defend, any claims, causes of action or judgments, by reason of personal injuries, including death, sustained by any person or persons, and for any claims for damages to property, arising from the construction or operation of the Project except as to any claims arising or resulting from acts or omissions of the Port Authority, its officials, employees, agents or contractors or arising or resulting from the exercise of any rights or obligations which the Port Authority has reserved or assumed.

Section 9.02  The City or JCEDC shall not be liable for any claims arising or resulting from acts or omissions of the Port Authority, contractors or parties participating in the development of the Marine Terminal; provided that such limitation shall not extend to any claims arising or resulting from acts or omissions of the City, its officials, employees, agents or contractors or from acts or omissions of the JCEDC, its officials, employees, agents or contractors or arising or resulting from the exercise of any rights or obligations which the City or JCEDC has reserved or assumed.

Section 9.03  Neither the Commissioners of the Port Authority nor any of them, nor any officer, agent or employee thereof, nor the Mayor, any Councilman, or any officer, agent or employee of the City, nor the Executive Director or any Director, officer, agent or employee of the JCEDC shall be charged personally with any liability, or held liable under the terms or provisions of this Agreement, or because of its execution or attempted execution, or because of any breach or attempted or alleged breach thereof.

Section 9.04  Nothing contained within this Agreement is intended to nor shall it be construed to create any rights of any kind whatsoever in persons not parties to this agreement.

ARTICLE X

DEFAULT AND REMEDIES

Section 10.01  If any of the parties hereto shall materially breach any of the representations, warranties, or covenants set forth in this Agreement, and such breach shall be recurring or continue for a period of thirty (30) days, such party shall be deemed to be in default of this Agreement.  Either non-defaulting party shall serve written notice of such default upon the defaulting party with a copy to all other parties and if, within thirty (30) days after such notice is served, the breach is not remedied or substantial action commenced to remedy such breach, such breach shall then constitute an Event of Default.

Section 10.02  Upon the occurrence of an Event of Default, either non-defaulting party may sue for damages or seek equitable relief in a Court of competent jurisdiction pursuant to the applicable statutes relating to suits against either party.

ARTICLE XI

NOTICE

Section 11.01   Any notice required under this Agreement to be sent by any party to the other shall be sent by certified mail, return receipt requested, and addressed as follows:

a) When sent to the Port Authority it shall be addressed to: Director, Port Department, The Port Authority of New York and New Jersey, 64 West, One World Trade Center, New York, New York 10048, unless prior to giving said notice the Port Authority shall have notified the parties hereto otherwise.

b) When sent to the City, it shall be addressed to : Mayor, City of Jersey City, City Hall, Grove Street, Jersey City, New Jersey 07302, unless prior to giving said notice the City shall have notified the parties hereto otherwise.

c) When sent to the JCEDC it shall be addressed to: Executive Director, Jersey City Economic Development Corporation, 601 Pavonia Avenue, Jersey City, New Jersey 07306 unless prior to giving said notice the JCEDC shall have notified the parties hereto otherwise.

ARTICLE XII

MISCELLANEOUS

Section 12.01  This agreement shall be construed in accordance with and the rights of the parties hereto shall be determined by the laws of the State of New Jersey.

Section 12.02  Neither this agreement nor any thing contained herein is intended, nor shall be construed as a consent, either expressed or implied by the Port Authority that it or the Marine Terminal be subject to state legislation or regulations, which would, in the absence of this agreement , otherwise not be applicable to it.

Section 12.03  This agreement, including the Exhibits attached hereto, sets forth the entire agreement among the parties concerning the subject matter hereof and shall not be modified or amended except by an instrument in writing signed by the parties.  It is understood that this agreement revokes all prior and contemporaneous oral or written proposals, oral or written agreements, understandings, representations, conditions, warranties, covenants and all other circumstances between the parties relating to the subject matter of this Agreement.

Section 12.04  None of the parties shall assign, or attempt to assign, its respective obligations under this Agreement without the prior written consent of each of the other parties.

Section 12.05  This agreement shall become effective on the date of its execution or on the date of approval by the parties as provided in Section 12.06 hereof, whichever is later.

Section 12.06 (a) The parties agree that this Agreement shall not become effective until approved by the City Council of the City of Jersey City.  Accordingly, the City shall deliver to the Port Authority and JCEDC a certified copy of any ordinance or resolution of the City Council, approved as to form by its Corporation Counsel, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereunder, within ten (10) days after its effective date or the execution of this Agreement, whichever is later.

(b)  The parties further agree that this Agreement shall not become effective until approved by the Board of Commissioners of the Port Authority and until the appropriate authorizations and certifications are made by the Board of Commissioners of the Port Authority, including those which are required in fulfillment of covenants with bondholders and applicable law prior to the issuance of Port Authority Consolidated Bonds.  Accordingly, the

Port Authority shall deliver to the City and JCEDC a certified copy of any such resolution of the Board of Commissioners of the Port Authority, authorizing the execution of this Agreement and the consummation of transactions contemplated hereunder, within ten (10) days after the effective date of such resolution or the execution of this Agreement, whichever is later.

(c)  The parties further agree that this Agreement shall not become effective until approved by the Board of Directors of the JCEDC.  Accordingly, the JCEDC shall deliver to the Port Authority and the City a certified copy of the resolution of its Board of Directors approving this Agreement and authorizing its execution and the consummation of transactions contemplated hereunder, which resolution shall be delivered within ten (10) days after the effective date thereof or the execution of this Agreement, whichever is later.

Section 12.07  This agreement shall be binding upon the parties and their legal representatives, successors and assigns.

IN WITNESS WHEREOF, the undersigned have caused their duly authorized representatives to execute this Agreement as of the date first above written.

Attest:

City Clerk

Attest:

Secretary

Attest:

Sheila Thompson
Secretary

City of Jersey City

Anthony R. Cucci, Mayor

The Port Authority of
New York and New Jersey

Stephen Berger
Executive Director

Jersey City Economic
Development Corporation

Thomas D. Ahern
Executive Director

20





THE PORT AUTHORITY OF NEW YORK & NEW JERSEY

PORT AUTHORITY MARINE TERMINAL

DATE

EXHIBIT

A





EXHIBIT

C

THE PORT AUTHORITY OF
NEW YORK & NEW JERSEY

PORT AUTHORITY
MARINE TERMINAL

DATE:

EXHIBIT D

THIS DEED, made of this          day of          , 1988,
between THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, a body
corporate and politic, established by Compact between the States
of New York and New Jersey, with the consent of the Congress of
the United States, having its principal office at One World Trade
Center, New York, New York 10048, hereinafter referred to as
"Grantor," and the JERSEY CITY ECONOMIC DEVELOPMENT CORPORATION,
a non-profit corporation of the State of New Jersey, having its
principal office at 601 Pavonia Avenue, Jersey City, New Jersey
07306, herewith referred to as "Grantee".

WITNESSETH, that Grantor for and in consideration of
Three Million Dollars ($3,000,000.00) lawful money of the United
States of America, to be paid and satisfied by Grantee in the
manner specified in a certain unrecorded Agreement heretofore
entered into between the parties hereto and the City of Jersey
City, dated          , 1988, hereinafter referred to as the
"Agreement," and other good and valuable consideration, has
given, granted, bargained, sold and conveyed and by these
presents does give, grant, bargain, sell and convey unto Grantee
and to its successors and assigns forever, all right, title and
interest of Grantor in and to:

All that tract or parcel of land situate, lying and
being in the City of Jersey City, County of Hudson and State of
New Jersey, more particularly described as follows:

BEGINNING at a point formed by the intersection of
the northeasterly line of lands of The Port Authority of New
York and New Jersey with the southerly line of lands of the
New Jersey Turnpike Newark Bay Hudson County Extension, said
point being further described as the northwesterly corner of
a certain Tract I of land conveyed to The Port Authority of
New York and New Jersey by The Penn Central Corporation et
al. by deed dated December 30, 1981 and recorded in the
Hudson County Register's Office on December 31, 1981 in Deed
Book 3339 at page 328 et seq. and having coordinates in the
New Jersey State Plane Coordinate system of North
675,326.297 feet and East 2,159,090.583 feet and running the
following sixteen (16) courses and distances along said
northeasterly line of the lands of The Port Authority of New
York and New Jersey:

1. S64°-58'-06"E 211.05 feet to a point; thence

2. S24°-41'-14"W 20.34 feet to a point; thence

3. S65°-18'-46"E 224.65 feet to a point; thence

4. N24°-41'-14"E 20.34 feet to a point; thence

5. S65°-18'-46"E 44.54 feet to a point of curvature; thence

6. Along the arc of a circle curving to the left having a radius of 1702.04 feet, a central angle of 13°-24'-55" and an arc length of 398.52 feet to a point of tangency; thence

7. S78°-43'-41"E 459.25 feet to a point of curvature; thence

8. Along the arc of a circle curving to the right having a radius of 4026.45 feet, a central angle of 7°-57'-40" and an arc length of 559.47 feet to a point of tangency; thence

9. S70°-46'-01"E 155.97 feet to a point of curvature; thence

10. Along the arc of a circle curving to the right having a radius of 1307.44 feet, a central angle of 15°-38'-05" and an arc length of 356.77 feet to a point of tangency; thence

11. S55°-07'-56"E 150.75 feet to a point of curvature; thence

12. Along the arc of a circle curving to the right having a radius of 649.35 feet, a central angle of 6°-43'-25" and an arc length of 76.20 feet to a point of tangency; thence

13. S48°-24'-31"E 138.46 feet to a point of curvature; thence

14. Along the arc of a circle curving to the left having a radius of 1305.57 feet, a central angle of 8°-22'-55" and an arc length of 191.00 feet to a point of tangency; thence

15. S56°-47'-26"E 299.30 feet to a point of curvature; thence

16. Along the arc of a circle curving to the right having a radius of 950.64 feet, a central angle of 5°-49'-50" and an arc length of 96.74 feet to a point; thence

17. S31°-29'-14"W 1045.06 feet across the lands of The Port Authority of New York and New Jersey to a point in the southerly line of said Tract I; thence

18. N37°-52'-05"W 396.53 feet along the southerly line of said Tract I to a point; thence

19. N56°-11'-52"W 989.31 feet still along the southerly line of said Tract I to a point; thence

20. N33°-48'-08"E 0.37 feet still along the southerly line of said Tract I to a point; thence

21. N58°-20'-45"W 512.60 feet still along the southerly line of said Tract I to a point in the northeasterly line of lands conveyed by the United New Jersey Railroad and Canal Company to Fairview Terminal, Inc. by deed dated September 6, 1968 and recorded in the Hudson County Register's Office on May 8, 1981 in Deed Book 3322 at page 294 and another dated October 4, 1961 and recorded in the Hudson County Register's Office on June 6, 1962 in Deed Book 2905 at page 422; thence the following eight (8) courses and distances along said northeasterly line:

22. N31°-39'-15"E 5.28 feet to a point; thence

23. N38°-57'-45"W 265.07 feet to a point of curvature; thence

24. Along the arc of a circle curving to the left having a radius of 886.35 feet, a central angle of 14°-29'-30" and an arc length of 224.18 feet to a point of tangency; thence

25. N53°-27'-15"W 40.39 feet to a point of curvature; thence

26. Along the arc of a circle curving to the left having a radius of 836.35 feet, a central angle of 4°-53'-30" and an arc length of 71.40 feet to a point of tangency; thence

27. N58°-20'-45"W 36.81 feet to a point; thence

28. N31°-39'-15"E 17.28 feet to a point; thence

29. N58°-20'-45"W 307.16 feet to a point of curvature of a nontangent curve to which point a radial line bears S75°-44'-44"E and the northeast corner of a certain parcel of land designated as R5A on a map entitled: "New Jersey Department of Transportation, ENTIRE TRACT MAP, Route 185 (1953) Section 1, Harbor Drive to Caven Point Road, Showing Existing Right of Way and Parcels To Be Acquired in The City of Jersey City, County of Hudson, Scale:  As indicated, July 1977"; thence

30. Along the arc of a circle curving to the right having a radius of 175.00 feet, a central angle of 6°-25'-03" and an arc length of 19.60 feet and along the easterly line of Parcel R5A to a point of compound curvature; thence

31. Along the arc of a circle curving to the right having a radius of 475.00 feet, a central angle of 46°-37'-38" and an arc length of 386.55 feet partially along the easterly line of Parcel R5A and partially through the lands of The Port Authority of New York and New Jersey to a point of tangency; thence

32. S67°-17'-56"W 248.12 feet still through the lands of The Port Authority of New York and New Jersey to a point; thence

33. N22°-42'-04"W 50.00 feet still through the lands of The Port Authority of New York and New Jersey to a point in the lands of the State of New Jersey

34. N67°-17'-56"E 248.12 feet along the lands of the State of New Jersey to a point of curvature; thence

35. Along the arc of a circle curving to the left having a radius of 425.00 feet, a central angle of 31°-31'-38" and an arc length of 233.86 feet and along the lands of the State of New Jersey to a point of curvature in the southerly line of said parcel R5A; thence

36. Continuing along the arc of the same circle recited in course 35 curving to the left having a radius of 425.00 feet, a central angle of 15°-06'-00" and an arc length of 112.01 feet and through the lands of the State of New Jersey to the beginning point of a nontangent curve to which beginning of curve a radial line bears S77°-06'-49"E; thence

37. Along the arc of a circle curving to the left having a radius of 150.00 feet, a central angle of 12°-01'-11" and an arc length of 31.47 feet and still through the lands of the State of New Jersey to a point of curvature and a point in the southerly line of said Tract I conveyed to The Port Authority of New York and New Jersey; thence

38. Continuing along the arc of the same curve recited in course 37 curving to the left having a radius of 150.00 feet, central angle of 32°-51'-23" and an arc length of 86.02 feet and along the southerly line of said Tract I to the terminus of the curve to which terminus a radial line bears N58°-00'-37"E; thence

39. N36°-55'-27"W 181.94 feet still along the southerly line of said Tract I to a point; thence

40. N73°-35'-36"W 236.62 feet still along the southerly line of said Tract I to a point of curvature of a nontangent curve to which point a radial line bears S19°-01'-04"W; thence

41. Along the arc of a circle curving to the right having a radius of 210.00 feet, a central angle of 19°-22'-32" and an arc length of 71.01 feet still along the southerly line of said Tract I to another point of curvature in the southerly line of lands of the New Jersey Turnpike Newark Bay Hudson County extension and to which point a radial line bears S13°-43'-36"E; thence

42. Along the arc of a circle curving to the left having a radius of 2830.00 feet, a central 0°-35'-11" and an arc length of 28.96 feet and along said southerly line of the New Jersey Turnpike to a point; thence

43. N22°-02'-51"W 53.50 feet still along the southerly line of the New Jersey Turnpike to a point of curvature of a nontangent curve to which point a radial line bears S14°-09'-52"E; thence

44. Along the arc of a circle curving to the left having a radius of 2777.00 feet, a central angle 2°-36'-37" and an arc length of 126.51 feet and still along the southerly line of the New Jersey Turnpike to a point to which a radial line bears S16°-46'-28"E; thence

45. N16°-46'-28"W 5.00 feet along said radial line and along the southerly line of the New Jersey Turnpike to a point of curvature of a nontangent curve; thence

46. Along the arc of a circle curving to the left having a radius of 2772.00 feet, a central angle of 1°-10'-56" and an arc length of 57.19 feet to the point and place of beginning.

EXCLUDING therefrom the following described parcel of property:

Beginning at a point formed by the intersection of the division line between the lands of the State of New Jersey and said Tract I with the westerly line of lands now or formerly of Fairview Terminal, Inc., said point being further described as the northeast corner of said Parcel R5A and running:

1. Southerly along said westerly line of lands now or formerly of Fairview Terminal, Inc. and along the arc of a circle curving to the right having a radius of 175.00 feet, a central angle of 6°-25'-03" and an arc length of 19.60 feet to a point of compound curvature; thence

2. Southerly still along said westerly line and along the arc of a circle curving to the right having a radius of 475.00 feet, a central angle of 14°-39'-57" and an arc length of 121.58 feet to a point in the northerly line of a certain Tract IV of land conveyed to The Port Authority of New York and New Jersey by the Penn Central Corporation et al. by deed dated December 30, 1981 and recorded in the Hudson County Register's Office on December 31, 1981 in Deed Book 3339 at page 337 et seq.; thence

3. N58°-20'-45"W 50.12 feet along the northerly line of said Tract IV to a point of curvature of a nontangent curve, to which point a radial line bears S54°-13'-42"E; thence

4. Along the arc of a circle curving to the left having a radius of 425.00 feet, a central angle of 15°-06'-00" and an arc length of 112.01 feet to the beginning of a nontangent curve to which beginning of curve a radial line bears S77°-06'-49"E; thence

5. Along the arc of a circle curving to the left having a radius of 150.00 feet, a central angle of 12°-01'-11" and an arc length of 31.47 feet to a point in the southerly line of said Tract I; thence

6. S58°-20'-45"E 57.45 feet along said southerly line of Tract I to the point and place of beginning.

BEING a portion of the premises conveyed to Grantor by deed from The Penn Central Corporation and The United New Jersey Railroad and Canal Company dated December 30, 1981 and recorded in the office of the Hudson County Register on December 31, 1981, in Deed Book 3339, at page 328 etc.

RESERVING to Grantor, its successors and assigns, a permanent and perpetual easement over and upon the above-described premises for ingress and egress, with men and vehicles, to and from Industrial Drive and Grantor's real property abutting said premises, which easement shall be for the benefit of Grantor and Grantor's tenants, and their respective agents, servants, licensees and invitees; provided, however, that such easement shall terminate at such time as Colony Road shall be extended northerly to provide direct access to Grantor's said real property and such extension thereof shall be dedicated to public use by duly adopted ordinances, but in no event later than one year after Grantee has provided the property interests for the extension of Colony Road.

By acceptance of delivery of this Deed, Grantee covenants that the premises hereby conveyed shall be used solely for the development and operation of an industrial park and for no other purpose whatsoever and shall at no time be used in a manner which unreasonably interferes with or hinders the operation of Grantor's Jersey City marine terminal facilities. This covenant shall be deemed to run with the land and shall be binding upon Grantee, its successors and assigns.

The within conveyance is subject to a condition that in the event that Grantee shall fail to award bona fide contracts for the design and construction of improvements within the above-described premises in an aggregate amount of at least One Million Dollars ($1,000,000) within two (2) years after the Effective Date of the Agreement, Grantor shall have the right to terminate the within conveyance and to re-enter the premises and Grantee

shall, if so requested by Grantor, deliver to Grantor a deed
reconveying said real property to Grantor, title to be subject
only to those encumbrances affecting the property at the time the
within deed was delivered.

TOGETHER with all and singular and buildings,
improvements, ways, woods, waters, watercourses, rights,
liberties, privileges, hereditaments and appurtenances to the
same belonging or in anywise appertaining, and the reversion and
reversions, remainder and remainders, rents, issues and profits
thereof, and of every part and parcel thereof.

AND ALSO all the estate, right, title, interest, use,
possession, property, claim and demand whatsoever, of the Grantor
both in law and in equity, of, in and to the premises herein
described, and every part and parcel thereof, with the
appurtenances.

TO HAVE AND TO HOLD all and singular, the premises
herein described, together with the appurtenances, but subject to
the reservation, covenant and condition hereinabove set forth,
unto the Grantee and to Grantee's proper use and benefit forever.

IN WITNESS WHEREOF, the Grantor has caused these
presents to be signed and attested by its proper corporate
officers and its corporate seal to be hereto affixed and the day
and year above written.

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY

BY: _____

TITLE: _____

ATTEST

BY: _____

TITLE: _____

# EXHIBIT D

### AGREEMENT FOR THE VOLUNTARY
### PAYMENT IN LIEU OF TAXES (PILOT) BETWEEN
### THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
### AND THE CITY OF JERSEY CITY

**THIS AGREEMENT** is made as of ___March___ 1X, 2012, between **THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY**, a body corporate and politic created by Compact between the States of New York and New Jersey with the consent of the Congress of the United States of America and having its principal executive office at 225 Park Avenue South, in the City, County and State of New York (hereinafter referred to as the "Port Authority") and **THE CITY OF JERSEY CITY**, a municipal corporation in the County of Hudson, State of New Jersey and organized under and existing by virtue of, the laws of the State of New Jersey, having its principal office located at 280 Grove Street, Jersey City, New Jersey (hereinafter referred to as the "City"). Collectively, throughout this agreement, the Port Authority and the City shall be referred to as the "Parties."

### WITNESSETH

**NOW THEREFORE,** the parties hereto for themselves, their successors and assigns mutually undertake, covenant and agree as follows:

I.   **GENERAL**

1.01   Governing Law

This Agreement shall be construed and enforced in accordance with the laws of the State of New Jersey and shall be governed by the provisions of (a) N.J.S.A., 32:1-35.52, (b) N.J.S.A. 32:1-35.60, N.J.S.A. 32:1-144, et seq, and (c) Ordinance No.11-122 pursuant to which the Municipal Council approved the Payments in Lieu of Taxes, and authorized the execution of this Agreement.

1.02   General Definitions

Unless specifically provided otherwise or the context otherwise requires, the following terms when used in this Agreement shall mean:

a.   Payments in Lieu of Taxes or PILOT – The amount the Port Authority has agreed to pay the City hereof which sum is in lieu of any taxes on the Improvements and the Land, including but not limited to any special assessments, added and or omitted assessments or property taxes of whatsoever kind which amount, if applicable, shall be pro-rated in the year in which the Payments in Lieu of Taxes terminate.

b.  Payments in Lieu of Taxes Commencement Date – The Payments in Lieu of Taxes Commencement Date shall be January 1, 2011

c.  City – The City of Jersey City.

d.  Default – Shall be a breach of or the failure of the Port Authority to perform any obligation imposed upon the Entity by the terms of this Agreement beyond any applicable grace or cure periods after written notice of such failure.

e.  Improvements – Any building, structure, improvements, or fixture permanently affixed to the Land for which property taxes are routinely assessed.

f.  Land - The subject property more particularly described as Block 1514.C, Lots 301 and 302, Block 1514.D Lots 401 and 402, Block 1514.C Lot 302.DUP consisting of an area of 56.99 acres and the portion of Port Jersey Boulevard vacated by Ordinance 11-123 consisting of approximately 13.06 acres.

g.  Law – Law shall refer to N.J.S.A. 32:1-35.52, N.J.S.A. 32:1-35.60, N.J.S.A. 32:1-144, et seq., and Ordinance No. 11-122 which authorized the execution of this Agreement and all other relevant Federal, State or City statutes, ordinances, resolutions, rules and/or regulations.

h.  Ordinance – Ordinance No. 11-122 adopted by the Municipal Council of the City on October 12, 2011, attached hereto as Exhibit A, authorizing and accepting this PILOT Agreement pursuant to the authority set forth in N.J.S.A. 32:1-145.

i.  Project – The Land and Improvements thereon which are the subject of this Agreement.

j.  Termination – Any action or omission which by operation of the terms of this PILOT Agreement shall cause this PILOT Agreement to be terminated.

1.03    Exhibits Incorporated

All exhibits referred to in this PILOT Agreement and attached hereto are incorporated herein and made part hereof.

## II.    DURATION OF AGREEMENT

2.01    Term

It is understood and agreed by the parties that this Agreement, including the obligation to pay Payments in Lieu of Taxes and the tax exemption granted hereof, shall remain in effect during the period of usefulness of the Project and unless modified in accordance with section 3.06 below, shall continue in force only while fee title to the Project is owned by the Port Authority or any other agent, corporation, association or other entity formed by or contracting with the Port Authority.

2

2.02      Implementation of exemption & Filing with NJ DLGS

The City Clerk shall deliver to the City Tax Assessor a certified copy of the Ordinance No.11-122 adopted by the Municipal Council implementing the PILOT described herein however, the parties acknowledge and agree that the basis of the tax exemption is statutory and not dependent upon the adoption of the Ordinance. The Tax Assessor shall implement the exemption and continue to enforce that exemption without further documentation until the expiration of the entitlement to exemption by the terms of this PILOT Agreement.

Further, upon the adoption of this PILOT Agreement, a certified copy of Ordinance No. 11-122 adopted by the Municipal Council approving the tax exemption described herein and this PILOT Agreement shall forthwith be transmitted to the Director of the Division of Local Government Services by the City Clerk.

## III.     PAYMENTS IN LIEU OF TAXES (PILOT)

3.01      Commencement of PILOT

In consideration of the tax exemption, the Port Authority shall make payment of the PILOT commencing on the PILOT Commencement Date. In the event that the Port Authority fails to timely pay any installment due, the amount past due shall bear interest permitted under applicable New Jersey law then being assessed by the City against other delinquent taxpayers in the case of unpaid taxes or tax liens on the land until paid.

3.02      Payment of PILOT

The Port Authority shall pay to the City the PILOT (as calculated in Section 3.03 of this Article), within ten (10) days of their due dates. The PILOT shall be paid to the City on a semi-annual basis, with the first half payment due on January 1 and the second half payment due on July 1 of each year the PILOT payments are due. The PILOT shall be prorated in the year in which it terminates.

Each said payment shall be made to the Treasurer of the City of Jersey City. Checks shall be made payable to his/her order. Said payments shall be devoted by the City solely to purposes to which taxes may be applied, unless and until otherwise directed by the law of the State of New Jersey. The City shall forward to the County and School Board that amount which represents those entities' portion of the PILOT payments.

3

3.03     Calculation of the PILOT

The Parties agree, acknowledge and stipulate that the PILOT sums payable pursuant to this Agreement are fair and reasonable.[1]

The Port Authority agrees to pay to the City for the year 2011 and for each calendar year thereafter for so long as the Port Authority shall own the premises described in Exhibit "A" attached hereto and the City agrees to accept as an annual payment pursuant to the aforesaid statutes, in lieu of any and all City taxes and assessments on the premises, the sum of **$1,360,030.10**[2] per year which includes the land area of 56.99 acres of land and improvements **$1,106,468.50** and 13.06 acres of Port Jersey Boulevard **$253,561.65** which is to be vacated by the City.  This amount shall be reduced in the first year by any tax payments the Port Authority has made to the City for 2011.  Attached as Exhibit B is a list of tax payments made by the Port Authority to the City for which the Port Authority shall receive a credit towards the PILOT payments for 2011.

The PILOT amount shall be determined using the 2010 property tax year throughout the term of the PILOT without any increases or augmentation of any kind.

3.04     Exemption

For each year, from the date of acquisition by the Port Authority, and thereafter for as long as the Port Authority shall own the Land, the City will cancel upon its tax records all items entered thereon for taxes, assessments and interest against the property comprising the aforesaid premises and for each such year the City will mark the said property exempt on its tax records with a notation that such entry is made in accordance with this Agreement.  For purposes of this PILOT, taxable amounts shall be frozen as of 2010.

3.05     Semi-annual Installments PILOT

The PILOT shall be paid to the City on a semi-annual basis, with the first half payment due on January 1 and the second half payment due on July 1 of each year PILOT payments are due.

3.06     Reservation of Rights to Renegotiate PILOT agreement

The Port Authority reserves the right to renegotiate this PILOT agreement in the event the Legislature modifies and/or amends in any manner, including but not

---

[1] The calculations under this pilot are for the year 2010 and includes the Local Jersey City Tax, County of Hudson Tax, Jersey City School District Tax and School Debt Service tax.
[2] $253,561.65 of the $1,360,030.10 in the first year shall be pro-rated to the date when Port Jersey Boulevard is officially and fully vacated and title has reverted to the Port Authority.

limited to the calculation, methodology or source of funding for any service for which the Local, County and or School taxes are based which results in a diminishment in taxes otherwise conventionally chargeable from 2010 amounts. The Port Authority shall first give written notice to the City of its intention to renegotiate this PILOT Agreement. In the event of such renegotiation, the new PILOT amount shall be pro-rated from date of notice from the Port Authority.

## IV.   REMEDIES

### 4.01      Remedies for Non-Payment by the Entity

In the event of a Default on the part of the Port Authority to pay any installment of the PILOT Amount required by this agreement, the City's sole recourse is and shall be to seek specific performance of the terms of this agreement.  No other action by the City is or shall be permitted in the event of Default on the part of the Port Authority and no tort or contract claim for any other element or quantum of damages shall be asserted against the Port Authority and the City hereby waives any such causes of action against the Port Authority, its commissioners, directors, representatives, employees and agents.

## V.    PROPERTY INTERESTS

### 5.01.     Leasehold Transfers,

Notwithstanding anything to the contrary contained in this Agreement, the City acknowledges that any assignment, conveyance, mortgage or other transfer of Port Authority's interest in the subject property, Lease and any sublease or other use and/or occupancy agreement with respect to any portion of the Land and/or Improvements entered into by Port Authority shall not be deemed or construed to violate this Agreement or result in a Termination.

### 5.02      Subordination of Fee Title

It is expressly understood and agreed that the Port Authority has the right to encumber and/or assign the fee title to the Land and/or Improvements for the sole purpose of obtaining financing for use in the Project, and that any such encumbrance or assignment shall not be deemed to be a violation of this Agreement.

## VI.   WAIVER

### 6.01   No Waiver

Nothing contained in this PILOT Agreement or otherwise shall constitute a waiver or relinquishment by the City or the Port Authority of any non-tax rights and remedies provided by the law except as expressly set forth in this Agreement.

## VII.   NOTICE

### 7.01   Notice

Any notice required hereunder to be sent by any party to another party shall be sent to all other parties hereto simultaneously by certified or registered mail, return receipt requested, as follows:

When sent to the Port Authority, it shall be sent to the following address (or to such other address as Port Authority or its successor in interest under the Lease may specify from time to time):

> **Port Authority of New York & New Jersey**
> **225 Park Avenue South, 14th Floor**
> **New York, New York 10003**
> **Attn: General Counsel**

When sent to the City, it shall be addressed to:

> **Jersey City, City Hall,**
> **280 Grove Street,**
> **Jersey City, New Jersey 07302,**
> **Attn: City Clerk**

With copies sent to the **Business Administrator** and **Corporation Counsel** of the City unless prior to the giving of notice the City shall have notified the Port Authority otherwise. The notice to the City shall identify the subject with the tax account numbers of the tax parcels comprising the Land.

## VIII.   DEFAULT

### 8.01   Default

Default shall be the failure of the Port Authority to conform to the terms of this Agreement beyond any applicable notice, cure or grace period.

## IX.    TERMINATION

### 9.01        Conventional Taxes

Upon Termination or expiration of this Agreement, the Parties hereto may agree to enter a new PILOT Agreement to replace this Agreement.

## X.    MISCELLANEOUS

All of the following provisions shall continue from the date of execution and survive the term of this agreement or any termination thereof.

### 10.01    Conflict

The parties agree that in the event of a conflict between any other terms or conditions of any document or other agreement and this PILOT Agreement, the language in this PILOT Agreement shall govern and prevail as to the specific matters covered herein.

### 10.02    Oral Representations

There have been no oral representations made by either of the parties hereto which are not contained in this PILOT Agreement.    This PILOT Agreement is entire agreement between the parties and there shall be no modifications thereto other than by a written instrument executed by the parties hereto and delivered to each of them.

### 10.03    Entire Document

All conditions in the Ordinance of the City Council approving this Agreement, annexed hereto as Exhibit A are incorporated in this Agreement and made a part hereof

### 10.04    Good Faith

In their dealings with each other, the parties agree that they have and shall act in good faith throughout the negotiation of this agreement.

### 10.06    Municipal Services

The Port Authority shall make payments for any municipal services not within the scope of property taxes, including water and sewer charges if applicable and any services that create a lien on parity with or superior to the lien for the Annual Service Charges, as required by law.  Nothing herein is intended to release Port Authority from its obligation to make such payments.

10.07     Counterparts

This Agreement may be simultaneously executed in counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

10.08     Amendments

This Agreement may not be amended, changed, modified, altered or terminated without the written consent of the parties hereto.

10.09     No Third Party Rights:

Nothing contained herein is intended, nor shall be construed, to create any rights of any kind whatsoever in third persons not parties to this Agreement.

10.10     No Individual Liability:

Neither the Commissioners of the Port Authority nor any individual officer or official of the Port Authority or the City, nor any agent or employee of either of the Parties hereto shall be charged personally by any of the others with any liability nor held liable to either of the Parties hereto under any term, provision or paragraph of this Agreement or because of its execution or attempted execution or because of any breach hereof.

10.11     Captions Not Binding:

The captions in this agreement are inserted for reference only and in no way define, describe or limit the scope or intent of this Agreement or of any of the provisions hereof

10.12     Severability.

If any term or provision of this agreement or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this agreement shall be valid and enforced to the fullest extent permitted by Law.

10.13     Procedural defects

If any defect in any procedural or public notice requirements or any other defect in the process required for the approval of this transaction is brought to the attention of either party, both parties agree to take any and all steps necessary to immediately correct the procedural deficiency to appropriately authorize the transaction contemplated hereby and effectuate the transaction.

8

10.14    <u>Construction</u>

The parties have participated jointly in the negotiation and drafting of this agreement. Consequently, in the event an ambiguity or question of intent or interpretation arises, this agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring and disfavoring any party by virtue of the authorship of any provision of this agreement.  When the context requires the gender of all words used herein includes the masculine, feminine and neuter, and the number of all words includes the singular and plural.  The terms "hereto," "herein," or "hereunder" refer to this agreement as a whole and not to any particular Article or Section hereof unless otherwise specified, all references to specific Articles, Sections, Schedules or Exhibits are deemed references to the corresponding Articles, Sections, Schedules and Exhibits in, to and of this agreement.

**IN WITNESS WHEREOF**, each party hereto has caused this Agreement to be duly executed on its behalf on the date and year first above written.

WITNESS:                                                     THE CITY OF JERSEY CITY

_____                     _____
ROBERT BYRNE, RMC                              JOHN KELLY, BUSINESS
                                                                     ADMINISTRATOR

WITNESS:                                                     PORT AUTHORITY OF NEW YORK &
                                                                     NEW JERSEY

_____                     _____
                                                                     EXECUTIVE DIRECTOR

| Port Authority Use Only: | |
| --- | --- |
| Approval as to Terms: | Approval as to Form: |
| | |

9



(Port Authority Acknowledgment)

STATE OF NEW YORK     )
                                )ss.:
COUNTY OF NEW YORK  )

On the 18th day of May , 2012 before me, the undersigned, a Notary Public in and for said state, personally appeared PATRICK J. FOYE personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged that he executed the same in his capacity as EXECUTIVE DIRECTOR for the Port Authority of New York and New Jersey, and that by his signature on the instrument, the individual, or the corporation upon behalf of which the individual acted, executed the instrument.

_____
(Signature of Notary Public)

DARRELL BUCHBINDER
Notary Public, State of New York
No. 06BU5475
Qualified in Westchester County
Commission Expires on April 30, 20__

(City of Jersey City Acknowledgment)

STATE OF                )
                         )ss.:
COUNTY OF HUDSON   )

On the 28th day of March , 2012 before me, the undersigned, a Notary Public in and for said state, personally appeared Robert Byrne/John Kelly personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged that he executed the same in his capacity as a City Clerk/Business Admin of the City of Jersey City and that by his signature on the instrument, the individual, or the corporation upon behalf of which the individual acted, executed the instrument.

```
SEAN J. GALLAGHER
NOTARY PUBLIC OF NEW JERSEY
I.D. # 2212707
Commission Expires 4/30/2013
```

Sean J. Gallagher
_____
(Signature of Notary Public)

DARRELL BUCHSINGER
Notary Public, State of New York
No. 60-0475475
Qualified in Westchester County
Commission Expires on April 30, 20__



SEAN L. GALLAGHER
NOTARY PUBLIC OF NEW JERSEY
I.D. # 2437247
Commission Expires 10/4/2015

EXHIBIT A

(Ordinance No. 11-122 adopted by the Municipal Council of the City on October 12, 2011)

City Clerk File No. **Ord. 11-122**

Agenda No. **3.G** 1st Reading

Agenda No. **4.5F** 2nd Reading & Final Passage



# ORDINANCE
# OF
# JERSEY CITY, N.J.

COUNCIL AS A WHOLE
offered and moved adoption of the following ordinance:

CERTIFIED to be a true copy of ORDINANCE adopted by the Municipal Council of the city of Jersey City at its meeting of **OCT 26 2011**

CITY ORDINANCE 11-122

CITY CLERK

TITLE: ORDINANCE AUTHORIZING THE EXECUTION OF AN AGREEMENT WITH THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY PERTAINING TO A MARINE TERMINAL ON THE PORT JERSEY BOULEVARD, PURSUANT TO ~~N.J.S.A. 32:1-35.31 AND~~ N.J.S.A. 32:1-144

THE MUNICIPAL COUNCIL OF THE CITY OF JERSEY CITY DOES ORDAIN:

WHEREAS, the Port Authority of New York and New Jersey is undertaking the construction of a Marine Terminal in the Port Jersey area of the City of Jersey City, more particularly described on a map attached hereto; and

~~WHEREAS, pursuant to N.J.S.A. 32:1-35.31 the Port Authority of New York and New Jersey may not use or acquire any municipally owned real property interest, including property already devoted to a public use, for Marine Terminal purposes without the consent of the municipality; and~~

WHEREAS, the Port Authority of New York and New Jersey has acquired certain real property in Jersey City, more particularly described as Block 1514.C, Lots 301 and 302; and Block 1514.D, Lots 401 and 402, *Block 1514.C, Lot 302DUP*, which property was traversed by a dedicated public right of way or street, known as a portion of Port Jersey Boulevard and more particularly described in a street vacation ordinance adopted on even date; and

WHEREAS, the Port Authority of New York and New Jersey has determined that the property, including a portion of Port Jersey Boulevard, is necessary, convenient or desirable for Marine terminal purposes; and

~~WHEREAS, pursuant to N.J.S.A. 32:1-35.31 in order to obtain the City's consent for the acquisition of its property, a portion of Port Jersey Boulevard, through the adoption of a street vacation the Port Authority of New York and New Jersey has agreed to pay the City an annual fee; and~~

WHEREAS, pursuant to N.J.S.A. 32:1-144, to insure that the City does not suffer undue loss of taxes or assessments, due to the acquisition of non City owned Marine Terminal property, the Port Authority of New York and New Jersey has agreed to pay the City a fair and reasonable annual payment; and

WHEREAS, the City of Jersey City is willing to enter into an agreement whereby, the Port Authority of New York and New Jersey will pay the City total sum of $1,360,030.

NOW, THEREFORE, BE IT ORDAINED, by the Municipal Council of the City of Jersey City that:

1.  the Mayor or Business Administrator is authorized to execute an agreement whereby the Port Authority of New York and New Jersey will pay the City the annual sum of $1,360,030 in consideration of the City's consent to the acquisition of a portion of Port Jersey Boulevard and an amount attributable to the loss of taxes and assessments arising from the acquisition

ORDINANCE AUTHORIZING THE EXECUTION OF AN AGREEMENT WITH THE PORT
AUTHORITY OF NEW YORK AND NEW JERSEY PERTAINING TO A MARINE TERMINAL ON
THE PORT JERSEY BOULEVARD, PURSUANT TO N.J.S.A. 32:1-35.31 AND N.J.S.A. 32:1-144

of the above described non municipal property for use as a Marine Terminal, all in
accordance with N.J.S.A. 32:1-35.31 and N.J.S.A. 32:1-144 and any other documents
appropriate or necessary to effectuate the purposes of the within ordinance.

2.       The agreement shall be in substantially the form attached, subject to such minor modification
as the Business Administrator or Corporation Counsel deems appropriate or necessary.

A.       All Ordinances and parts of Ordinances inconsistent herewith are hereby repealed.

B.       This Ordinance shall be a part of the Jersey City Code as though codified and fully set forth
therein. The City Clerk shall have this ordinance codified and incorporated in the official copies of
the Jersey City Code.

C.       This Ordinance shall take effect at the time and in the manner as provided by law
but in no event prior to the adoption of the Ordinance approving the Morris Canal Redevelopment
Plan.

D.       The City Clerk and the Corporation Counsel be and they are hereby authorized and directed
to change any chapter numbers, article numbers and section numbers in the event that the
codification of this Ordinance reveals that there is a conflict between those numbers and the existing
code, in order to avoid confusion and possible accidental repealers of existing provisions.

NOTE:       All material is new; therefore, underlining has been omitted.
            For purposes of advertising only, new matter is indicated by **bold face**
            and repealed matter by *italic*.

JM/he
9/21/11

APPROVED AS TO LEGAL FORM

_____
          Corporation Counsel

Certification Required   ☐
Not Required             ☐

APPROVED: _____

APPROVED: _____
                   Business Administrator

# Ordinance of the City of Jersey City, N.J.

ORDINANCE NO.    Ord 11-122

3.G.  SEP 27 2011        4.F.  OCT 12 2011

TITLE:



Ordinance authorizing the execution of an agreement
with the Port Authority of New York and New Jersey
pertaining to a marine terminal on the Port Jersey
Boulevard, pursuant to ~~N.J.S.A 32:1-35.31~~ and N.J.S.A
32:1-144.

### RECORD OF COUNCIL VOTE ON INTRODUCTION   SEP 27 2011   9-0

| COUNCILPERSON | AYE | NAY | N.V. | COUNCILPERSON | AYE | NAY | N.V. | COUNCILPERSON | AYE | NAY | N.V. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SOTTOLANO | ✓ | | | GAUGHAN | ✓ | | | BRENNAN | ✓ | | |
| DONNELLY | ✓ | | | FULOP | ✓ | | | AHMAD | ✓ | | |
| LOPEZ | ✓ | | | RICHARDSON | ✓ | | | VELAZQUEZ | ✓ | | |

✓ Indicates Vote     N.V.–Not Voting (Abstain)

### RECORD OF COUNCIL VOTE TO CLOSE PUBLIC HEARING   OCT 12 2011   9-0

Councilperson  SOTTOLANO  moved, seconded by Councilperson  BRENNAN  to close P.H.

| COUNCILPERSON | AYE | NAY | N.V. | COUNCILPERSON | AYE | NAY | N.V. | COUNCILPERSON | AYE | NAY | N.V. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SOTTOLANO | ✓ | | | GAUGHAN | | | | BRENNAN | ✓ | | |
| DONNELLY | ✓ | | | FULOP | ✓ | | | AHMAD | ✓ | | |
| LOPEZ | ✓ | | | RICHARDSON | | | | VELAZQUEZ | ✓ | | |

✓ Indicates Vote   YVONNE BALCER     N.V.–Not Voting (Abstain)
ESTHER WINTNER

### RECORD OF COUNCIL VOTE ON AMENDMENTS, IF ANY   OCT 12 2011

Councilperson  FULOP  moved to amend* Ordinance, seconded by Councilperson  SOTTOLANO  & adopted  9-0

| COUNCILPERSON | AYE | NAY | N.V. | COUNCILPERSON | AYE | NAY | N.V. | COUNCILPERSON | AYE | NAY | N.V. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SOTTOLANO | ✓ | | | GAUGHAN | ✓ | | | BRENNAN | ✓ | | |
| DONNELLY | ✓ | | | FULOP | ✓ | | | AHMAD | ✓ | | |
| LOPEZ | ✓ | | | RICHARDSON | | | | VELAZQUEZ | ✓ | | |

✓ Indicates Vote     N.V.–Not Voting (Abstain)

### RECORD OF FINAL COUNCIL VOTE   OCT 12 2011   9-0

| COUNCILPERSON | AYE | NAY | N.V. | COUNCILPERSON | AYE | NAY | N.V. | COUNCILPERSON | AYE | NAY | N.V. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SOTTOLANO | ✓ | | | GAUGHAN | ✓ | | | BRENNAN | ✓ | | |
| DONNELLY | ✓ | | | FULOP | ✓ | | | AHMAD | ✓ | | |
| LOPEZ | ✓ | | | RICHARDSON | ✓ | | | VELAZQUEZ | ✓ | | |

✓ Indicates Vote     N.V.–Not Voting (Abstain)

Adopted on first reading of the Council of Jersey City, N.J. on _____ SEP 27 2011

Adopted on second and final reading after hearing on _____ OCT 12 2011

This is to certify that the foregoing Ordinance was adopted by
the Municipal Council at its meeting on  OCT 12 2011

Robert Byrne, City Clerk

*Amendment(s):   PAGE 1.
3rd Wheras,
add Block 1514, Lot 302DUP
(in italics)
REMOVE 2nd and 5th WHEREAS
REMOVE NJSA 32:1-35.31 and
from Now, THEREFORE, BE IT ORDAINED
SECTION 1. and title.

APPROVED:

Peter M. Brennan, Council President
Date:  OCT 12 2011

APPROVED:

Jerramiah T. Healy, Mayor
Date  OCT 17 2011

Date to Mayor  OCT 13 2011

EXHIBIT B

Amounts paid by or on behalf of the Port Authority of New York & New Jersey - $394,613.18

# EXHIBIT E

**Brian Platt**

| | |
|---|---|
| **From:** | svanduyne@panynj.gov |
| **Sent:** | Wednesday, October 09, 2013 11:27 AM |
| **To:** | Brian Platt |
| **Subject:** | Freedom of Information Online Request Form |

Thank you for your submission to the Port Authority of New York and New Jersey.

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

1

**THE PORT AUTHORITY** OF NY & NJ

*FOI Administrator*

October 16, 2013

Mr. Brian Platt
Jersey City
280 Grove Street
Jersey City, NJ 07302

Re: Freedom of Information Reference No. 14332

Dear Mr. Platt:

We are in receipt of your October 9, 2013 request for records of The Port Authority of New York and New Jersey for copies of all contracts and/or agreements related to usage of the Greenville Yards by companies/organizations other than the Port Authority. Copies of all proposed plans for usage of the Greenville Yards facilities, including expansions, and requirements to fulfill any of these plans, and the current and forecasted Greenville Yard usage statistics rail traffic passing through, destinations initial start and final end as Greenville Yard is merely a transfer point, along with projected traffic and destinations.

A determination as to the availability of records responsive to your request will be made within twenty (20) business days from the date of this letter. At that time, you will be advised in writing of whether we have located records responsive to your request under the Port Authority's Freedom of Information Code (the "Code", copy enclosed). If additional time is necessary to process your request, you will be advised in writing at that time.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Ann L. Qureshi
FOI Administrator

Enclosure

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642*
*F: 212 435 7555*

**THE PORT AUTHORITY** OF NY & NJ

*FOI Administrator*

November 18, 2013

Mr. Brian Platt
Jersey City
280 Grove Street
Jersey City, NJ  07302

Re:  Freedom of Information Reference No. 14332

Dear Mr. Platt:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of all contracts and/or agreements related to usage of the Greenville Yards by companies/organizations other than the Port Authority.  Copies of all proposed plans for usage of the Greenville Yards facilities, including expansions, and requirements to fulfill any of these plans, and the current and forecasted Greenville Yard usage statistics rail traffic passing through, destinations initial start and final end as Greenville Yard is merely a transfer point, along with projected traffic and destinations.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about the week of December 16, 2013.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642*
*F: 212 435 7555*

**THE PORT AUTHORITY** OF NY & NJ

*FOI Administrator*

December 23, 2013

Mr. Brian Platt
Jersey City
280 Grove Street
Jersey City, NJ  07302

Re:  Freedom of Information Reference No. 14332

Dear Mr. Platt:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of all contracts and/or agreements related to usage of the Greenville Yards by companies/organizations other than the Port Authority.  Copies of all proposed plans for usage of the Greenville Yards facilities, including expansions, and requirements to fulfill any of these plans, and the current and forecasted Greenville Yard usage statistics rail traffic passing through, destinations initial start and final end as Greenville Yard is merely a transfer point, along with projected traffic and destinations.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about the week of January 6, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642*
*F: 212 435 7555*

THE PORT AUTHORITY OF NY & NJ

*FOI Administrator*

January 9, 2014

Mr. Brian Platt
Jersey City
280 Grove Street
Jersey City, NJ 07302

Re: Freedom of Information Reference No. 14332

Dear Mr. Platt:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of all contracts and/or agreements related to usage of the Greenville Yards by companies/organizations other than the Port Authority. Copies of all proposed plans for usage of the Greenville Yards facilities, including expansions, and requirements to fulfill any of these plans, and the current and forecasted Greenville Yard usage statistics rail traffic passing through, destinations initial start and final end as Greenville Yard is merely a transfer point, along with projected traffic and destinations.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about the week of February 10, 2014. At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642*
*F: 212 435 7555*

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

February 14, 2014

Mr. Brian Platt
Jersey City
280 Grove Street
Jersey City, NJ  07302

Re:  Freedom of Information Reference No. 14332

Dear Mr. Platt:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of all contracts and/or agreements related to usage of the Greenville Yards by companies/organizations other than the Port Authority.  Copies of all proposed plans for usage of the Greenville Yards facilities, including expansions, and requirements to fulfill any of these plans, and the current and forecasted Greenville Yard usage statistics rail traffic passing through, destinations initial start and final end as Greenville Yard is merely a transfer point, along with projected traffic and destinations.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about the week of March 3, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642   F: 212 435 7555*

THE PORT AUTHORITY OF NY & NJ

FOI Administrator

March 10, 2014

Mr. Brian Platt
Jersey City
280 Grove Street
Jersey City, NJ  07302

Re:  Freedom of Information Reference No. 14332

Dear Mr. Platt:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of all contracts and/or agreements related to usage of the Greenville Yards by companies/organizations other than the Port Authority.  Copies of all proposed plans for usage of the Greenville Yards facilities, including expansions, and requirements to fulfill any of these plans, and the current and forecasted Greenville Yard usage statistics rail traffic passing through, destinations initial start and final end as Greenville Yard is merely a transfer point, along with projected traffic and destinations.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about the week of March 31, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

April 8, 2014

Mr. Brian Platt
Jersey City
280 Grove Street
Jersey City, NJ  07302

Re:  Freedom of Information Reference No. 14332

Dear Mr. Platt:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of all contracts and/or agreements related to usage of the Greenville Yards by companies/organizations other than the Port Authority.  Copies of all proposed plans for usage of the Greenville Yards facilities, including expansions, and requirements to fulfill any of these plans, and the current and forecasted Greenville Yard usage statistics rail traffic passing through, destinations initial start and final end as Greenville Yard is merely a transfer point, along with projected traffic and destinations.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about the week of April 28, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Sincerely,

Heavyn-Leigh American
FOI Officer

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642   F: 212 435 7555*

# EXHIBIT F

# WEINER | LESNIAK LLP

## ATTORNEYS AT LAW
www.weinerlesniak.com

BRIAN M. HAK                                                    bhak@weinerlesniak.com
Member of the Firm                                            Direct Dial 973-602-3881

January 2, 2014

<u>**Via Federal Express**</u>

The Port Authority of New York and New Jersey
FOI Administrator
225 Park Avenue South, 17th Floor
New York, New York 10003

> **Re:     Freedom of Information Code Request**
> **Request No. 1**
> **Our File No. 21114**

Dear FOI Administrator:

I write on behalf of the City of Jersey City. Pursuant to The Port Authority of New York and New Jersey's ("PA") Freedom of Information Code, provide the following with regard to real property owned by the PA located at 2 Montgomery Street, Jersey City, New Jersey ("City") and otherwise currently designated as Block 11605, Lot 2 on the official tax maps of the City:

1.     All documents regarding the purchase of the property by the PA on or about December 22, 2010 including the deed, closing statement, appraisal reports, correspondence, memoranda, reports, and e-mails.

2.     All leases between the PA and any other person, company, organization or other entity regarding the property. Also include rent rolls, income and expense statements, and plans and drawings relative to any renovations that have been made either by the PA or any tenants on the property.

3.     All documents relative to the marketing of any portion of the property for rental including, but not limited to, advertisements, listings, and brokerage agreements.

4.     All documents relative to any use or presently intended use of the property.

5.     All documents relating to the payment of real estate taxes or the making of other forms of payments to the City on the property whether such payments are termed as payments in lieu of taxes ("PILOT"), rents, fees or some other form of payment of money, or other form of consideration of any kind.

We seek all of the records requested above. If this request for documents is denied in part, please specify the exemptions claimed for each page that is withheld. In addition, for

FOI Administrator                                          January 2, 2014
Re:  Freedom of Information Code                                    Page 2

documents withheld in their entirety please state the date of and the number of pages in each
document.   Please advise us if any of the requested documents are missing or have been
destroyed.  We seek complete sets of records, but if complete sets of records do not exist, then
we request copies of any portion of the document that does exist.   If no such documents exist,
please issue a written statement confirming that these documents do not exist.  Additionally, in
order to minimize delay, please do not withhold making any of the requested records available
because other requested records are not yet found, redacted, or otherwise prepared for release.

       Thank you for your assistance with this matter.

                          Very truly yours,

                          WEINER LESNIAK LLP

                          By:

                              Brian M. Hak, Esq.
                              A Member of the Firm

BMH/tag

713319_1

# WEINER | LESNIAK LLP

## ATTORNEYS AT LAW
www.weinerlesniak.com

BRIAN M. HAK
Member of the Firm

bhak@weinerlesniak.com
Direct Dial 973-602-3881

January 2, 2014

**Via Federal Express**

The Port Authority of New York and New Jersey
FOI Administrator
225 Park Avenue South, 17th Floor
New York, New York 10003

> Re:    **Freedom of Information Code Request**
> **Request No. 2**
> **Our File No. 21114**

Dear FOI Administrator:

I write on behalf of the City of Jersey City. Pursuant to The Port Authority of New York and New Jersey's ("PA") Freedom of Information Code, provide the following with regard to real property owned by the PA located in Jersey City, New Jersey ("City") known as the "Journal Square Transportation Center" and otherwise currently designated as Block 9501, Lot 1 on the official tax maps of the City:

1. All documents regarding the purchase of the property including the deed, closing statement, appraisal reports, correspondence, memoranda, reports, and e-mails.

2. All correspondence, memoranda, reports, e-mails and other documents with respect to an agreement regarding the property dated December 20, 1967 between the City and the Port Authority Trans-Hudson Corporation including, but not limited to, documents that relate to the manner in which any payments by the PA to the City provided for in the agreement were arrived at or calculated.

3. All documents reflecting any changes or amendments, whether written or oral, with respect to the agreement referenced in #2 above.

4. All leases between the PA and any other person, company, organization or other entity regarding the property. Also include rent rolls, income and expense statements, and plans and drawings relative to any renovations that have been made either by the PA or any tenants on the property.

5. All documents relative to the marketing of any portion of the property for rental including, but not limited to, advertisements, listings, and brokerage agreements.

FOI Administrator                                              January 2, 2014
Re:  Freedom of Information Code                                        Page 2

6.      All documents relating to the payment of real estate taxes or the making of other forms of
        payments to the City on the property whether such payments are termed as payments in
        lieu of taxes ("PILOT"), rents, fees or some other form of payment of money, or other
        form of consideration of any kind.

        We seek all of the records requested above.  If this request for documents is denied in
part, please specify the exemptions claimed for each page that is withheld.  In addition, for
documents withheld in their entirety please state the date of and the number of pages in each
document.  Please advise us if any of the requested documents are missing or have been
destroyed.  We seek complete sets of records, but if complete sets of records do not exist, then
we request copies of any portion of the document that does exist.  If no such documents exist,
please issue a written statement confirming that these documents do not exist.  Additionally, in
order to minimize delay, please do not withhold making any of the requested records available
because other requested records are not yet found, redacted, or otherwise prepared for release.

        Thank you for your assistance with this matter.

                                        Very truly yours,

                                        WEINER LESNIAK LLP

                                        By:
                                                Brian M. Hak, Esq.
                                                A Member of the Firm

BMH/tag

713382_1

# WEINER | LESNIAK LLP

### ATTORNEYS AT LAW
www.weinerlesniak.com

BRIAN M. HAK                                    bhak@weinerlesniak.com
Member of the Firm                              Direct Dial 973-602-3881

January 2, 2014

**Via Federal Express**

The Port Authority of New York and New Jersey
FOI Administrator
225 Park Avenue South, 17th Floor
New York, New York 10003

> **Re:   Freedom of Information Code Request**
> **Request No. 3**
> **Our File No. 21114**

Dear FOI Administrator:

I write on behalf of the City of Jersey City. Pursuant to The Port Authority of New York and New Jersey's ("PA") Freedom of Information Code, provide the following with regard to real property owned by the PA located in Jersey City, New Jersey ("City") known as "Greenville Yards" and otherwise currently designated as Block 30501, Lot 1 on the official tax maps of the City:

1.  All documents regarding the purchase of the property including the deed, closing statement, appraisal reports, correspondence, memoranda, reports, and e-mails.

2.  All correspondence, memoranda, reports, e-mails and other documents with respect to an agreement regarding the property dated August 19, 1988 between the City, the PA and the Jersey City Economic Development Corporation including, but not limited to, documents that relate to the manner in which any payments by the PA to the City provided for in the agreement were arrived at or calculated.

3.  All documents reflecting any changes or amendments, whether written or oral, with respect to the agreement referenced in #2 above.

4.  All leases between the PA and any other person, company, organization or other entity regarding the property. Also include rent rolls, income and expense statements, and plans and drawings relative to any renovations that have been made either by the PA or any tenants on the property.

5.  All documents relative to the marketing of any portion of the property for rental including, but not limited to, advertisements, listings, and brokerage agreements.

FOI Administrator                                                January 2, 2014
Re:  Freedom of Information Code                                          Page 2

6.     All documents relating to the payment of real estate taxes or the making of other forms of
       payments to the City on the property whether such payments are termed as payments in
       lieu of taxes ("PILOT"), rents, fees or some other form of payment of money, or other
       form of consideration of any kind.

7.     All contracts and/or agreements relating to the use of the property and/or any of its
       facilities, or any portion thereof, by any company, organization or entity other than the
       PA.  Also provide copies of all proposed plans, studies, reports, and other documents
       regarding the use of the property and/or any facilities thereon, including such documents
       that relate to the expansion of any of the facilities on the property and the requirements to
       fulfill any of those plans, including, but not limited to, current and forecasted usage
       statistics of rail traffic that may pass through the property.

8.     All documents, plans, studies, reports, and memoranda regarding the redevelopment of
       Greenville Yards including the construction of a proposed barge-to-rail facility as
       represented by the PA in a May 18, 2010 press release.  Provide copies of all documents
       setting forth the amount of money that has been spent by the PA to-date on the proposed
       facility.

9.     All documents relating to the use or presently intended use of the property and the nature
       and duration of such uses.

       We seek all of the records requested above.  If this request for documents is denied in
part, please specify the exemptions claimed for each page that is withheld.  In addition, for
documents withheld in their entirety please state the date of and the number of pages in each
document.   Please advise us if any of the requested documents are missing or have been
destroyed.  We seek complete sets of records, but if complete sets of records do not exist, then
we request copies of any portion of the document that does exist.   If no such documents exist,
please issue a written statement confirming that these documents do not exist.  Additionally, in
order to minimize delay, please do not withhold making any of the requested records available
because other requested records are not yet found, redacted, or otherwise prepared for release.

       Thank you for your assistance with this matter.

                                          Very truly yours,

                                          WEINER LESNIAK LLP

                                          By:_____
                                             Brian M. Hak, Esq.
                                             A Member of the Firm

BMH/tag
713384_1

# WEINER | LESNIAK LLP

## ATTORNEYS AT LAW
### www.weinerlesniak.com

BRIAN M. HAK
Member of the Firm

bhak@weinerlesniak.com
Direct Dial 973-602-3881

January 2, 2014

**Via Federal Express**

The Port Authority of New York and New Jersey
FOI Administrator
225 Park Avenue South, 17th Floor
New York, New York 10003

>       Re:     **Freedom of Information Code Request**
>               **Request No. 4**
>               **Our File No. 21114**

Dear FOI Administrator:

      I write on behalf of the City of Jersey City. Pursuant to The Port Authority of New York and New Jersey's ("PA") Freedom of Information Code, provide the following with regard to real property owned by the PA located in Jersey City, New Jersey ("City") known as the "Port Jersey-Global Marine Terminal" and otherwise currently designated as Block 30403, Lot 1; Block 30404, Lot 4; and Block 30501, Lots 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14 & 100 on the official tax maps of the City ("the property"):

1.      All documents regarding the purchase by the PA of the portion of the property from Global Terminal & Container Services, LLC ("Global") on or about June 23, 2010 that is the subject of an agreement dated May 18, 2012 between the City and the PA including the deed, closing statement, appraisal reports, correspondence, memoranda, reports, and e-mails.

2.      All documents regarding the purchase by the PA of other portions of the property including the deeds, closing statements, appraisal reports, correspondence, memoranda, reports, and e-mails.

3.      All correspondence, memoranda, reports, e-mails and other documents with respect to the agreement between the City and the PA referenced in # 1 above including, but not limited to, documents that relate to the manner in which any payments by the PA to the City provided for in the agreement were arrived at or calculated.

4.      All documents reflecting any changes or amendments, whether written or oral, with respect to the agreement referenced in # 1 above.

5.      The lease agreement between the PA and Global and all other documents that relate to the purchase and lease back transaction between the PA and Global.

FOI Administrator                                                  January 2, 2014
Re:  Freedom of Information Code                                            Page 2

6.    Any and all other leases or other agreements between the PA and any other person,
      company, organization or other entity regarding such real property.  Also include rent
      rolls, income and expense statements, and plans and drawings relative to any renovations
      that have been made either by the PA or any tenants on the property.

7.    All documents relative to the marketing of any portion of the property for rental
      including, but not limited to, advertisements, listings, and brokerage agreements.

8.    All documents relating to the payment of real estate taxes or the making of other forms of
      payments to the City on the property whether such payments are termed as payments in
      lieu of taxes ("PILOT"), rents, fees or some other form of payment of money, or other
      form of consideration of any kind.

9.    All contracts and/or agreements relating to the use and operation of the property and/or
      any of its facilities by Global or any other company, organization or entity other than the
      PA.  Also provide copies of all proposed plans, studies, reports, and other documents
      regarding the use of the property and/or any facilities thereon, including such documents
      that relate to the expansion of any of the facilities on the property and the requirements to
      fulfill any of those plans, including, but not limited to, current and forecasted usage
      statistics.

10.   All documents relating to the use or presently intended use of any of these properties and
      the nature and duration of such uses.

      We seek all of the records requested above.  If this request for documents is denied in
part, please specify the exemptions claimed for each page that is withheld.  In addition, for
documents withheld in their entirety please state the date of and the number of pages in each
document.  Please advise us if any of the requested documents are missing or have been
destroyed.  We seek complete sets of records, but if complete sets of records do not exist, then
we request copies of any portion of the document that does exist.  If no such documents exist,
please issue a written statement confirming that these documents do not exist.  Additionally, in
order to minimize delay, please do not withhold making any of the requested records available
because other requested records are not yet found, redacted, or otherwise prepared for release.

      Thank you for your assistance with this matter.

                                          Very truly yours,

                                          WEINER LESNIAK LLP

                                          By:
                                               Brian M. Hak, Esq.
                                               A Member of the Firm

BMH/tag

713388_1

# WEINER | LESNIAK LLP

## ATTORNEYS AT LAW
www.weinerlesniak.com

BRIAN M. HAK                                                      bhak@weinerlesniak.com
Member of the Firm                                               Direct Dial 973-602-3881

January 2, 2014

**Via Federal Express**

The Port Authority of New York and New Jersey
FOI Administrator
225 Park Avenue South, 17th Floor
New York, New York 10003

Re:     **Freedom of Information Code Request**
        **Request No. 5**
        **Our File No. 21114**

Dear FOI Administrator:

I write on behalf of the City of Jersey City. Pursuant to The Port Authority of New York and New Jersey's ("PA") Freedom of Information Code, provide the following with regard to real property owned by the PA located within the City of Jersey City, State of New Jersey ("City") and owned by the Port Authority of New York and New Jersey ("PA"):

1.    All documents regarding the purchase of the property including the deed, closing statement, appraisal reports, correspondence, memoranda, reports, and e-mails.

2.    Documents regarding the use or presently intended use of the property and the nature and duration of such uses.

3.    Internal or external communications concerning the payment of real estate taxes or the making of other forms of payments to the City on the property whether such payments are termed as payments in lieu of taxes ("PILOT"), rents, fees or some other form of payment of money, or other form of consideration of any kind.

4.    All leases between the PA and any other person, company, organization or other entity regarding the property. Also include rent rolls, income and expense statements, and plans and drawings relative to any renovations that have been made either by the PA or any tenants on the property.

5.    All documents relative to the marketing of any portion of the property for rental including, but not limited to, advertisements, listings, and brokerage agreements.

6.    All contracts and/or agreements relating to the use of the property and/or any of its facilities by any company, organization or entity other than the PA.

FOI Administrator                                     January 2, 2014
Re:  Freedom of Information Code                           Page 2

## **LIST OF PROPERTIES**

1.  100 Academy Street (Block 10901, Lot 83)

2.  Waldo Avenue Rear (Block 10901, Lot 90)

3.  No street address (Block 10901, Lot 113)

4.  350 Washington Street (Block 11609, Lot 1)

5.  Chestnut Avenue (Block 9702, Lot 3)

6.  Chestnut Avenue (Block 9702, Lot 23)

7.  215 Baldwin Avenue (Block 10803, Lot 25)

8.  246 Broadway (Block 9001, Lot 5)

9.  Columbus Drive (Block 13101, Lot 3)

10. No street address (Block 10901, Lot 110)

11. No street address (Block 10901, Lot 112)

12. Merseles Street (Block 10901, Lot 114)

13. 90 Columbus Drive (Block 13003, Lot 2)

14. 234 Provost Street (Block 8902, Lot 1)

15. Fourteenth Street & Provost Street (Block 7203, Lot 4)

16. 124 Thirteenth Street (Block 7203, Lot 5)

17. 80 River Dr. (Rear) (Block 7302, Lot 25)

18. 80 River Drive (Block 7302, Lot 27)

19. 88 River Drive (Block 7302, Lot 31)

20. 86 River Drive (Block 7302, Lot 29)

21. 236 Provost Street (Block 236, Lot 1)

22. 20 Harbor Drive (Block 30306, Lot 1)

23. Route 169 (Block 30306, Lot 2)

FOI Administrator                                                    January 2, 2014
Re:  Freedom of Information Code                                            Page 3

        We seek all of the records requested above.  If this request for documents is denied in
part, please specify the exemptions claimed for each page that is withheld.  In addition, for
documents withheld in their entirety please state the date of and the number of pages in each
document.   Please advise us if any of the requested documents are missing or have been
destroyed.  We seek complete sets of records, but if complete sets of records do not exist, then
we request copies of any portion of the document that does exist.   If no such documents exist,
please issue a written statement confirming that these documents do not exist.  Additionally, in
order to minimize delay, please do not withhold making any of the requested records available
because other requested records are not yet found, redacted, or otherwise prepared for release.

        Thank you for your assistance with this matter.

                                Very truly yours,

                                WEINER LESNIAK LLP

                                By:
                                        Brian M. Hak, Esq.
                                        A Member of the Firm

BMH/tag

713392_1

# WEINER | LESNIAK LLP

## ATTORNEYS AT LAW
www.weinerlesniak.com

BRIAN M. HAK
Member of the Firm

bhak@weinerlesniak.com
Direct Dial 973-602-3881

January 2, 2014

**Via Federal Express**

The Port Authority of New York and New Jersey
FOI Administrator
225 Park Avenue South, 17th Floor
New York, New York 10003

> Re:    **Freedom of Information Code Request**
>         **Request No. 6**
>         **Our File No. 21114**

Dear FOI Administrator:

I write on behalf of the City of Jersey City. Pursuant to The Port Authority of New York and New Jersey's ("PA") Freedom of Information Code, provide the following:

1.    Provide any and all documents relating to:

Any agreements between the Port Authority of New York and New Jersey, or any of its related entities, ("PA") and any municipality or other public entity, whether located in the State of New York or the State of New Jersey, providing for payments on real property that has been acquired, owned, or used by the PA whether such payments are termed as payments in lieu of taxes ("PILOT"), rents, fees or some other form of payment of money, or other form of consideration of any kind ("Payments"), by the PA to the municipality or other public entity in which the real property is located. With respect to any such agreement, provide all correspondence, memoranda, reports, e-mails and other documents regarding the agreement including, but not limited to, documents that relate to the manner in which any Payments by the PA to the municipality or other public entity provided for in the agreement were arrived at or calculated.

2.    With respect to any real property that has been acquired, owned, or used by the PA provide any and all documents relating to situations where the PA has passed real estate tax obligations or Payments on to tenants.

3.    With respect to any real property that has been acquired, owned, or used by the PA provide any and all documents relating to situations where the Payments provided by the PA to the municipality in which the real property is located has been other than monetary.

4.    With respect to any real property that has been acquired, owned, or used by the PA provide any and all documents relating to situations where the PA has made Payments to

FOI Administrator                                                January 2, 2014
Re:  Freedom of Information Code                                          Page 2

the municipality that were more than the amount last paid as real estate taxes on the
property prior to the time it was acquired by the PA.

5.     With respect to any real property that has been acquired, owned, or used by the PA
       provide any and all documents relating to situations where the PA has paid regular real
       estate taxes or made Payments retroactively.

6.     With respect to any real property that has been acquired, owned, or used by the PA
       provide any and all documents relating to any litigation or threatened litigation
       concerning the payment of real estate taxes or the making of Payments by the PA.

       We seek all of the records requested above.  If this request for documents is denied in
part, please specify the exemptions claimed for each page that is withheld.  In addition, for
documents withheld in their entirety please state, in addition, the date of and the number of pages
in each document.  Please advise us if any of the requested documents are missing or have been
destroyed.  We seek complete sets of records, but if complete sets of records do not exist, then
we request copies of any portion of the document that does exist.  If no such documents exist,
please issue a written statement confirming that these documents do not exist.  Additionally, in
order to minimize delay, please do not delay making any of the requested records available
because other requested records are not yet found, redacted, or otherwise prepared for release.

       Thank you for your assistance with this matter.

                                      Very truly yours,

                                      WEINER LESNIAK LLP

                                      By: _____
                                            Brian M. Hak, Esq.
                                            A Member of the Firm

BMH/tag

713395_1

# EXHIBIT G

# WEINER | LESNIAK LLP

## ATTORNEYS AT LAW
www.weinerlesniak.com

BRIAN M. HAK                                                    bhak@weinerlesniak.com
Member of the Firm                                             Direct Dial 973-602-3881

January 2, 2014

**Via Federal Express**

The Port Authority of New York and New Jersey
FOI Administrator
225 Park Avenue South, 17th Floor
New York, New York 10003

      Re:    **Freedom of Information Code Request**
              **Request No. 6**
              **Our File No. 21114**

Dear FOI Administrator:

      I write on behalf of the City of Jersey City. Pursuant to The Port Authority of New York and New Jersey's ("PA") Freedom of Information Code, provide the following:

1.      Provide any and all documents relating to:

      Any agreements between the Port Authority of New York and New Jersey, or any of its related entities, ("PA") and any municipality or other public entity, whether located in the State of New York or the State of New Jersey, providing for payments on real property that has been acquired, owned, or used by the PA whether such payments are termed as payments in lieu of taxes ("PILOT"), rents, fees or some other form of payment of money, or other form of consideration of any kind ("Payments"), by the PA to the municipality or other public entity in which the real property is located. With respect to any such agreement, provide all correspondence, memoranda, reports, e-mails and other documents regarding the agreement including, but not limited to, documents that relate to the manner in which any Payments by the PA to the municipality or other public entity provided for in the agreement were arrived at or calculated.

2.      With respect to any real property that has been acquired, owned, or used by the PA provide any and all documents relating to situations where the PA has passed real estate tax obligations or Payments on to tenants.

3.      With respect to any real property that has been acquired, owned, or used by the PA provide any and all documents relating to situations where the Payments provided by the PA to the municipality in which the real property is located has been other than monetary.

4.      With respect to any real property that has been acquired, owned, or used by the PA provide any and all documents relating to situations where the PA has made Payments to

FOI Administrator                                          January 2, 2014
Re:  Freedom of Information Code                                    Page 2

the municipality that were more than the amount last paid as real estate taxes on the property prior to the time it was acquired by the PA.

5.     With respect to any real property that has been acquired, owned, or used by the PA provide any and all documents relating to situations where the PA has paid regular real estate taxes or made Payments retroactively.

6.     With respect to any real property that has been acquired, owned, or used by the PA provide any and all documents relating to any litigation or threatened litigation concerning the payment of real estate taxes or the making of Payments by the PA.

We seek all of the records requested above.  If this request for documents is denied in part, please specify the exemptions claimed for each page that is withheld.  In addition, for documents withheld in their entirety please state, in addition, the date of and the number of pages in each document.  Please advise us if any of the requested documents are missing or have been destroyed.  We seek complete sets of records, but if complete sets of records do not exist, then we request copies of any portion of the document that does exist.  If no such documents exist, please issue a written statement confirming that these documents do not exist.  Additionally, in order to minimize delay, please do not delay making any of the requested records available because other requested records are not yet found, redacted, or otherwise prepared for release.

Thank you for your assistance with this matter.

Very truly yours,

WEINER LESNIAK LLP

By: 
Brian M. Hak, Esq.
A Member of the Firm

BMH/tag

713395_1

# EXHIBIT H

**THE PORT AUTHORITY** OF NY & NJ

*FOI Administrator*

January 16, 2014


Brian M. Hak, Esq.
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14500

Dear Mr. Hak:

We are in receipt of your January 2, 2014 request for records of The Port Authority of New York and New Jersey for copies of various documents related to the property located at 2 Montgomery Street in Jersey City, New Jersey.

A determination as to the availability of records responsive to your request will be made within twenty (20) business days from the date of this letter.  At that time, you will be advised in writing of whether we have located records responsive to your request under the Port Authority's Freedom of Information Code (the "Code", copy enclosed). If additional time is necessary to process your request, you will be advised in writing at that time.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

Enclosure

225 Park Avenue South, 17th Floor
New York, NY 10003
T: 212 435 3642
F: 212 435 7555

**THE PORT AUTHORITY** OF NY & NJ

*FOI Administrator*

January 16, 2014

Brian M. Hak, Esq.
Weiner Lesniak, LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14501

Dear Mr. Hak:

We are in receipt of your January 2, 2014 request for records of The Port Authority of New York and New Jersey for copies of various records related to the Port Authority's ownership of the Journal Square Transportation Center.

A determination as to the availability of records responsive to your request will be made within twenty (20) business days from the date of this letter.  At that time, you will be advised in writing of whether we have located records responsive to your request under the Port Authority's Freedom of Information Code (the "Code", copy enclosed). If additional time is necessary to process your request, you will be advised in writing at that time.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

Enclosure

**THE PORT AUTHORITY** OF NY & NJ

*FOI Administrator*

January 16, 2014

Brian M. Hak, Esq.
Weiner Lesniak LLP
629 Parsiappany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14502

Dear Mr. Hak:

We are in receipt of your January 2, 2014 request for records of The Port Authority of New York and New Jersey for copies of various records related to the Port Authority's ownership of Greenville Yards.

A determination as to the availability of records responsive to your request will be made within twenty (20) business days from the date of this letter.  At that time, you will be advised in writing of whether we have located records responsive to your request under the Port Authority's Freedom of Information Code (the "Code", copy enclosed). If additional time is necessary to process your request, you will be advised in writing at that time.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

Enclosure

225 Park Avenue South, 17th Floor
New York, NY 10003
T: 212 435 3642
F: 212 435 7555

**THE PORT AUTHORITY** OF NY & NJ

*FOI Administrator*

January 16, 2014

Brian M. Hak, Esq.
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14503

Dear Mr. Hak:

We are in receipt of your January 2, 2014 request for records of The Port Authority of New York and New Jersey for copies of various records related to the Port Authority's ownership of Port Jersey-Global Marine Terminal.

A determination as to the availability of records responsive to your request will be made within twenty (20) business days from the date of this letter.  At that time, you will be advised in writing of whether we have located records responsive to your request under the Port Authority's Freedom of Information Code (the "Code", copy enclosed). If additional time is necessary to process your request, you will be advised in writing at that time.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

Enclosure

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642*
*F: 212 435 7555*

**THE PORT AUTHORITY** OF NY & NJ

*FOI Administrator*

January 16, 2014

Brian M. Hak, Esq.
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ 07054

Re:  Freedom of Information Reference No. 14504

Dear Mr. Hak:

We are in receipt of your January 2, 2014 request for records of The Port Authority of New York and New Jersey for copies of various records related to properties owned by the Port Authority in Jersey City, New Jersey.

A determination as to the availability of records responsive to your request will be made within twenty (20) business days from the date of this letter.  At that time, you will be advised in writing of whether we have located records responsive to your request under the Port Authority's Freedom of Information Code (the "Code", copy enclosed). If additional time is necessary to process your request, you will be advised in writing at that time.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

Enclosure

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642*
*F: 212 435 7555*

**THE PORT AUTHORITY** OF NY & NJ

*FOI Administrator*

January 16, 2014

Brian M. Hak, Esq.
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14505

Dear Mr. Hak:

We are in receipt of your January 2, 2014 request for records of The Port Authority of New York and New Jersey for copies of agreements and other various records related to tax payments on property owned by the Port Authority.

A determination as to the availability of records responsive to your request will be made within twenty (20) business days from the date of this letter.  At that time, you will be advised in writing of whether we have located records responsive to your request under the Port Authority's Freedom of Information Code (the "Code", copy enclosed). If additional time is necessary to process your request, you will be advised in writing at that time.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

Enclosure

225 Park Avenue South, 17th Floor
New York, NY 10003
T: 212 435 3642
F: 212 435 7555

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

February 18, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road, P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14500

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various documents related to the property located at 2 Montgomery Street in Jersey City, New Jersey.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about March 28, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

February 18, 2014

Mr. Brian M. Hak
Weiner Lesniak, LLP
629 Parsippany Road, P.O. Box 0438
Parsippany, NJ 07054

RECEIVED

Re: Freedom of Information Reference No. 14501

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to the Port Authority's ownership of the Journal Square Transportation Center.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about March 28, 2014. At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642   F: 212 435 7555*

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

February 18, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsiappany Road, P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14502

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to the Port Authority's ownership of Greenville Yards.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about March 28, 2104.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

February 18, 2014

RECEIVED

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road, P.O. Box 0438
Parsippany, NJ 07054

Re:  Freedom of Information Reference No. 14503

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to the Port Authority's ownership of Port Jersey-Global Marine Terminal.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about March 28, 2014. At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

February 18, 2014

RECEIVED
FEB 2 4 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road, P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14504

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to properties owned by the Port Authority in Jersey City, New Jersey.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on or about March 28, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

February 18, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road, P.O. Box 0438
Parsippany, NJ 07054

Re:  Freedom of Information Reference No. 14505

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New
Jersey's Freedom of Information Code for copies of agreements and other various records related
to tax payments on property owned by the Port Authority.

Additional time is required to process your request. We anticipate that a determination as to the
availability of records responsive to your request will be made on or about March 28, 2014.  At
that time, you will be advised in writing of whether we have located records responsive to your
request.

Please refer to the above FOI reference number in any future correspondence relating to your
request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

225 Park Avenue South, 17th Floor
New York, NY 10003
T: 212 435 3642   F: 212 435 7555

2 1114

THE PORT AUTHORITY OF NY & NJ

*FOI Administrator*

March 28, 2014

RECEIVED

2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ 07054

Re: Freedom of Information Reference No. 14500

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various documents related to the property located at 2 Montgomery Street in Jersey City, New Jersey.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on April 25, 2014. At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

THE PORT AUTHORITY OF NY & NJ

FOI Administrator



APR 0 3 2014

March 28, 2014

Mr. Brian M. Hak
Weiner Lesniak, LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ 07054

Re:  Freedom of Information Reference No. 14501

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to the Port Authority's ownership of the Journal Square Transportation Center.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on April 25, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

THE PORT AUTHORITY OF NY & NJ

*FOI Administrator*

RECEIVED

‌ ‌ ‌ 2014

March 28, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14502

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to the Port Authority's ownership of Greenville Yards.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on April 25, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

THE PORT AUTHORITY OF NY & NJ

*FOI Administrator*

RECEIVED

APR 0 3 2014

March 28, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ 07054

Re: Freedom of Information Reference No. 14503

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to the Port Authority's ownership of Port Jersey-Global Marine Terminal.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on April 25, 2014. At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

THE PORT AUTHORITY OF NY & NJ

*FOI Administrator*

March 28, 2014

RECEIVED

APR 0 3 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14504

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to properties owned by the Port Authority in Jersey City, New Jersey.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on April 25, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

225 Park Avenue South, 17th Floor
New York, NY 10003
T: 212 435 3642
F: 212 435 7555

THE PORT AUTHORITY OF NY & NJ

*FOI Administrator*

March 28, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14505

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of agreements and other various records related to tax payments on property owned by the Port Authority.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on April 25, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

April 30, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ 07054

Re: Freedom of Information Reference No. 14500

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various documents related to the property located at 2 Montgomery Street in Jersey City, New Jersey.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on May 30, 2014. At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642   F: 212 435 7555*

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

April 30, 2014

Mr. Brian M. Hak
Weiner Lesniak, LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14501

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to the Port Authority's ownership of the Journal Square Transportation Center.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on May 30, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

225 Park Avenue South, 17th Floor
New York, NY 10003
T: 212 435 3642   F: 212 435 7555

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

April 30, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsiappany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14502

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New
Jersey's Freedom of Information Code for copies of various records related to the Port
Authority's ownership of Greenville Yards.

Additional time is required to process your request. We anticipate that a determination as to the
availability of records responsive to your request will be made on May 30, 2014.  At that time,
you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your
request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

April 30, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14503

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New
Jersey's Freedom of Information Code for copies of various records related to the Port
Authority's ownership of Port Jersey-Global Marine Terminal.

Additional time is required to process your request. We anticipate that a determination as to the
availability of records responsive to your request will be made on May 30, 2014.  At that time,
you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your
request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

April 30, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ 07054

Re:  Freedom of Information Reference No. 14504

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of various records related to properties owned by the Port Authority in Jersey City, New Jersey.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on May 30, 2014.  At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

225 Park Avenue South, 17th Floor
New York, NY 10003
T: 212 435 3642   F: 212 435 7555

**THE PORT AUTHORITY** OF NY & NJ

FOI Administrator

April 30, 2014

Mr. Brian M. Hak
Weiner Lesniak LLP
629 Parsippany Road
P.O. Box 0438
Parsippany, NJ  07054

Re:  Freedom of Information Reference No. 14505

Dear Mr. Hak:

We continue to process your request for records under the Port Authority of New York and New Jersey's Freedom of Information Code for copies of agreements and other various records related to tax payments on property owned by the Port Authority.

Additional time is required to process your request. We anticipate that a determination as to the availability of records responsive to your request will be made on May 30, 2014. At that time, you will be advised in writing of whether we have located records responsive to your request.

Please refer to the above FOI reference number in any future correspondence relating to your request.

Very truly yours,

Daniel D. Duffy
FOI Administrator

*225 Park Avenue South, 17th Floor*
*New York, NY 10003*
*T: 212 435 3642   F: 212 435 7555*

# EXHIBIT I

# WEINER | LESNIAK LLP

*BMH*

## ATTORNEYS AT LAW
www.weinerlesniak.com

**PAUL M. WEINER**
Member of the Firm

pweiner@weinerlesniak.com

January 7, 2014

**Via Federal Express And Certified Mail**

David Samson, Chairman
Board of Commissioners
The Port Authority of New York and New Jersey
225 Park Ave. South, 15th Floor
New York, New York 10003

Patrick Foye, Executive Director
The Port Authority of New York and New Jersey
225 Park Ave. South, 15th Floor
New York, New York 10003

Re:    Port Authority Properties in Jersey City

Gentlemen:

We represent the City of Jersey City (the "City") with respect to its claims regarding real estate property taxation and PILOT (payment in lieu of taxes) issues relating to Port Authority owned properties in the City.

### Background

On October 29, 2013, Mayor Fulop wrote to Mr. Foye in an effort to facilitate a resolution of these issues. To date, however, he has received no response. We hope by this letter to open a meaningful dialogue in which these issues can be fairly and reasonably addressed in the hopes of reaching an amicable resolution, that is consistent with relevant constitutional considerations and with the statutory purpose that the City not suffer undue loss of taxes and assessments by reason of the Port Authority's acquisition and ownership of property in the City.

We understand that the Port Authority owns approximately 40 properties in the City. Seven of these properties are the subject of three PILOT agreements between the Port Authority

Re:  Port Authority Properties in Jersey City                                    January 7, 2014
                                                                                 Page 2

and the City.   The Port Authority is paying no taxes and making no PILOT payments with

respect to the other 33 properties it owns in the City.  The loss of revenues to the City, as the Port

Authority has accumulated properties from taxpaying property owners and has paid grossly

inadequate PILOTS with respect to only a handful of these properties and nothing on the other

properties, has been astronomical.

<u>**The Three Pilot Agreements**</u>

**Path Plaza.**  One of the PILOT agreements was executed nearly a half century ago and

does not even make provision for PILOT payments by the Port Authority.  While we understand

that for approximately the last 25 years the Port Authority has been making minimal payments

with respect to this property, they have been less than 1% of what the present real estate taxes

would be on the property.  Furthermore, there are extensive retail and other private uses at the

site that are not accounted for by way of real estate taxes.  Antiquated and neither fair nor

reasonable, this PILOT agreement needs to be discussed, and reformed.

We have made a Freedom of Information Code ("FOIC") request to the Port Authority

for documents regarding this property, including but not limited to documents (i) relating to the

basis for the minimal PILOT payments being made by the Port Authority and (ii) relating to

leases between the Port Authority and private tenants, and ask that you help expedite the Port

Authority's response to this and other FOIC requests we have made in anticipation of a meeting

to discuss this and other properties.

**Greenville Yard.**  The PILOT payments being made by the Port Authority under this

PILOT agreement executed 32 years ago have for the last 15 years been less than the amounts

prescribed in the agreement, and are substantially less than what the present real estate taxes

would be on the property.  We understand, moreover, that this property is soon to be the subject

Re:  Port Authority Properties in Jersey City                    January 7, 2014
                                                                 Page 3

of a $118.1 million redevelopment, which will include the construction of a new barge-to-rail

transfer facility that will only enhance the value of, and revenues from, this property for the Port

Authority while further burdening the City's infrastructure.  Besides escalators with respect to

this property, the planned redevelopment is a matter that needs to be discussed in the context of

the Port Authority's tax and/or PILOT obligations.

        We have made a FOIC request for documents regarding this property, including but not

limited to documents (i) relating to the discrepancy in the PILOT amounts and (ii) relating to the

proposed redevelopment project.

        **Port Jersey Global Marine Terminal.** Since this PILOT agreement was executed only

last year, the PILOT payments are generally in sync with what the present real estate taxes would

be on the property.  However, the agreement raises a number of questions which need to be

discussed and addressed, including the escalation of PILOT payments to be made by the Port

Authority in the future and the Port Authority's purchase and lease back transaction with Global

that will enable Global to avoid paying regular real estate taxes on the property in the future.

        We have made a FOIC request for documents regarding this property, including but not

limited to documents relating to the Port Authority's purchase and lease back transaction with

Global.

                    **The Other 33 Port Authority Properties in the City**

        The 33 Port Authority owned properties in the City that have no PILOT agreements raise

a series of different, but no less troublesome, issues.  19 of these properties are vacant land.

Some of these properties are apparently being used for public purposes authorized by particular

Port Authority statutes with PILOT provisions, but the Port Authority is making no PILOT

payments to the City.  Others are being used for private purposes or for other purposes for which

Re: Port Authority Properties in Jersey City                          January 7, 2014
                                                                     Page 4

no tax exemption or PILOT is authorized by the Port Authority statutes.  For example, one of
these properties (2 Montgomery Street) is improved with a five-story office building which
appears to be vacant.  The Port Authority is neither paying real estate taxes nor making PILOT
payments with respect to any of these properties, notwithstanding the fact that the majority of
these properties were acquired by the Port Authority more than 25 years ago.

        We have made a FOIC request for documents regarding these properties, including but
not limited to documents (i) relating to when each of these properties was acquired by the Port
Authority, (ii) relating to the use or presently intended use of any of these properties for a public
purpose and the nature and duration of such use, (iii) relating to the use of any of these properties
for a private purpose and the nature and duration of such use, (iv) relating to 2 Montgomery
Street and to any use or presently intended use of this property, and (v) relating to internal or
external communications concerning the payment of real estate taxes or the making of PILOT
payments with respect to any of these properties.

## The Harm to the City

        The City is concerned that the Port Authority has not acted in good faith and has acted
arbitrarily with respect to its obligation to pay real estate taxes or to make fair and reasonable
PILOT payments annually to the City.  The end result has been that while the Port Authority has
benefited handsomely from its acquisition and ownership of properties in the City, the City has
manifestly suffered an undue loss of taxes and assessments.

        To provide some perspective on the scope of the harm to the City, the payment of real
estate taxes on the 40 Port Authority owned properties in the City would currently yield about
$18 million annually and would have yielded more than $315 million in additional tax revenue
during the periods the properties have been owned by the Port Authority and taken off the tax

Re: Port Authority Properties in Jersey City                    January 7, 2014
                                                                Page 5

rolls.     While the three Port Authority PILOT agreements with the City generate about $2.2

million in annual PILOT payments, fair and reasonable PILOT payments on the properties that

are the subject of these agreements would currently yield millions more annually and would have

yielded tens of millions more in revenue during the periods these properties have been owned by

the Port Authority and taken off the tax rolls.

        During the same period, the Port Authority's gross and net revenues have mushroomed,

municipal budgets and the cost of living have increased tremendously, and City infrastructure

and municipal resources have been substantially burdened by Port Authority activities in the

City.

<u>**Disparate Treatment**</u>

        The City is also concerned that the Port Authority has not treated it in the same manner as

it has treated other municipalities or entities in New York and New Jersey with respect to these

issues.

        We have therefore made a FOIC request for documents regarding how the Port Authority

has acted vis-à-vis other municipalities and entities concerning these issues, including but not

limited to documents (1) relating to other agreements the Port Authority has entered into

involving PILOT payments or other payments or consideration of any nature, however

denominated (hereinafter for purposes of these requests, "payments") (ii) relating to situations

where the Port Authority has passed real estate tax obligations or payments on to tenants, (iii)

relating to situations where the consideration provided by the Port Authority has been other than

monetary,  (iv) relating to situations where the Port Authority has annually paid in one form or

another more than the amount last paid as real estate taxes on the property prior to the time it was

acquired by the Port Authority, (v) relating to situations where the Port Authority has paid real

estate taxes or made payments retroactively, (vi) relating to situations where the Port Authority has paid real estate taxes to a municipality or other entity, and (vii) relating to litigation or threatened litigation concerning the payment of real estate taxes or the making of payments by the Port Authority.

## The City's Freedom of Information Requests

We are soliciting your assistance in ensuring that the Port Authority responds in a prompt and appropriate manner to the FOIC requests we have made to the Port Authority on behalf of the City, since the City's experience to date in trying to obtain relevant documentation from the Port Authority has been most disappointing. On October 9, 2013, the City requested documents relating to just one of the 40 properties that the Port Authority owns in the City. To date, not a single document has been produced. This is very disconcerting, given the representations the Port Authority makes on its website as to transparency in describing its Freedom of Information Code:

> The business and activities of The Port Authority of New York and New Jersey have a substantial impact on the people of the States of New York and New Jersey, especially within the Port District and particularly the customers who use its facilities every day. As recognized in its By-Laws, it is the goal and policy of the Port Authority to conduct its business and activities in the public interest and therefore the public should have access to the records of the Port Authority to the greatest extent possible.

## Meeting to Discuss These Matters

We hope that a meeting, to be attended by appropriate representatives of the Port Authority and their counsel, can be scheduled shortly to discuss these issues and that such a meeting will be meaningful and productive.

Re:  Port Authority Properties in Jersey City                    January 7, 2014
                                                                 Page 7

### The City's Claims Against the Port Authority

While the Port Authority's Suability Statute does not apply to the claims that the City would assert against the Port Authority in federal district court should these issues not be amicably resolved, we want nonetheless to afford the Port Authority an opportunity to review and investigate the claims raised by the City, and respond in a manner that hopefully will avoid the need for litigation.  To that end, we briefly describe below the nature of the City's claims, based on the Port Authority statutes, their legislative history, relevant case law, and applicable provisions of the New Jersey and federal Constitutions. We believe the following principles should provide the framework for discussion of the issues raised in this letter.

**The Port Authority's Obligation to Act Reasonably and in Good Faith.**  We start with the proposition, well established in the case law, that as a public agency the Port Authority must act reasonably and in good faith, and not arbitrarily, with respect to issues of taxation.  This principle has been held to apply equally to the Port Authority's negotiation and implementation of PILOT agreements, and is underscored by the requirement of the Port Authority PILOT statutes that the Port Authority agree with the municipality to annual PILOT payments that are fair and reasonable.

**The Port Authority's "Discretion".**   The Port Authority does not have unbridled discretion as to whether or not to enter into a PILOT agreement.  As the text and the legislative history of the Port Authority PILOT statutes make clear, where a particular Port Authority statute authorizes a PILOT, the discretion accorded the Port Authority is not whether to enter into a PILOT agreement.  Rather it is whether to acquire and use property subject to the conditions of the statute (which include the requirements that there be a PILOT and that the municipality agree to the amount and to the terms and conditions of the PILOT).  Unfortunately, the Port Authority

Re: Port Authority Properties in Jersey City                    January 7, 2014
                                                                 Page 8

has taken the position in determining whether to negotiate PILOT agreements that its agreement to a PILOT is optional and purely voluntary. Consequently, there are numerous Port Authority properties in the City that are not the subject of a PILOT agreement but should be.

**Failure to Enter into a PILOT Agreement.** Where a statute has a PILOT provision and the Port Authority fails to enter into a PILOT agreement, the default is an obligation to pay taxes, not tax exemption. The City therefore is entitled to the payment of real estate taxes, since the date of Port Authority acquisition, on any property where a Port Authority statute makes provision for a PILOT but the Port Authority has chosen not to negotiate a PILOT agreement. With respect to these properties, however, the City is willing to negotiate PILOT agreements prospectively and retroactively provided the property is being used for a public purpose authorized by a Port Authority statute with a PILOT provision.

**Public Use.** The Port Authority can only exercise the option to make PILOT payments, rather than pay real estate taxes, where a property is being used for a public use specifically authorized by a Port Authority statute with a PILOT provision or is being held with the present design to devote the property within a reasonable length of time to such public use. Clearly, properties that have been held for decades, or even for years, do not meet this requirement.

**Port Authority "Ownership" of Properties.** The Port Authority cannot merely own or warehouse properties in the City without paying real estate taxes on them. This is so not only because of the language of the Port Authority statutes and the interpretative case law, but also because the New Jersey Constitution requires that property be assessed for taxation only under general laws and by uniform rules. The Port Authority's oft-taken position, in PILOT agreements and otherwise, that it is entitled to tax exemption or PILOT treatment based solely on its ownership of property violates this fundamental principle.

Re:  Port Authority Properties in Jersey City

January 7, 2014
Page 9

**Private Use.**  Similarly, the fact that the Port Authority owns a property in the City does not mean that it is tax exempt if it is being used, in whole or in significant part, for a private purpose.  The case law in New Jersey makes clear that Port Authority property employed to obtain revenue or profit through private business uses is subject to taxation.  We would direct your attention, in this regard, to the advertisement on the Port Authority's website for private retail tenants on the Concourse and Plaza Levels of the Journal Square Transportation Center in the City and the website's list of existing private tenants in the building.  Yet the Port Authority has paid no real estate taxes on this property for 46 years, made no PILOT payments with respect to this property for more than 20 years following its acquisition, and has for the last 25 years made annual payments to the City that are less than 1/100 of what would be the present real estate taxes on the property.

**Changed Circumstances.**  Under applicable New Jersey law, PILOT agreements cannot be enforced where circumstances have changed materially, including circumstances such as the parties' understanding as to the use of the property.  Whatever the situation may have been in 1967 when the Port Authority entered into a PILOT agreement with the City with respect to the Path Plaza property that (contrary to the express language of the applicable Port Authority statute) made no provision for PILOT payments, the circumstances have dramatically changed over time.  They have as well with respect to many other properties owned by the Port Authority in the City.

**Reformation.**  Reformation is a remedy expressly made available to the City under the Port Authority PILOT statutes – along with such other remedies as monetary damages, declaratory relief, specific performance, and accounting.  Reformation of the Port Authority's

Re:  Port Authority Properties in Jersey City                                      January 7, 2014
                                                                                                    Page 10

PILOT agreements with the City is necessary to take into account the effects of the passage of

time and to, logically, make the payments to the City by the Port Authority fair and reasonable.

    **The "Cap".**  In its negotiation of PILOT agreements with the City, the Port Authority

has apparently taken the position that the annual PILOT payments could never exceed the real

estate taxes on the property at the time the property was acquired by the Port Authority.  But that

is a misreading of the statute.  It takes an isolated provision of the Port Authority PILOT statutes

out of context and ignores other highly pertinent provisions, including the requirements that

PILOT payments be **"a fair and reasonable sum or sums annually"**, that they be **"in such**

**amount or amounts ... as shall be agreed upon"** by the Port Authority and the

**municipality**, and that they be **"to the end"** that the municipality **"not suffer undue loss of**

**taxes and assessments by reason of the acquisition and ownership"** of property by the Port

**Authority.**  The PILOT and other provisions of the Port Authority statutes have to be read in

their entirety and in a manner that is neither absurd nor unconstitutional.

    **Constitutional Considerations.**  The argument that PILOT payments cannot increase

with respect to a property, notwithstanding significant and possibly exponential increases over

time in what the real estate taxes would be on the property, is absurd -- especially when

considering PILOT agreements such as those with the City that were executed 46 and  32 years

ago.  The argument also does not pass constitutional muster -- under the New Jersey Constitution

or under the equal protection, due process, unlawful taking, and other provisions of the United

States Constitution.

    Moreover, in situations where it has suited its purposes, the Port Authority has found

ways to avoid any possible "cap" on PILOT payments.  This has been accomplished largely by

providing consideration in a form other than pure PILOT payments.   It has also been

Re:  Port Authority Properties in Jersey City                          January 7, 2014
                                                                       Page 11

accomplished by means of escalators in particular Port Authority statutes "preferring" select uses
or facilities.

A statute must be read in a manner which renders it constitutional, if possible.  However,
the Port Authority statutes, as read and as applied by the Port Authority, raise substantial issues
under the New Jersey and United States Constitutions.  So too does the Port Authority's
disparate and arbitrary treatment of tax and PILOT issues in its arrangements with other
municipalities or entities in New Jersey as well as New York.

**The Legislative Purpose.**  It is clear from the legislative history relating to the PILOT
statutes that the New York and New Jersey Legislatures were struggling with the issue of how to
balance the survivability of the Port Authority in its infancy and the protection of municipal
finances in communities where the Port Authority acquired properties.  Over the years, the
balance has shifted dramatically.

The Port Authority is no longer a fledging entity where individual projects had to be self-
sustaining.  It is a revenue-producing behemoth that draws from one project or facility to
subsidize other projects and facilities.  The Port Authority is not in danger of financial ruin – the
precipitant for its qualified tax exemption.  In contrast, municipalities have suffered severely
from the Port Authority's wholesale aggrandizement of territory in municipalities like the City of
Jersey City, taking substantial properties off the tax rolls and contributing to the enormous
erosion of the City's tax base to the severe detriment of its residents.  It is telling that of the 40
properties the Port Authority owns in the City, it is making inadequate PILOT payments on
seven properties and is paying nothing on the other 33 properties – many of which are simply
being warehoused.  The Legislatures of New York and New Jersey never contemplated a result

Re: Port Authority Properties in Jersey City

January 7, 2014
Page 12

this devastating to municipalities, while the Port Authority engages in lucrative ventures often arguably not within its statutory mission.

***

We hope that the matters outlined in this letter can be amicably resolved after meaningful and informed discussion, and look forward to a meeting to that end.

Very truly yours,

WEINER LESNIAK LLP

By: _____
Paul M. Weiner
A Member of the Firm

cc:    The Honorable Chris Christie, Governor of the State of New Jersey (via Federal Express)
       The Honorable Andrew M. Cuomo, Governor of State of New York (via Federal Express)
       The Honorable Steven M. Fulop, Mayor of City of Jersey City (via Federal Express)
       Jeremy Farrell, Jersey City Corporation Counsel (via Federal Express)

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

7010 1870 0003 1029 9686

Sent To
David Samson, Chairman
Board of Commissioners
The Port Authority of New York and New Jersey
225 Park Ave. South, 15th Floor
New York, New York 10003

PS Form 3800, August 2006    See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

David Samson, Chairman
Board of Commissioners
The Port Authority of New York and New Jersey
225 Park Ave. South, 15th Floor
New York, New York 10003

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7010 1870 0003 1029 9686

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

7010 1870 0003 1029 9808

Sent To
Patrick Foye, Executive Director
The Port Authority of New York and New Jersey
225 Park Ave. South, 15th Floor
New York, New York 10003

PS Form 3800, August 2006    See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Patrick Foye, Executive Director
The Port Authority of New York and New Jersey
225 Park Ave. South, 15th Floor
New York, New York 10003

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7010 1870 0003 1029 9808

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

# EXHIBIT J



# CITY OF JERSEY CITY
## OFFICE OF THE MAYOR

CITY HALL | 280 GROVE STREET | JERSEY CITY, NJ 07302
P: 201 547 5500 | F: 201 547 5442



STEVEN M. FULOP
*MAYOR OF JERSEY CITY*

STEVEN M. FULOP
*MAYOR OF JERSEY CITY*

October 29, 2013

Patrick J. Foye
Executive Director
The Port Authority of New York and New Jersey
225 Park Avenue South
New York, New York 10003

Dear Mr. Foye:

As the newly-elected Mayor of the City of Jersey City ("Jersey City" or the "City"), I write in hopes of facilitating a resolution to the numerous outstanding issues between your agency and Jersey City. As you are aware, the Port Authority owns and operates numerous facilities throughout Jersey City, many of which are integral to the operations of PATH, the Port Authority Police Department, and several other Port Authority departments. It is our view that the Port Authority has, in several respects, caused undue economic harm to Jersey City and we wish to discuss reasonable options that address this economic harm that work for both Jersey City and the Port Authority.

For example, several years ago, your agency acquired the office building at Two Montgomery Street and the Global Terminal Properties. To date, despite numerous requests by the prior mayoral administration to do so, your agency has failed to pay any property taxes on either of these properties as well as on several smaller properties throughout the City. Your agency has done this without any justification, and without any regard to the significant detrimental effects of these actions on Jersey City. Furthermore, your agency has used 236 Provost Street, which is owned by the City, as a Port Authority parking lot, also without justification. Finally, the City also seeks to reengage your agency in negotiating and preparing a Host Fee Agreement for the Greenville Yards facility, which will receive and transfer municipal garbage from the City of New York and consequently will impose a significant burden on the City's infrastructure.

The Port Authority simply cannot continue to ignore its obligations to pay property taxes to Jersey City, and Jersey City simply cannot ignore the fact that the Port Authority has refused to fulfill its obligations to pay taxes on these properties to the City. Furthermore, your agency has left entirely unaddressed the impact of the Greenville Yards facility on Jersey City and the City's limited resources. We would also like to discuss the economic impact of the Port Authority's PILOT payments and the failure of the Port Authority to satisfy a basic obligation to not cause economic harm to the municipalities in which it operates Port Authority facilities.

Therefore, please consider this letter my final good faith attempt to engage your agency in discussions regarding these outstanding issues. To that end, please reach out to my office within seven (7) days of your receipt of this letter to confirm your agency's willingness to discuss a resolution to the issues outlined above.

Sincerely,

STEVEN M. FULOP
Mayor

SMF/jtw

cc:   Bill Baroni, Deputy Executive Director
      Jeremy Farrell, Corporation Counsel

# EXHIBIT K

DUGHI, HEWIT & DOMALEWSKI, P.C.

LOUIS JOHN DUGHI, JR.
RUSSELL L. HEWIT
CRAIG A. DOMALEWSKI
ROBERT W. DONNELLY, JR.
MICHAEL J. KEATING
CHARLES M. RADLER, JR.
MARIO C. GURRIERI
KEITH A. GABLE
PAMELA HATTEM
GARY L. RIVELES*
RICHARD A. OUTHWAITE
SCOTT A. HALL
DARA L. SPIRO

WILLIAM H. GAZI (1964-2001)
LAWRENCE WEISS (1961-2011)

ATTORNEYS AT LAW

340 NORTH AVENUE
CRANFORD, NEW JERSEY 07016
(908) 272-0200
TELECOPIER: (908) 272-0909

OF COUNSEL
WILLIAM L'E. WERTHEIMER
MARY ELIZABETH GAZI
BRANDON D. MINDE

KRISTIN M. CAPALBO
AMANDA G. BENJAMIN-SMITH
ARIS E. L. DUTKA
LORI C. DUFFY
BENJAMIN H. ZILBERGELD
CYNDEE L. ALLERT
SARAH E. FITZPATRICK
JENNIFER L. YOUNG
EVA M. UHRIK
SEAN C. CALLAHAN
ANNA KITSOS

* CERTIFIED CIVIL TRIAL ATTORNEY

January 31, 2014

**VIA FEDERAL EXPRESS**
**AND ELECTRONIC MAIL**

Paul M. Weiner, Esq.
Weiner Lesniak, LLP
629 Parsippany Road
Parsippany, New Jersey  07054

       Re:  Port Authority Property in Jersey City
       Our File No.:  14206

Dear Paul:

       As you know, we represent the Port Authority of New York and New Jersey ("Port Authority") in connection with the above-referenced matter.  We are in receipt of your January 7, 2014 letter ("Letter") written on behalf of the City of Jersey City ("Jersey City" or "the City") and directed to Port Authority Chairman David Samson and Port Authority Executive Director Patrick Foye.  Kindly accept this correspondence as the Port Authority's response to your Letter.

       Jersey City's Freedom of Information Code Requests.

       In response to your requests concerning the status of the Port Authority's response to Jersey City's Freedom of Information Code ("FOIC") submissions, we refer you to the Port Authority's January 16, 2014 FOIC Acknowledgement Letters.  As we discussed, the Port Authority has begun the process of assessing the FOIC requests, which were very broad.  The Port Authority will provide additional information concerning the status of its efforts to respond to Jersey City's FOIC requests under separate cover.

DUGHI, HEWIT & DOMALEWSKI, P.C.

Paul M. Weiner, Esq.
Re:  Port Authority Property in Jersey City
Page 2


<u>The City's Claims Against the Port Authority</u>.

   Based on your Letter, we understand that Jersey City is contending that various statutes and case law entitle the City to:  (1) renegotiate several PILOT agreements between the City and the Port Authority; (2) compel the Port Authority to enter into new PILOT agreements in connection with Port Authority owned property located in Jersey City; and/or (3) compel the Port Authority to pay both retroactive and prospective taxes on Port Authority owned property located in Jersey City.  The Port Authority respectfully disagrees with Jersey City's interpretation of the law.

   Contrary to the City's contention, the clear and unambiguous language of relevant case law and statutory authority confirms that all property owned by the Port Authority in Jersey City is tax-exempt.  The relevant statutory authority is also clear that, setting aside properties owned by the Port Authority for which the City apparently concedes are not subject to taxes or PILOT, any decision by the Port Authority to enter into a PILOT agreement is purely voluntary and discretionary.  Moreover, for the properties in question, when the Port Authority exercises its discretion to enter into a PILOT agreement, the PILOT payments may not exceed the amount of taxes paid on the property prior to the time of the Port Authority's acquisition pursuant to the pertinent statute.  It is well-settled that "Courts . . . presume that a legislature says in a statute what it means and what it means in a statute stays there.  When the words of a statute are unambiguous, then this first canon is also the last: 'judicial inquiry is complete.'"  <u>Connecticut Nat. Bank v. Germain</u>, 503 U.S. 249, 254 (1992) (citation omitted).  Here, the statutes at issue are subject only to one reasonable interpretation:  (1) the Port Authority property is immune from taxation; (2) the Port Authority is never required to enter into a PILOT agreement; and (3) if the Port Authority exercises its discretion to enter into a PILOT agreement for the properties in question, the Port Authority's payment obligation is capped at the amount of real estate taxes paid on the property prior to the time of the Port Authority's acquisition.

   The Port Authority's tax-exempt status is supported by decisions issued by the highest courts of both New Jersey and New York.  Jersey City cannot impose real estate taxes and/or PILOT obligations on the property owned by the Port Authority.  The tax exemption applies even when Port Authority property is leased in whole or in part to private entities, so long as the property is used for a public purpose consistent with the Port Authority's statutory mandates.  Jersey City's claim that certain Port Authority property is being used for a non-public purpose is not accurate.  All of the property owned by the Port Authority in Jersey City is held and used for a public purpose in furtherance of the Port Authority's enabling statutes.

   Finally, Jersey City's arguments concerning the legislative history and purpose relating to the PILOT statutes ignores, among other things, other benefits derived from the Port Authority's acquisition and use of property in its jurisdiction.  As explained in

DUGHI, HEWIT & DOMALEWSKI, P.C.

Paul M. Weiner, Esq.
Re: Port Authority Property in Jersey City
Page 3

greater detail below, the benefits of the Port Authority's ownership and use of property in
Jersey City far outweigh any perceived financial loss allegedly suffered by the City.

Jersey City Ignores the Massive Economic Benefit of Port Authority Operations
Within the City.

While focusing purely on an alleged harm suffered by an alleged loss of tax
revenue, Jersey City is completely overlooking the massive economic benefit conferred to
the City as a result of the Port Authority's ownership of property and resulting Port Authority
operations in Jersey City. As you know, 4 of the 13 Port Authority Trans-Hudson Railroad
("PATH") stations are located in Jersey City, the most of any New Jersey municipality. Over
the past 50 years, the Port Authority has invested billions of dollars into the maintenance and
operation of the PATH system linking Jersey City to Newark in the west and New York City
in the east. Between 2007 and 2011, the Port Authority invested over $1.36 billion in Jersey
City's PATH facilities. In 2011 alone, the four Jersey City PATH stations served nearly
24 million passengers, which include the City's residents, people who work in the City, and
people who support businesses in the City. More than any other municipality in New Jersey,
Jersey City has benefited from the PATH system transporting thousands of its residents
across the region daily.

The Port Authority's operations in Jersey City have also been a significant
catalyst for major commercial and residential development in Jersey City. Development has
unquestionably flourished directly along the Port Authority's PATH rail lines, where
residential projects have been built and many corporate employers have opened offices. In
fact, within the immediate area of Jersey City's four PATH stations there are approximately
83 projects which have been approved or proposed for development and are under
construction or have been completed. The increase of both business and residential
development has resulted in a significantly expanded commercial and residential tax base for
Jersey City. Moreover, the Port Authority's significant on-going and expected investment in
Jersey City will leverage additional and substantial private sector investment and job
creation. There is no question that this expansion and growth is directly tied to the Port
Authority's investment in and operation of the PATH facilities in Jersey City.

Jersey City also fails to acknowledge that the Port Authority operates the
PATH at a significant annual deficit. While Jersey City and its residents and businesses
enjoy the benefit of the daily, 24-hour PATH service and related economic benefits, the
allocable portion of PATH's deficit to its Jersey City operations more than exceeds any
alleged shortfall in tax revenue that the City is claiming.

Any resolution of the City's claims must take into consideration these massive
benefits to Jersey City and its residents.

DUGHI, HEWIT & DOMALEWSKI, P.C.

Paul M. Weiner, Esq.
Re:  Port Authority Property in Jersey City
Page 4

Meeting To Discuss the City's Claims.

    The Port Authority has acted in good faith with respect to its statutory
obligations impacting its ownership of property in Jersey City and feels strongly that its
presence in Jersey City has not only contributed billions of dollars in direct economic
benefits to the City but has also been the primary engine driving Jersey City's economic
development over the past few decades.  The Port Authority is also confident that it will
prevail in the event of litigation.  However, in recognition of the long-standing relationship
between the Port Authority and the City, the Port Authority agrees that it makes sense to
have a meeting to discuss the City's claims, the Port Authority's defenses to those claims and
to ascertain whether an amicable resolution of these issues is possible.[1]  In this regard, this
will confirm our meeting next week on February 6, 2014 at 1:00 p.m.

    We look forward to seeing you next week.

                    Very truly yours,

                    DUGHI, HEWIT & DOMALEWSKI

                    Craig A. Domalewski
                    cdomalewski@dughihewit.com

G:\14206\14206-COR-CAD-WEINER-1-31-2014.doc

---

1 We would also like to discuss the status of the 2 Montgomery Street property.  As you may know, on
November 18, 2013 a Tax Sale Notice was issued by the Jersey City Tax Assessor for Port Authority owned
property located at 2 Montgomery Street.  The Notice advised that the property would be subject to a tax sale on
December 19, 2013.  The Port Authority objected to the tax sale and requested that the property be removed
from the tax sale list by letters dated December 9 and December 18, 2013.  To date, we have not received a
response.